CEM

FILED

MARCH 3, 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

08 C 1260

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER, and REBECCA A. TOWNSEND, | : |
| Defendants. | : |

Civil Action No:   JUDGE ZAGEL
MAGISTRATE JUDGE NOLAN

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission ("SEC" or "Commission"), alleges as follows:

### Nature of the Action

1.     This action involves fraud in connection with the purchase and sale of securities by Defendants Enterprise Trust Company ("Enterprise"), its president, John H. Lohmeier ("Lohmeier"), and its Vice President, Rebecca A. Townsend ("Townsend") (collectively, the "Defendants").

2.     Defendants fraudulently induced hundreds of customers of Advisory Financial Services ("AFC"), a registered broker-dealer, to transfer custody of approximately $49 million in mutual funds to Enterprise.  Unbeknownst to and without the authorization of the customers, Defendants placed the AFC customers' mutual funds into margin and other accounts where the AFC customers' securities served as collateral for leveraged margin trading, including options trading and short selling, that was

intended to benefit of Enterprise's other customers, including Lohmeier and Townsend. This margin trading was not intended to and did not benefit the AFC customers.

3.    On February 13, 2008, more than $8 million in AFC customers' mutual funds were sold without the AFC customers' knowledge or approval to cover Enterprise's margin debt.

4.    Defendants' fraudulent and deceptive conduct was not limited to the AFC customers, but also extended to brokerage firms where Enterprise had margin accounts. When these firms questioned Defendants about who actually owned the securities in the account and/or whether the actual owners of the securities had authorized the use of margin in connection with their securities, Defendants falsely represented that the AFC customers knew about and approved of the use of their assets as collateral for the margin trading in these margin accounts.

5.    Enterprise and Townsend, directly and indirectly, have engaged, and unless enjoined, will continue to engage in transactions, acts, practices and courses of business which constitute violations of Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. §240.10b-5 ] promulgated thereunder.

6.    Lohmeier, directly and indirectly, has engaged, and unless enjoined, will continue to engage in transactions, acts, practices and courses of business which constitute violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and has aided and abetted Enterprise's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Lohmeier, as a control person of Enterprise, is also jointly

and severally liable for Enterprise's violations of Section 10(b) of the Exchange Act and
Rule 10b-5 thereunder.

7.     The Commission brings this action to restrain and enjoin such
transactions, acts, practices and courses of business pursuant to Sections 21(d) and 20(e)
of the Exchange Act [15 U.S.C. § 78u(d) and § 78aa].

## JURISDICTION

8.     The Court has jurisdiction over this action pursuant Section 21(d)[15
U.S.C. §78u(d)] and 27 of the Exchange Act [15 U.S.C. §78aa].

9.     Defendants have, directly and indirectly, made, and are making, use of the
mails, and of the means and instrumentalities of interstate commerce, in connection with
the transactions, acts, practices and courses of business alleged in this Complaint.

10.     There is a reasonable likelihood that Defendants will, unless enjoined,
continue to engage in the transactions, acts, practices and courses of business set forth in
this Complaint, and transactions, acts, practices and courses of business of similar purport
and object.

11.     Venue is proper in this Court pursuant to Section 27 of the Exchange Act
[15 U.S.C. § 78aa].  The transactions, acts, practices, and courses of business alleged
herein occurred in the Northern District of Illinois.  Defendants Lohmeier and Townsend
are residents of the Northern District of Illinois.  Enterprise conducted the activities
discussed herein out of its Oak Brook, Illinois office.

## THE DEFENDANTS

12.     **Enterprise Trust Company** is chartered as a trust company in the State of Nevada, with an office located in Oak Brook, Illinois, from which it conducts most of its operations.

13.     **John H. Lohmeier**, age 43, resides in Oak Brook, Illinois and is the founder, sole shareholder and President of Enterprise.  At all times relevant to the allegations in this Complaint, Lohmeier directly participated in and exercised control over Enterprise's operations, including the acquisition of the AFC customers' accounts, Enterprise's trading activities, and Enterprise's activities in connection with the custodial AFC customers' assets.

14.     **Rebecca A. Townsend**, age 46, resides in Downers Grove, Illinois and is the Vice President of Enterprise.  Townsend is Enterprise's chief client manager and also worked with Lohmeier on transactions to acquire other clients or entities, including the acquisition of the AFC customers' accounts.

## FACTS

A.     **Enterprise's Formation.**

15.     Enterprise Trust Company ("Enterprise") was formed by John H. Lohmeier ("Lohmeier") and Rebecca A. Townsend ("Townsend") and chartered as a trust company by the State of Nevada on or about November 18, 2005.

16.     Prior to forming Enterprise, Lohmeier managed the trust department at Hinsbrook Bank & Trust Co. ("Hinsbrook") in Oak Brook, Illinois.  Townsend also worked for Hinsbrook as a trust administrator.

4

17.    In January 2006, Lohmeier and Townsend resigned and set up an office for Enterprise in Oak Brook, Illinois. Several customers followed Lohmeier from Hinsbrook to Enterprise.

18.    Shortly thereafter, on January 24, 2006, the State of Illinois Department of Financial and Professional Regulation ("DFPR") issued an Order to Cease and Desist to Enterprise, Lohmeier and Townsend.

