UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| Plaintiff, | : |
| v. | : Civil Action No. |
| **ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER,** and **REBECCA A. TOWNSEND,** | : |
| Defendants. | : |

## DECLARATION OF JOHN G. HAWORTH

I, John G. Haworth, pursuant to 28 U.S.C. 1746, declare as follows:

1. I am a Staff Accountant in the Broker-Dealer Examination Program of the United States Securities and Exchange Commission (the "SEC") in its Chicago, Illinois, office. I began my employment at the SEC in June 2005. I have a B.S. in accounting and Master of Accounting Science, both from the University of Illinois at Urbana-Champaign. I am a licensed Certified Public Accountant in the State of Illinois.

2. My duties as a Staff Accountant at the SEC include conducting examinations of broker-dealers, transfer agents and clearing agencies, as well as assisting with SEC investigations concerning possible securities law violations discovered during such examinations or from other sources. As part of my job, I routinely obtain and review records of broker-dealers and other financial institutions, and am intimately

familiar with the type of records and maintained by such entities. I also interview personnel of these entities as well as other witnesses.

3. During the course of my employment at the SEC, I participated in the investigation giving rise to the above-captioned lawsuit. I am submitting this declaration in support of Plaintiff SEC's Motion for a Temporary Restraining Order and other relief. The facts set forth herein are based on my personal knowledge or upon information contained in the files of the SEC.

4. Throughout this declaration I refer to various exhibits. All of these exhibits are contained in the Compendium of Exhibits Filed in Support of Plaintiff SEC's Motion for a Temporary Restraining Order ("Compendium of Exhibits") filed simultaneously herewith.

5. I am familiar with the factual bases and sources of information for all of the allegations set forth in the complaint and in the SEC's memorandum of law filed in support of its TRO motion, and am prepared to testify as to these bases and sources of the allegations and evidence set forth in those pleadings if called to do so at any evidentiary hearing relating to the TRO motion or at any preliminary injunction hearing.

**Identification and Description of Exhibits in Compendium**

6. Exhibit one is a true and correct copy of the transcript of John Lohmeier's investigative testimony, conducted on January 16, 2008.

7. Exhibit two is a true and correct copy of the transcript of Rebecca A. Townsend's investigative testimony before FINRA, conducted on January 17, 2008, produced to the SEC by FINRA.

8. Exhibit three is a true and correct copy of Enterprise Trust Company's ("Enterprise") Trust License dated, April 1, 2007, and Corporate Charter, dated November 18, 2005, produced to the SEC by Enterprise.

9. Exhibit four is a certified copy of Enterprise's Articles of Incorporation and other documents filed with the State of Nevada, produced to the SEC by the Secretary of State for the State of Nevada.

10. Exhibit five is a true and correct copy of an Order to Cease and Desist issued by the State of Illinois, Department of Financial and Professional Regulation on January 24, 2006, produced to the SEC by the State of Illinois, Department of Financial and Professional Regulation.

11. Exhibit six is a true and correct copy of a Consent Order issued by the State of Illinois, Department of Financial and Professional Regulation on March 29, 2006, produced to the SEC by the State of Illinois, Department of Financial and Professional Regulation.

12. Exhibit seven is a true and correct copy of Enterprise's Financial Statements as of December 31, 2006, produced to the SEC by Enterprise.

13. Exhibit eight is a true and correct copy of excerpts from the transcript of Jeanette Douglas's investigative testimony before FINRA, conducted on January 31, 2008, produced to the SEC by FINRA. It also includes an exhibit introduced during that testimony.

14. Exhibit nine is a true and correct copy of Enterprise's account opening documents with Legent Clearing, LLC ("Legent"), produced to the SEC by FINRA.

15. Exhibit 10 is a true and correct copy of the Margin Account Agreements between Enterprise and Legent for Enterprise's two accounts with Legent, obtained by FINRA and produced to the SEC by FINRA.

16. Exhibit 11 is a true and correct copy of the May 2006, account statement for the Enterprise's margin account at Legent, produced to the SEC by FINRA.

17. Exhibit 12 is a true and correct copy of the June 2006, account statement for the Enterprise's margin account at Legent, produced to the SEC by FINRA.