19.    On March 29, 2006, the Illinois Department of Financial and Professional Regulation ("DFPR") issued a Consent Order prohibiting Enterprise from using the word "trust" in its business name unless it obtained authorization from the DFPR. The Consent Order also prohibited Enterprise, Lohmeier and Townsend from conducting any activity as corporate fiduciaries in Illinois or holding themselves out as available to act as fiduciaries in Illinois without authorization from the DFPR. The Consent Order was issued because the DFPR found that Enterprise, Lohmeier and Townsend were conducting a trust business in Illinois without the authority to do so.

20.    After the Consent Order was issued, Enterprise, Lohmeier and Townsend continued to operate as Enterprise Trust Company out of Enterprise's Oak Brook, Illinois office. Since its inception, Enterprise has employed approximately six employees at its Oak Brook office, some of whom are part-time employees.

21.    At all times since its inception, Enterprise has conducted nearly all of its business operations out of its Illinois office. At one time, Enterprise had one, part-time employee in its Nevada office. That employee was terminated in or around December 2007.

22.     Throughout most of 2006, Enterprise was challenged by limited cash resources. In 2006, Enterprise suffered a net loss of $358,620.79.

**B.    Enterprise's Business Activities**

23.     Enterprise purports to provide several services to its clients, including asset and investment management, custodial services, traditional trust services, and income collection.

24.     At all times since its inception, Enterprise has placed all customer securities in its custody into brokerage accounts held in the name of Enterprise. The customers' securities were and are pooled together in each account. This type of account is referred to as an omnibus account. All of the customer securities in Enterprise's omnibus accounts were, and are, held in the name of Enterprise, not the individual customers.

25.     Throughout its existence, Enterprise has used a sub-accounting system in which it purports to accurately record and keep track of each of its client's securities that were held in Enterprise's various accounts.

26.     At all times relevant, Enterprise purported to offer two types of accounts to its clients: managed and custodial accounts.

27.     According to Lohmeier, for the managed accounts, Enterprise made investment decisions on behalf of the clients (herein referred to as "managed clients"), and the managed clients paid an investment management fee to Enterprise equal to .5% to 1.5% of their assets under management.

28.     For the custodial accounts, Enterprise merely acted as a custodian. As custodian, Enterprise was to hold the clients' assets, prepare and distribute quarterly

statements, and collect and distribute income for the client (herein referred to as "custodial client"). Lohmeier admitted that, for all of the custodial accounts, Enterprise would not change anything about the account without first discussing the change with the custodial client and would not make trades on their behalf. Lohmeier testified that he was required to act in the custodial clients' best interests "across the board." According to Defendants, Enterprise charged the custodial clients between $10 and $85 per year.

29.    According to Lohmeier, Lohmeier and his spouse, some of their relatives, and Townsend all had managed accounts at Enterprise. According to Lohmeier's sworn testimony, Lohmeier's and his wife's Enterprise accounts are valued at approximately $5 million.

30.    Some or all of the managed clients, including Lohmeier and his wife, participated in Enterprise's trading strategy, meaning they earned profits and sustained losses based on the trading done in Enterprise's accounts.

31.    At all times during Enterprise's existence, Lohmeier was responsible for all investment decisions and trading carried out for all Enterprise clients.

## C.    Enterprise's Legent Account

32.    In 2006, most of Enterprise's clients' securities were held in a brokerage account at Legent Clearing LLC ("Legent"), an independent clearing broker-dealer. Enterprise opened this account on April 10, 2006, through Traderight Securities, Inc., an Illinois-based broker-dealer registered with the Commission, which served as the introducing broker-dealer for the account.

33.    On or about May 31, 2006, Lohmeier signed Legent's Margin Account Agreement ("Margin Agreement"), which was required for Enterprise to trade in the account on margin.

34.    Margin enables a customer to borrow money from a brokerage firm to make a securities transaction.  It permits the customer to, among other things, engage in leveraged trading and short selling.  The brokerage firm's loan is secured, or collateralized, with the customer's cash or securities in the account.  If the value of the securities in the account decline, so does the value of the collateral supporting the loan, and, as a result, the brokerage firm will require the customer to deposit additional cash or securities into the account, or sell some of the positions to generate additional cash.  When a brokerage firm asks its customer for additional collateral in the account, this is called a margin call.  A brokerage firm's determination of when to require a customer to deposit additional collateral and how much collateral is governed by federal law, rules promulgated by the Financial Industry Regulatory Authority, Inc. ("FINRA"), and the brokerage firm's own margin policies.

35.    Legent's Margin Agreement stated, among other things, that the "[s]ecurities in a margin account are registered in Legent's name and are collateral for any margin loan" and that "[i]f...adequate collateral does not exist, it may be necessary to issue a call (request) for additional margin collateral (cash or deposit of additional marginable securities)."  It also stated that "[i]f you do not meet a margin call, Legent may liquidate securities in the account to...satisfy the call" and that "Legent can sell your securities or other assets without contacting you."  It further stated that "to satisfy Legent's policy regarding margin maintenance requirements, Legent may, in its

discretion, require You to provide additional collateral or liquidate any part of the Property held in Your Account. Without limitation, any of the following circumstances may give rise to Legent's exercise of this power: ...(vi.) the occurrence of any event which, in Legent Clearing's judgment, operates to impair Client's ability to perform its obligations under this Margin Agreement."