18. Exhibit 13 is a true and correct copy of an email from John Lohmeier dated August 22, 2006, introduced as an exhibit in the investigative testimony, before FINRA, of Rebecca A. Townsend conducted on January 17, 2008, produced to the SEC by FINRA.

19. Exhibit 14 is a true and correct copy of the Asset Purchase agreement between Locke Haven, LLC and Advisory Financial Consultants ("AFC"), dated December 20, 2006, obtained by FINRA and produced to the SEC by FINRA.

20. Exhibit 15 is a true and correct copy of a correspondence from Traderight Securities, Inc. ("Traderight") to FINRA, produced to the SEC by FINRA.

21. Exhibit 16 is a true and correct copy of a package of documents Enterprise sent to AFC customers prior to their opening accounts at Enterprise, produced to the SEC by Enterprise.

22. Exhibit 17 is a true and correct copy of the Enterprise Private Portfolio Investment Agency Agreement, produced to the SEC by Enterprise.

23. Exhibit 18 is the original, signed Declaration of Howard Johnson, dated February 26, 2008.

24. Exhibit 19 is a true and correct copy of a welcome package sent to former AFC customers after they opened up Enterprise accounts, produced to the SEC by Enterprise.

25. Exhibit 20 is a true and correct copy of an Enterprise Strategy Client List, produced to the SEC by Enterprise.

26. Exhibit 21 is a true and correct copy of excerpts from the investigative testimony, before FINRA, of George Dragel conducted on November 14, 2007, produced to the SEC by FINRA.

27. Exhibit 22 is a true and correct copy of a letter from Lohmeier to SEC Senior Attorney Allison Fakhoury dated September 24, 2007.

28. Exhibit 23 is a true and correct copy of the May 2007, account statement for the Enterprise's account at U.S. Bank, produced to the SEC by Sungard.

29. Exhibit 24 is a true and correct copy of the Special Custody Account Agreement between U.S. Bank, Enterprise, Legent and Traderight dated May 31, 2007, obtained by FINRA and produced to the SEC by FINRA.

30. Exhibit 25 is a true and correct copy of an email from Paul Keller on September 5, 2007, produced to the SEC by Sungard, the company that provide subaccounting services to Enterprise for its clients.

31. Exhibit 26 is a true and correct copy of an email from Alan Markarian of U.S. Bank to Tim Leyen at Sungard dated November 20, 2007, produced to the SEC by U.S. Bank.

32. Exhibit 27 is a true and correct copy of the January 2007 account statement for the Enterprise's margin account at Legent, produced to the SEC by Legent.

33.     Exhibit 28 is a true and correct copy of the May 2007 account statement for the Enterprise's margin account at Legent, produced to the SEC by Legent.

34.     Exhibit 29 is a true and correct copy of the September 2007 account statement for the Enterprise's margin account at Legent, produced to the SEC by Legent.

35.     Exhibit 30 is a true and correct copy of an email from George Dragel dated March 2, 2007, introduced as an exhibit in the investigative testimony, before FINRA, of George Dragel conducted on November 26, 2007, produced to the SEC by FINRA.

36.     Exhibit 31 is a true and correct copy of a letter from John Lohmeier dated March 2, 2007, introduced as an exhibit in the investigative testimony, before FINRA, of Michael Rukujzo conducted on November 28, 2007, produced to the SEC by FINRA.

37.     Exhibit 32 is a true and correct copy of a letter from Michael Rukujzo dated March 2, 2007, introduced as an exhibit in the investigative testimony, before FINRA, of Michael Rukujzo conducted on November 28, 2007, produced to the SEC by FINRA.

38.     Exhibit 33 is a true and correct copy of excerpts from the investigative testimony, before FINRA, of Craig Black conducted on November 14, 2007, produced to the SEC by FINRA.

39.     Exhibit 34 is a true and correct copy of the December 2007 account statement for the Enterprise's margin account at optionsXpress, produced to the SEC by optionsXpress.

40.     Exhibit 35 is a true and correct copy of Enterprise's account opening documents with Interactive Brokers, LLC ("Interactive Brokers"), produced to the SEC by Interactive Brokers.

41. Exhibit 36 is a true and correct copy of Enterprise's account opening documents with Dorman Trading, produced to the SEC by Traderight.

42. Exhibit 37 is a true and correct copy of Enterprise's shareholder list dated July 5, 2005, produced to the SEC by the State of Nevada Financial Institution Division.