36.    Beginning in June 2006 and continuing through November 2007, Lohmeier caused Enterprise to engage in extensive margin trading in the Legent account. Enterprise's trading on margin in the Legent account included engaging in short selling and options trading.

37.    A short sale of stock or other security is premised on the belief that the price of the security will go down, so that the short seller can buy it back at a lower price. A "short position" is created by selling a security that one does not own. An open short position is a short sale of a security that has not yet been repurchased. The "value" of an open short position is the amount that one would be required to pay to repurchase the security to close out the position.

38.    All short sales must occur in margin accounts. Brokers require customers with open short positions to pledge collateral in an amount sufficient to cover an open short position. A brokerage firm may also require additional amounts of collateral to protect the brokerage firm from adverse price movements with respect to the security being shorted. The collateral may be in the form of cash or securities or some combination of the two. The difference in the account between the value of an open position and the cash in the margin account is the margin balance. If the value of the collateral in a margin account is less than the value of the open short position, there is a

debit balance, to which margin interest is charged to the account. Brokers typically charge the customer interest on margin balances.

39.    Almost immediately after beginning this trading, Legent issued numerous margin calls to Enterprise because Enterprise did not have enough collateral in its account to support Lohmeier's trading.

40.    In order to satisfy these margin calls, Enterprise was forced to reduce its open positions, sell securities in the margin account, or add cash or securities to the account, or some combination of the three.

41.    These margin calls provided a strong motive for Defendants to increase the assets held in its margin account at Legent, since the pledge of additional assets as collateral in Enterprise's margin account would increase the amount of leveraged trading available to it.

42.    During the summer of 2006, Lohmeier was seeking to acquire additional assets through the acquisition of a financial advisor.

**D.    Traderight's Acquisition of The AFC Customer Accounts.**

43.    In 2006, Ruthe Gomez ("Gomez"), the 83 year-old owner of Advisory Financial Consultants ("AFC"), a San Francisco-based brokerage firm, decided that she wanted to retire soon and began looking for a company to which she could sell her business, which consisted of approximately 1800 brokerage accounts.

44.    The total value of the assets held in these AFC accounts in 2006 was approximately $100 million, nearly all of which consisted of mutual funds, with the remainder in annuities.

45.     Predominantly all of AFC's customers' accounts consisted of long-term investments in mutual funds. Many of these AFC brokerage accounts were owned by older investors approaching retirement or already retired with investment objectives that were neither speculative nor otherwise aggressive. Additionally, many of the accounts were IRAs, 403(b) plans, or other retirement accounts containing "qualified" assets, as that term is used by the Internal Revenue Service.

46.     None of the AFC customers traded in common stock or engaged in margin or options trading in their AFC accounts.

47.     Each of the AFC customers had a registered representative, or individual broker, affiliated with AFC. Gomez was the broker for some of the customers. The AFC brokers did not have discretionary authority over the AFC customer accounts, meaning that they did not have the authority to make investment decisions or trades without prior approval from the customer.

48.     AFC and Enterprise were introduced to each other in September of 2006. Gomez conducted the negotiations on behalf of AFC, and Townsend was the main contact person for Enterprise.

49.     Enterprise and Traderight considered a possible joint purchase of AFC after which Traderight would be the broker for all of the AFC customer accounts and Enterprise would solicit these customers to become Enterprise clients who paid a fee to have Enterprise manage their money.

50.     Enterprise would benefit because it would earn investment management fees from any of the AFC customers who converted to a fee-based account and, as discussed below, use the AFC customers' mutual funds as collateral in Enterprise's

margin accounts. As early as August of 2006, Lohmeier told Traderight that he intended to transfer all securities acquired as a result of the AFC transaction into Enterprise's margin account at Legent.

51.    In December 2006, AFC entered into an agreement to sell approximately 1800 retail brokerage accounts to Locke Haven, LLC, a joint venture between Townsend and Lohmeier and the principals of Traderight formed for this transaction. Locke Haven agreed to pay Gomez up to $450,000; $225,000 up front for the transfer of the AFC accounts to Traderight, and an additional $225,000 if more than 50% of the AFC customers' assets were then transferred to Enterprise.

52.    Pursuant to the parties' agreement, in January 2007, all of Gomez's customers' accounts and assets were transferred to Traderight as the new brokerage firm and Gomez became a Traderight registered representative. AFC was paid $225,000 for the account transfers to Traderight; $72,000 by Enterprise and the remainder by Traderight and/or its principals.

53.    The parties to the agreement intended, at the time that they were negotiating the transaction, that after the AFC customer accounts were transferred to Traderight, the AFC customers would be solicited to become Enterprise clients, after which their securities would be transferred into Enterprise's account at Legent.

54.    All of the Defendants understood at the time of the negotiations and execution of this transaction that once the AFC accounts were acquired, the AFC customers' assets would be placed in the Legent account where they could serve as additional collateral for Enterprise's margin trading. This was a primary purpose of the AFC transaction.