43. Exhibit 38 is information on margin from www.sec.gov.

44. Exhibit 39 is information on short sales from www.sec.gov.

45. Exhibit 40 is a schedule I created that reflects the former AFC customers' mutual funds liquidated on February 13, 2008.

46. Exhibit 41 is an email from optionsXpress to SEC staff members, Allison M. Fakhoury and Steven Klawans dated February 21, 2008. Attached to that email was a spreadsheet of securities liquidated by optionsXpress on February 13, 2008.

47. Exhibit 42 is a true and correct copy of order tickets for mutual funds liquidated on February 13, 2008 in the optionsXpress account and schedules of customers who owned those mutual funds, produced to the SEC by Enterprise

48. Exhibit 43 is a true and correct copy of a list of former AFC customers who are customers of Enterprise, produced to the SEC by Enterprise.

49. Exhibit 44 is a true and correct copy of the transcript of Cathy Berwaldt's investigative testimony before FINRA, conducted on September 25, 2007, produced to the SEC by FINRA.

50. Exhibit 45 is a true and correct copy of Daily Account Activity Statements for Enterprise margin account no. U381638 at Interactive Brokers, LLC, for the dates February 13, 14, 15, 19 and 29, 2008, produced to the SEC by Interactive Brokers.

51. Exhibit 46 is a true and correct copy of an email from Interactive Brokers to John Lohmeier, sent February 19, 2006 at 6:19 p.m., produced to the SEC by Interactive Brokers.

**Determination of Former AFC Customer Liquidations**

52. As part of my work on this case, I have been asked to determine which former AFC customers' mutual funds were liquidated on February 13, 2008 by optionsXpress, a broker-dealer registered with the SEC.

53. I have determined that at least $8,014,177.97 of AFC customer mutual funds were liquidated from the optionsXpress account on February 13, 2008, and set forth my methodology below.

54. To make this determination, I reviewed records produced to the SEC by optionsXpress and Enterprise.

55. On February 21, 2008, optionsXpress sent an email to SEC staff members, Allison M. Fakhoury and Steven Klawans, with an attached spreadsheet that lists the securities in Enterprise's trading account that optionsXpress liquidated ("list of liquidations") on February 13, 2008. The email and attached spreadsheet are Exhibit 41.

56. Enterprise separately maintains records that purport to identify each Enterprise client's holdings in those securities.

57. In the course of the SEC's investigation, Enterprise produced order tickets ("order tickets") and schedules ("customer schedules") that purport to identify the Enterprise customers whose mutual fund holdings were liquidated on February 13, 2008, in Enterprise's account at optionsXpress. The customer schedules identify Enterprise customers who were not former AFC customers by designating them as "NON-AFC." I considered that Enterprise customers on the customer schedules who did not have the

8

designation "NON-AFC" to be former AFC customers. These documents, attached as Exhibit 42, also identify separately each mutual fund and which Enterprise customer own shares of the mutual fund.

58. The optionsXpress list of liquidations shows all 12 of the mutual funds, in addition to other securities, that optionsXpress liquidated on February 13, 2008. The following chart lists the 12 mutual funds that were liquidated:

|    | *Description*                                 | *Ticker* |
|----|-----------------------------------------------|----------|
| 1  | Pioneer Real Estate Shares Class A            | PWREX    |
| 2  | American Funds - Capital World Growth & Income| CWGIX    |
| 3  | Van Kampen Equity Income Fund                 | ACEIX    |
| 4  | Pioneer Government Income Fund Class A        | AMGEX    |
| 5  | Van Kampen Comstock Fund Cl A                 | ACSTX    |
| 6  | Lord Abbett Total Return Fund Class A         | LTRAX    |
| 7  | Rydex Series Trust – Precious Metals Fund     | RYMPX    |
| 8  | Pioneer Equity-Income Fund Class A            | PEQIX    |
| 9  | Pioneer Fund Class A                          | PIODX    |
| 10 | Pioneer Value Fund Cl A                       | PIOTX    |
| 11 | Pioneer High Yield Fund Class A               | TAHYX    |
| 12 | Pioneer Mid Cap Growth Fund Class A           | PITHX    |

59. To determine which of these liquidated mutual funds were owned by former AFC customers, I matched the order tickets for each of the mutual funds to the list of liquidations. I then matched Enterprise's customer schedules to the order tickets.