**E.**    **Enterprise's Solicitation of The AFC Customers.**

55.    Soon after the AFC customer accounts were transferred to Traderight, Enterprise and Gomez solicited many of the former AFC customers to become Enterprise clients and to transfer their assets to Enterprise.

56.    In January 2007, both Gomez and Enterprise sent a packet of information to the former AFC customers in order to induce them to transfer their securities holdings to Enterprise's custody.

57.    The packet typically included a January 2007 letter on AFC's letterhead signed by Gomez, an Investment Agreement, a Legent "Asset Transfer Form" and some Enterprise marketing information.

58.    The January 2007 letter included in the customer packet stated that Gomez was pleased to announce "our merger with Enterprise Trust Company." The letter additionally stated: "Enterprise will fulfill the role of a successor for me in the future, but also provide value today. In order to accomplish this though, we do need to organize somewhat differently how we report your account to you. *Your current funds will remain unchanged.* No new fees will be assessed as we make this transition to the new company. *The only new feature will be Enterprise Trust serving as the new custodian of your account.* (emphasis added)

59.    Townsend participated in the drafting of the January 2007 letter and reviewed it before it was sent to the former AFC customers by Enterprise.

60.    The Investment Agreement contained in the January 2007 customer packet was drafted on Enterprise letterhead. Lohmeier and Townsend were both responsible for

the contents of the Investment Agreement. Lohmeier and Townsend each signed
Investment Agreements on behalf of Enterprise.

61.    The Investment Agreement stated that "The Client is opening an asset
management account with Enterprise Trust Company, as Agent." It further stated, in the
first paragraph, that Enterprise would have the power to "keep all assets safely, collect
income and the proceeds of sales and maturities; distribute income and principal as
directed by Customer, and provide periodic accounting statements."

62.    The second paragraph of the Investment Agreement provided that
Enterprise had the power "to retain, invest and reinvest in assets of any kind and take
other investment action it considers appropriate in its sole direction…" The Agreement
in the fifth paragraph also stated that the investments used by Enterprise "may include
options, inverse performance funds, venture capital, private placement securities, and real
estate." The second paragraph of the Investment Agreement explicitly limited
Enterprise's discretion, however, by providing that any investment action taken by
Enterprise would be "based on the Customer's stated risk profile and investment
objectives." Prior to sending out the Investment Agreement to AFC customers,
Townsend and others at Enterprise typed "Growth & Income" for asset allocation model
and "Full" for choice of "discretion" on all of the forms. They did this without contacting
any of the AFC customers to find out what their investment objectives were.

63.    The Investment Agreement did not discuss the use of margin or short
selling. The Investment Agreement did not authorize Enterprise to place the AFC
customers' mutual funds into margin accounts where they would serve as collateral for
trading intended to benefit other Enterprise clients.

64.    At the time that Enterprise sent out the customer packets and Investment Agreements to the AFC customers, Defendants knew that, contrary to the representations in these documents, they intended to pledge the AFC customers' mutual funds as collateral for trading in margin accounts intended to benefit other Enterprise customers.

65.    Upon receiving the January 2007 customer packets from Enterprise, several customers called Gomez with questions about the documents, particularly why they needed to sign the Investment Agreement.

66.    In or about January 29, 2007, Gomez and Townsend held a meeting with approximately 30 AFC customers during which Townsend answered questions. Townsend told the AFC customers at the meeting that Enterprise would handle their accounts in the same manner as Gomez did and that the customers would retain the authority to make decisions with respect to their securities.  Townsend also admitted telling investors that the language in the Investment Agreement was just some standard form and that Enterprise would not exercise discretionary authority in their accounts without obtaining their permission.  Additionally, Townsend told the AFC customers at the meeting that "just because you sign this document doesn't mean that we'll sell your fund tomorrow" and that for such a sale to occur there would be further discussions. Each of these representations by Townsend was false.  Townsend knew, at the time she made these statements, that Enterprise intended to pledge these securities as collateral in margin accounts for the benefit of other Enterprise clients.

67.    Approximately half of the AFC customers signed the Investment Agreement.  The mutual funds in approximately 700 of the 1800 AFC customer accounts held at Traderight were transferred to Enterprise.  Once the mutual funds were transferred

to Enterprise, they were no longer held in the customers' names at the mutual fund companies. Only Enterprise could take action relating to the mutual funds and provide information about the customers' investments. Enterprise used a sub-accounting system purportedly to keep track of which customers owned which of the securities in Enterprise's omnibus accounts.

68.    Fewer than 10 of the AFC customers who became Enterprise clients elected to have Enterprise manage their accounts and pay a fee for that service. Virtually all of the AFC customers who signed up with Enterprise elected to have Enterprise serve merely as a custodian of their account.

69.    The Defendants did not disclose to any of the custodial AFC customers that their mutual funds would be placed in a margin account where they would be used as collateral for margin trading intended to benefit other Enterprise clients, and not the custodial AFC customers themselves.

70.    Enterprise's placing of the custodial AFC customers' mutual funds in margin and other accounts where they would serve as collateral for margin trading intended to benefit other Enterprise clients, was contrary to the representations in the Investment Agreement, the January 2007 letter and Townsend's verbal representations to the AFC customers.