60. From matching those documents together, I created the schedule reflected in Exhibit 40, which summarizes the former AFC customers' mutual funds that were liquidated ("Summary Schedule").

61. The Summary Schedule corrects an error in Enterprise's documents that purport to identify the total amount of mutual fund holdings that were liquidated. For two of the 12 mutual funds, the order tickets show that optionsXpress cancelled the initial order to sell all of the shares of these two mutual funds and then entered an order to sell a

lower amount of shares of those mutual funds. As a result, some shares of the mutual fund remained after the liquidation. Enterprise's customer schedules for these two mutual funds, however, mistakenly showed that optionsXpress sold all of the shares for those two mutual funds. According to Enterprise's customer schedules, all of the shares of these two mutual funds were owned by AFC customers. The Summary Schedule includes the lower amount of mutual fund shares that were actually liquidated.

62. After confirming that the total amount of mutual fund holdings that optionsXpress liquidated was $9,870,921.41, I deducted certain mutual fund share amounts.

63. First, I deducted the liquidated mutual fund holdings of Enterprise customers who were not former AFC customers. According to Enterprise's customer schedules, one of the 12 mutual funds that was liquidated, Rydex Series Trust – Precious Metals Fund (symbol: RYMPX), did not contain any former AFC customer assets. The $1,681,641.48 in proceeds from the liquidation of this mutual fund is excluded on the Summary Schedule since there were no former AFC customers invested in this mutual fund.

64. In addition, according to Enterprise's customer schedules, there was one NON-AFC customer, John Sallstrom, who owned one of the mutual funds that was liquidated, Pioneer Fund A (PIODX). The $23,791.34 in proceeds from the liquidation of the mutual fund owned by John Sallstrom are also excluded on the Summary Schedule.

65. All of the other liquidated mutual funds were owned solely by former AFC customers as none were designated "NON-AFC" on Enterprise's customer schedules.

66. I then excluded liquidated mutual fund holdings of former AFC customers who possibly became managed clients of Enterprise. To do this, I reviewed the "Strategy Client List" that Enterprise produced to the SEC on December 11, 2007. The "Strategy Client List" is attached as Exhibit 20. It is my understanding that the Strategy Client List purports to be a list of Enterprise's managed clients. I identified five former AFC customers, who appear to be on the Strategy Client List, who held shares of mutual funds that were liquidated. The $151,310.62 in proceeds from the liquidation of the mutual funds owned by these five customers are also excluded on the Summary Schedule..

67. The Summary Schedule shows that the amount of mutual funds liquidated by optionsXpress on February 13, 2008 that belonged to former AFC customers, and excludes any possible Strategy Clients, to be $8,014,177.97.

68. On February 29, 2008, I participated in a telephone call with John Letteri, one of Defendants' attorneys. In that call, Letteri agreed that the value of liquidated shares of AFC customers in the optionsXpress account was approximately $8 million, and also acknowledged that Enterprise's prior productions on this subject had been incomplete.

**AFC Customers who Owned Retirement Accounts**

69. On February 28, 2008, Enterprise produced to the SEC a list of the account titles of former AFC customers who became Enterprise customers.

70. Exhibit 43 is a true and correct copy of a document produced by the Enterprise that lists the account titles of former AFC customers who became Enterprise customers.

71.  That list reflects that many of former AFC customer' account titles included designations for retirement accounts, such as "IRA," "Roth IRA," "SEP," and "403(b)."

**Lohmeier's Testimony Regarding Nevada Employee**

72.  On January 16, 2008, John Lohmeier appeared before the SEC staff and provided sworn testimony. An excerpt from his testimony is below:

```
56:19  Q  Okay. And do you have any full-time employees at
   20      the Nevada office?
   21  A  Yes.
   22  Q  And who is that?
   23  A  Chris Jones.
   24  Q  What's his position?
   25  A  Vice president of business development.
57: 1  Q  Vice president?
    2  A  Of business development.
    3  Q  And what are his duties and responsibilities?
    4  A  To develop business, service the clients that are
    5      out there.
    6  Q  He works full-time?
    7  A  He works part-time.
    8  Q  How many hours?
    9  A  I'd say 20.
57:21  Q  And how long has Chris Jones been employed by
   22      Enterprise?
   23  A  A year and a half.
```

73.  On February 29, 2008, Paul Ashworth an employee of the State of Nevada Financial Institutions Division told the staff of the SEC that he learned, after conducting an on-site exam of Enterprise in January 2008, that Jones was no longer on Enterprise's website. Mr. Ashworth further told the SEC staff that he contacted Jones on February 6, 2008, and Jones told Mr. Ashworth that he was terminated by Enterprise in December 2007 for not producing enough business.