71.    Nothing in the Investment Agreement authorized Enterprise to place the custodial AFC customers' securities in a margin account where they would serve as collateral for trading intended to benefit other Enterprise customers. Further, placing the AFC customer assets in the margin account of this highly leveraged account was inconsistent with the risk profile of "Growth & Income" that Defendants had placed in

the Investment Agreement. It was also contrary to the representation contained in the

Investment Agreement that the AFC customers' funds would remain safe. It was also

contrary to the representation set forth in the January 7, 2007 letter stating that AFC

customers' securities holdings "would remain unchanged" and to Townsends' similar

oral representations to custodial AFC clients prior to their executing the Investment

Agreement.

F.    **Enterprise's Misuse of the Custodial Customers' Assets.**

72.    From February 2007 to June 2007, a total of $49 million in AFC customer

mutual funds were transferred to Enterprise accounts at Legent and US Bank. Lohmeier

and Townsend both participated in effecting the asset transfers. Initially, Defendants and

Traderight intended that all of the assets of AFC clients who signed Investment

Agreements were to be deposited in Enterprise's Legent Account. However, many of the

former AFC customers had invested in the mutual funds of one particular mutual fund

company, which would not transfer the mutual funds to Legent.

73.    To remedy this problem, the Defendants arranged for these customers'

mutual funds to be transferred to and held in accounts at US Bank.

74.    Defendants entered into a special agreement to permit the mutual funds at

US Bank to be used as collateral for their trading in the Legent account. On May 31,

2007, Enterprise, Traderight, Legent and US Bank executed a "Special Custody Account

Agreement." Pursuant to this agreement, all of the assets in one US Bank account were

designated as collateral for the short selling conducted by Enterprise in the Legent

Account. Under this agreement, none of the AFC customers' assets in the collateral

account at US Bank could be transferred or sold without Legent's approval.

75.    By July 2007, the collateral account at US Bank had approximately $22.5 in mutual funds and there was only $2.5 million in the two other non-pledged accounts.

76.    Many of AFC customers' assets consisted of retirement funds.  The Defendants knew that many of the AFC customers' accounts were IRAs, 403(b)s, and other forms of retirement accounts.  Such assets could not be placed in margined or leveraged accounts or commingled with non-qualified assets pursuant to IRS rules.  Nonetheless, Defendants caused even these AFC customers' assets to be pledged as collateral for Enterprise's leveraged margin trading at Legent and commingled them with non-qualified assets.

77.    In early March 2007, Legent informed Traderight that the paperwork that Legent had received from Enterprise did not contain sufficient authorization or disclosure regarding the use of margin for the AFC customers and that without further documentation, Legent could not permit the use of margin in connection with the AFC customers' securities.

78.    Traderight informed Lohmeier about this problem and on March 5, 2007, Lohmeier prepared, signed and submitted to Traderight an attestation in which he falsely stated that: "The clients who have agreed to transfer their assets into Enterprise Trust Company at Legent Clearing have given Enterprise full discretion.  ***Additionally, they have been provided with, and approved, the required documentation and notification regarding the margin account where there assets will be held.***  They have been given the appropriate disclosures regarding their assets." (emphasis added)  Traderight prepared a similar attestation and forwarded both attestations to Legent.

79.    Based on these representations, Legent allowed Enterprise to use the AFC customers' securities as collateral for the margin trading that benefited other Enterprise clients.

80.    Lohmeier's misrepresentation to Legent concerning Enterprise's customers' "approval" of the required documentation regarding the margin account where their assets would be held was knowingly false and material.

81.    With the addition of the AFC customers assets to serve as collateral in the accounts at Legent and US Bank, Enterprise, in the spring of 2007, began taking large short positions in the Legent Account. Enterprise's trading in this account was intended to benefit its managed clients, including Lohmeier and Townsend, who were participating in Enterprise's trading strategy.

82.    Increasing the amount of customers' assets in the Legent Account created more collateral, enabling Enterprise to have greater leverage for trading, take larger short positions, and avoid and/or satisfy significant margin calls.

83.    The custodial AFC customers did not participate in or benefit from the trading in the Legent account, or in any other benefits (such as short-interest rebates) that accrued as a result of the trading activity in the account.

84.    Defendants' use of the custodial AFC customer mutual funds as collateral for the trading in the Legent accounted subjected those funds to a risk of liquidation in order to satisfy any margin calls issued by Legent.

85.    Enterprise, Lohmeier and Townsend did not disclose to the custodial AFC customers that they placed their securities into margin or other accounts where the securities would serve as collateral for trading that benefited other customers. The

account statements that Enterprise sent to customers did not reflect that their assets were in a margin account or served as collateral for trading that benefited other customers.

86.    From January 2007 to May 2007, before the bulk of the AFC customers' assets were transferred to Enterprise, Enterprise received 14 margin calls in the Legent Account, ranging from $33,202 to $2,660,479.  After the execution of the Special Custody Account Agreement, Enterprise did not receive any margin calls during the period June through August 2007 and only two between August and November.

## G.    Enterprise's Transfer of AFC Customers' Assets To optionsXpress

87.    In November 2007, Enterprise was informed by Legent that it would not accept any additional mutual funds as collateral for margin trading.