**Enterprise's Plan to Make Customers Whole**

74. On February 29, 2008, Enterprise, through its counsel John Letteri, informed the staff of the SEC that was in the process of implementing a plan to make whole the former AFC customers whose mutual funds were liquidated.

75. Letteri broke down the plan into three categories: (a) former AFC customers whose mutual funds were being held in Enterprise's margin account at optionsXpress at the time of liquidation but who had made requests to Enterprise to transfer their mutual funds out of the custody of Enterprise prior to liquidation; (b) former AFC customers whose mutual funds were at optionsXpress at the time of liquidation but had made no request to transfer funds prior to liquidation; and (c) non-AFC customer mutual funds.

76. Letteri stated that the first category comprised mutual funds valued at $1.4 million; the second category approximately $6.6 million; and the third category approximately $1.68 million.

77. Letteri stated that as to the first category, Enterprise had repurchased the shares through US Bank and was in the process of transferring them to the accounts previously identified by these customers in their transfer requests. Letteri did not identify the source of funds for these purchases.

78. As to the second category, Letteri broke it down into two subcategories: (i) liquidated holdings had consisted of mutual funds with a Morningstar Rating of at least 4 stars; and (ii) AFC customers whose liquidated holdings had consisted of mutual funds with a Morningstar Rating of 3 stars or lower. Letteri represented the sub-group with the higher rated funds comprised only approximately $150,000 to $200,000 of the $6.6 million of AFC customer funds in this group.

13

79. Letteri said that Enterprise had re-established, at Interactive Brokers (a broker-dealer at which Enterprise has a margin account), the exact same mutual fund positions for the small subset in the higher rated funds. For the bulk of the customers, Letter represented the Enterprise had established equivalent positions, also at Interactive Brokers, but with safer securities. He identified the new portfolio by stock symbols CWGIX, SPY, SHY and GLD.

80. As to the third category of liquidated assets, which were the non-AFC customers whose mutual funds were liquidated, Letter represented that Enterprise had established equivalent positions in the identical manner as he had with the former AFC customers at Interactive Brokers for whom he had purchased the portfolio described in the prior paragraph.

81. Letteri represented that Enterprise paid for these purchases by increasing its margin debt at Interactive Brokers. Letteri represented that all of the collateral in the Interactive Brokers margin account is fee-paying, and that no additional assets had been placed in the account. Letteri did not indicate, however, whether the new securities purchased for the former AFC customers are themselves being treated as collateral by Interactive Brokers in Enterprise's margin account there.

82. Letteri stated that Enterprise intended to send a letter notifying them of the change, and that they would all be given the opportunity to revert back to their prior, liquidated holdings, if they preferred such mutual funds to the portfolio that Enterprise had selected.

83. During the phone call, I asked Letteri about what Enterprise intended to do with the stocks and bonds that had been liquidated from the optionsXpress account. This

represented $1,284,638.83. Letteri indicated that he was unaware that any stocks or bonds had been liquidated in the optionsXpress account.

84. Letteri did not inform the SEC staff during this call that on February 19, 2008, Interactive Brokers notified Enterprise that Interactive Brokers it would not longer permit Enterprise to have an account and required Enterprise's account to be closed or transferred by March 11, 2008.

85. Letteri also did not inform the SEC staff during this call that Enterprise presently has a margin debt in the account of more than $20 million. This additional information is detailed below.

**SEC Independent Understanding About Enterprise's Interactive Brokers Account**

86. Enterprise has represented that Interactive Brokers account and the US Bank account hold client assets.

87. Enterprise's account at Interactive Brokers has been approved for trading on margin. As part of my duties in this investigation, I have been monitoring Enterprise's account at Interactive Brokers. I, and other staff members of the SEC, have had oral and electronic communications with Marty Wood, Compliance Counsel for Interactive Brokers, and have also received account information on a regular basis. The following reflects my understanding of recent activities relating to Interactive Brokers. All of the balance and activity information set forth below is contained in Exhibit 45.