88.    As of November 30, 2007, Enterprise was carrying a large open short position of approximately $16.6 million and a margin debit of approximately $12.7 million.  The AFC customer mutual funds pledged in the US Bank and Legent accounts constituted the principal source of collateral securing this margin debt and the short positions.

89.    After Lohmeier was informed by Legent of this decision, he entered into discussions with optionsXpress about Enterprise opening a margin account there. optionsXpress is an online brokerage firm whose principal operations are in Chicago, Illinois.  Lohmeier met and spoke with optionsXpress's risk manager as well as its head of institutional trading prior to opening the account.

90.    On November 16, 2007, Lohmeier opened a new margin account at optionsXpress.  In the online application for Enterprise's accounts, Mr. Lohmeier identified Enterprise's account as a "corporate" account, and did not indicate on the

application, or to anyone with optionsXpress that Enterprise would be placing assets in the account that were actually owned by clients, and not Enterprise. The first page of the account application required Lohmeier to acknowledge that optionsXpress had the right to liquidate securities held in the account at any time and without notice to Enterprise, in optionsXpress' sole discretion when such action is anticipated or deemed necessary to protect optionsXpress from potential loss. optionsXpress approved margin trading in Enterprise's margin account.

91.     When he opened the optionsXpress margin account, Lohmeier signed a form pursuant to which he acknowledged that he received, reviewed and agreed to the terms of "Appendix A – Margin Account Agreement Terms." The Margin Account Agreement Terms set forth the terms and conditions for the margin account, and made clear the risk to any and all securities held in the account. Among the plain disclosures, set forth in boldface in the Margin Account Agreement Terms , were the following:

- "You can lose more funds than you deposit in the margin account."
- "optionsXpress can force the sale of securities in your account."
- "optionsXpress can sell your securities without contacting you."
- "You are not entitled to choose which security in your margin account is liquidated or sold to meet a margin call."
- "optionsXpress can increase its "house" maintenance margin requirements at any time and is not required to provide you with advance written notice."
- "You are not entitled to an extension of time on a margin call."

92.    On December 5, 2007, Enterprise began transferring securities into the optionsXpress account, including some of the AFC customers' mutual funds that were in the accounts at Legent and US Bank.

93.    At the time of the transfer, Enterprise was carrying a $12.6 margin debit in the Legent Account. This debit was transferred to optionsXpress, collateralized primarily by the AFC customers' mutual funds.

94.    Because these assets were held in the name of Enterprise, optionsXpress did not know that these were not Enterprise's assets.

95.    Lohmeier then began to engage in the same type of highly leveraged, short trading that it had engaged in at Legent. This trading was intended to benefit Enterprise's actively managed clients, including Lohmeier, various of his family members, and Townsend. Among the intended benefits to the managed clients were interest rebates that Enterprise received as a result of the large open short positions he was able to carry, in principal, part due to the collateral in the margin account.

96.    None of Enterprise's custodial clients were intended to or did benefit from this trading. However, many of them bore the risk of liquidation by having their mutual funds deposited in the optionsXpress account to collateralize Enterprise's leveraged trading, large short positions and margin debit.

97.    By the end of January 2008, Enterprise had established an open short position in excess of $116,100,222, and long positions in stock with a market value of $514,489, resulting in a net stock position of negative $115,585,733 as of January 31, 2008. Enterprise's margin account only had $103,995,045.38 in cash to cover this negative stock position, creating a deficit of $12 million in the account. The

$13,807,666.02 in mutual funds $1,070,176.56 and bonds that Enterprise had transferred into the optionsXpress margin account served as collateral securing that deficit. More than $8 million of these mutual funds came from the custodial AFC customers.

98.    Defendants did not disclose to any of the AFC customers that their mutual funds had been placed at risk in yet another margin account used to conduct trading for the benefit of Enterprise's actively managed clients.

99.    On February 6, 2008, optionsXpress' compliance department learned that Enterprise had been submitting numerous transfer requests seeking to move mutual funds and other securities out of its margin account to accounts in the names of various individuals (and not of Enterprise) located at various other broker-dealers.

100.    optionsXpress became concerned upon learning this, because Lohmeier had opened the margin account as a corporate account, and had not informed optionsXpress that the securities in the account belonged to anyone other than Enterprise at the time the account was opened. optionsXpress's Compliance Department also became aware from its review of these requests that some of the requests sought the transfer of securities into IRA accounts, 403(b) accounts and other retirement accounts that are considered "qualified" plans pursuant to IRS regulations. This raised additional concerns about whether Enterprise had pledged "qualified" assets as part of the collateral in its margin account, since it was optionsXpress's understanding that such commingling is prohibited pursuant to IRS regulations.

101.    On February 7, 2007, Hillary Victor ("Victor"), OptionsXpress's Corporate Counsel, and Benjamin Morof ("Morof"), its Chief Compliance Officer, contacted Enterprise by telephone to discuss these concerns. Also participating in the call

for optionsXpress was Nathan Goodman, its Head of Institutional Trading. They spoke with Townsend, who informed them that at least some of the mutual funds in the Enterprise margin account at optionsXpress did in fact belong to underlying Enterprise clients, and not to Enterprise.