88. As of February 13, 2008, Enterprise's account at Interactive Brokers had a total value of $5,531,921.49. That value consisted of $147,891,651.69 in cash, negative $153,797,880.00 in short stock positions, $10,992,227.88 in long stock positions and $445,921.92 in other assets.

89. The difference between the value of the short positions in this account and the amount of cash in this account reflects a margin debt of $5,906,228.31 as of February 13, 2008.

90. On February 14, 2008 Enterprise purchased and sold securities that resulted in a net increase of $1,777,835.94 in stock and a corresponding decrease in cash of an approximately equal amount.

91. On February 15, 2008 Enterprise purchased securities that resulted in an increase of $4,494,706.00 in stock and a corresponding decrease in cash of an approximately equal amount.

92. On February 19, 2008 Enterprise purchased securities that resulted in an increase of $11,311,705.00 in stock and a corresponding decrease in cash of an approximately equal amount. Enterprise also entered into related single-stock futures contracts on this same date.

93. As of February 19, 2008, Enterprise's account at Interactive Brokers had a total value of $5,638,830.49. That value consisted of $130,360,936.18 in cash, negative $153,845,147.00 in short stock positions, $28,632,164.64 in long stock positions and $490,876.67 in other assets.

94. The difference between the value of the short positions in this account and the amount of cash in this account reflects a margin debt of $23,484,210.82 as of February 19, 2008.

95. The value of the purchases of all of the long stock in the Enterprise account at Interactive Brokers during the period from February 14 through February 19 was $17,584,246.94, which approximately equals the value of the increase in the margin

debt. The total value of the account increased $106,909.00 between February 13, 2008, and February 19, 2008.

96. Enterprise used margin debt to pay for the stock purchases between February 13, 2008, and February 19, 2008. All of the stock purchased between February 13, 2008, and February 19, 2008, is collateral in the account and at risk of liquidation in event of a margin call.

97. On February 19, 2008 Interactive Brokers informed Enterprise that Interactive Brokers had decided to require Enterprise to close its account by March 11, 2008. Interactive Brokers also informed Enterprise that its account had, effective immediately, been placed in liquidation-only status and that Enterprise could only close positions and not establish new ones. (Ex. 46)

98. As of February 29, 2008, Enterprise's account at Interactive Brokers had a total value of $4,147,679.55. That value consisted of $127,593,501.38 in cash, negative $148,838,280.77 in short stock positions, $24,838,280.77 in long stock positions and $554,202.40 in other assets.

99. The difference between the value of the short positions in this account and the amount of cash in this account reflects a margin debt of $21,244,803.62.

**Enterprise Accounts and Current Balances**

100. The SEC staff reviewed account records and communicated with various financial institutions to determine where Enterprise has brokerage, bank, or other financial accounts and determine what the balances are in those accounts.

17

101. Enterprise held the following accounts with the balances indicated as of the dates noted:

|  | Balance | Date of Balance |
|---|---|---|
| U.S. Bank | $21,915,617.29 | 2/29/2008 |
| optionsXpress, Inc. | 4,072,249.36 | 2/29/2008 |
| Interactive Brokers, LLC | 4,147,679.55 | 2/29/2008 |
| Legent Clearing, LLC | 515,826.20 | 2/29/2008 |
| LPL Financial | 7,763.57 | 2/29/2008 |
| **Total Securities** | **$30,659,135.97** | |
| Dorman Trading, LLC | 824,336.26 | 2/26/2008 |
| Leaders Bank | 842,979.52 | 2/24/2008 |
| **Total** | **$32,326,451.75** | |

102. The account value listed above for optionsXpress account differs from the account value that was set forth in Exhibit R to the Declaration of Ben Morof. This is because optionsXpress this morning identified that a transfer that had been posted to the account sometime prior to today was sent in error. optionsXpress has confirmed that the number set forth in paragraph 101 above is the correct current balance for the account.

I, John G. Haworth, declare under penalty of perjury that the foregoing is true and correct.

_____
John G. Haworth

Executed on March _3_, 2008
Chicago, Illinois

18