102.    The same optionsXpress employees contacted Enterprise later that day and spoke again with Townsend. During that conversation, they expressed concern about the use of customer assets in a corporate margin account and about the commingling of "qualified" retirement funds with unqualified funds, and questioned whether the customers had authorized the use of their assets in the account in this manner. They informed Townsend that, among other things, they needed to determine Enterprise's authority to use margin in connection with the customers' securities and to engage in short selling in that account.

103.    Townsend falsely stated in response that the customers had in fact authorized such use, and said that she would send optionsXpress a copy of Enterprise's private portfolio agreement. Townsend also indicated that Enterprise also maintained risk questionnaires for customers. This statement was intentionally misleading, as Townsend knew that Enterprise had neither sought nor received risk questionnaires for any of the AFC customers whose mutual funds were being used as collateral in the optionsXpress account. Townsend did not inform optionsXpress of this fact.

104.    Ms. Townsend sent an email at 10:16 a.m. the next day to optionsXpress attaching two PDFs, each containing a different version of a document entitled "Private Portfolio Investment Agency Agreement" that was written on Enterprise letterhead. Neither version was filled out or signed. The two forms were substantially identical,

except that the second version contained a new paragraph 5 at the bottom of the first page, which added to Enterprise's other discretionary powers the power to pledge or hypothecate securities and commingle them with "securities carried for other customers in an omnibus account which has margining capability." One other difference is that the first PDF included an additional one page document, entitled "Margin Account Disclosure Statement," that appears to have been a document prepared by Legent Clearing.

105.    In a cover letter to her email, Townsend stated that the first form was the basic discretionary agreement that every Enterprise client signs, and that the second form had been revised for 2008 after a company and legal review. Townsend's email was false or, at best, misleading, since she knew that none of the AFC customers' had signed the second version. Townsend did not disclose this fact to optionsXpress.

106.    The same optionsXpress employees contacted Enterprise later that same morning to continue discussions about the margin account. Both Lohmeier and Townsend participated in this call. During this second call, Lohmeier informed optionsXpress that Enterprise had an identical margin account arrangement at Interactive Brokers, another online brokerage firm. Mr. Lohmeier also offered to provide a legal opinion on the legality of commingling "qualified" with unqualified securities in a margin account. Lohmeier falsely stated during the call that the Investment Agreement expressly permitted Enterprise to use margin and engage in short selling, and referred optionsXpress to the two PDFs that Townsend had sent that morning.

107.    optionsXpress Corporate Counsel reviewed the documents and noticed that neither of the two forms of investment agreement included shorting stock among the

list of permitted investments in paragraph 6 of the agreement. She communicated this fact to Mr. Lohmeier. In response, Lohmeier stated that Ms. Townsend had sent the wrong form by mistake, and then caused Townsend to send a new, blank version of Enterprise's discretionary agreement. This version was substantially identical to the second form, except that this one added "shorting securities" to the list of permitted investments set forth at paragraph 6 of that document.

108.    Later during this same day, the same group of participants had another telephone discussion, in which optionsXpress informed Ms. Townsend and Mr. Lohmeier that it remained uncomfortable with the way in which the account was being used and sought further assurances and documentation relating to the margin account. Morof indicated to Enterprise that optionsXpress would not be able continue to allow any risk in the account unless it received sufficient comfort as to the legality and appropriateness of the way in which the account was being used.

109.    optionsXpress asked Enterprise to provide optionsXpress with copies of that third form of investment agreement that had actually been signed by customers whose mutual funds had been placed in the margin account, and also to provide a legal opinion in support of Mr. Lohmeier's contention that Enterprise was legally permitted to co-mingle IRA funds and other "qualified" assets with unqualified assets in the margin account.

110.    Enterprise never provided this requested information.

111.    On February 13, 2008, optionsXpress's Risk Management Group determined that it was no longer willing to allow Enterprise to have risk in its account, and issued a margin "risk" call, notifying Enterprise that it was required to deposit

$11,000,000 in cash into the margin account due to optionsXpress's concern as to the risk of the margin account, and Enterprise's failure to satisfy optionXpress's compliance department's requests for information concerning the actual owners of the mutual funds that Enterprise was using as collateral in the margin account. At the time of the margin call, Enterprise had open short positions of approximately $121 million, and cash in the account of only approximately $109 million. In response to the margin call, Enterprise informed optionsXpress that it would not be meeting the $11 million margin call.

112.    On February 13, 2008, optionsXpress took steps to eliminate the margin debt in the account. To accomplish this, optionsXpress first closed Enterprise's open short positions. To close out these short positions, optionsXpress purchased stock at a cost of approximately $121 million, leaving a negative balance of approximately $11 million dollars in the margin account, as there was only approximately $110 million of cash in the account to pay for the closing out of those positions. In order to satisfy Enterprise's $11 million debt to optionsXpress, optionsXpress then liquidated Enterprise's collateral, beginning with orders to liquidate the stocks and bonds, and then the largest mutual fund positions. OptionsXpress liquidated $11,155,353 of Enterprise's securities. Of this amount, optionsXpress applied $10,786,283 to satisfy Enterprise's negative balance.

113.    After closing out all short positions and liquidating assets to eliminate Enterprise's deficit in the account, the balance of all remaining cash and securities in the Enterprise margin account was $4,250,785.14, which included $3,776, 983 in securities.

114.    optionsXpress has frozen the remaining assets in both of Enterprise's accounts, which consist of bonds and mutual funds that optionsXpress did not need to liquidate to satisfy Enterprise's debt, plus whatever cash remained in the account.

**H.    Enterprise's Current Activities**

115.    On Friday, February 29, 2008, Enterprise informed that SEC that it had reestablished positions on behalf of all AFC customers.  Enterprise represented, among other things, that $6.6 million worth of securities had been repurchased at Interactive Brokers.  These repurchases were made in yet another margin account, thus putting the custodial AFC customers' securities as risk of being sold to satisfy a margin call or margin debt.

116.    Further, these securities were purchased in a margin account that already had a large margin deficit and large open short positions, and Enterprise paid for these purchases by increasing the accounts' margin debt, which has grown to more than $20 million as of February 29.  Interactive Brokers has now informed Defendants that it is closing the account on March 11, 2008.  With only $4 million in equity in that account, and $20 million in debt, and more than $100 million in open short positions, it is likely that the custodial clients' funds are going to be liquidated once again come March 11.

117.    The AFC custodial customers constitute only approximately half of Enterprise's custodial clients.  Enterprise continues to maintain margin accounts at other brokerage firms, including Interactive Brokers, and continues to maintain large open short positions that are collateralized with other securities.  To date, Enterprise has not provided the Commission with evidence establishing that the assets of other custodial

clients of Enterprise are not being pledged or hypothecated as collateral for any of

Enterprise's trading positions, trading debt, or for any other purpose, in those accounts.

## COUNT I

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder

### (All Defendants)

118.    Paragraphs 1 through 117 are hereby realleged and incorporated by reference herein.

119.    By virtue of the conduct alleged herein, Defendants Enterprise, Lohmeier and Townsend, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operated and will operate as a fraud and deceit upon purchasers and sellers of such securities.

120.    Defendants knew or were reckless in not knowing of the activities described in Paragraphs 1 through 117 above.

121.    By reason of foregoing, Defendants have violated and are violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## COUNT II

### Violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)]
### and Rule 10b-5 [17 C.F.R. 240.10b-5] thereunder by Lohmeier as control persons
### pursuant to Section 20(a) of the Exchange Act[15 U.S.C. § 77t(a)]

#### (Lohmeier)

122.    Paragraphs 1 through 121 are realleged and incorporated by reference.

123.    Enterprise, under Lohmeier's control, in connection with the purchase or sale of securities, by the use of any means or instrumentalities of interstate commerce or by the use of the mails, directly or indirectly, have employed and are employing devices, schemes and artifices to defraud; have made and are making untrue statements of material fact and have omitted and are omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and have engaged and are engaging in acts, practices and courses of business which operated and will operate as a fraud and deceit upon purchasers and sellers of such securities.

124.    By reason of the activities described in paragraphs 1 through 121 above, Enterprise have violated and are violating Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

125.    By reason of the foregoing, and pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)], Lohmeier is liable for Enterprise's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

## COUNT III

### Aiding and Abetting Violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder, [15 U.S.C. § 78t(e)]

### (Lohmeier)

126.    Paragraphs 1 through 121 are realleged and incorporated by reference.

127.    By virtue of the conduct alleged above in paragraphs 1 through 121, Enterprise violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

128.    By his conduct described in paragraphs 1 through 121, Lohmeier knowingly or recklessly substantially assisted Enterprise's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §§ 240.10b-5].

129.    By reason of the foregoing, Lohmeier aided and abetted Enterprise's violations of 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, thereby violating Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## RELIEF REQUESTED

**WHEREFORE**, the Commission respectfully requests that the Court:

### I.

Find that Defendants Enterprise, Lohmeier, and Townsend committed the violations charged and alleged herein and enter judgment against each of them.

### II.

Grant a Temporary Restraining Order and Orders of Preliminary and Permanent

Injunction, in a form consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently restraining and enjoining each of the Defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with them who receive actual notice of the Order, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

### III.

Grant appropriate additional emergency interim relief, consistent, with Rule 65(d) of the Federal Rules of Civil Procedures, to prevent further secretion or dissipation of assets invested by investors, including the issuance of an asset freeze order, an order appointing receiver, and other ancillary emergency interim relief as is set forth in the SEC's Emergency Motion for a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief filed contemporaneously with this complaint.

### IV.

Issue an Order requiring Defendants Enterprise and Lohmeier, jointly and severally, to disgorge the ill-gotten gains that they received as a result of their wrongful conduct (including any losses they avoided by virtue of their unlawful conduct), including prejudgment interest.

### V.

Issue an Order requiring Defendant Townsend to disgorge the ill-gotten gains that

32

she received as a result of their wrongful conduct, including prejudgment interest.

## VI.

Issue an Order imposing appropriate civil penalties upon each of the Defendants pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

## VII.

Retain jurisdiction of this action in accordance with the principals of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered or to entertain any suitable application or motion for additional relief within the jurisdiction of this Court.

## VIII.

Grant such orders for further relief the Court deems appropriate.

Respectfully submitted,

_____

Steven J. Levine (IL Bar No. 6226921)
Steven L. Klawans (IL Bar No. 6229593)
Allison M. Fakhoury (IL Bar No.6281486)

Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: March 3, 2008