UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Civil Action No. |
| : | |
| ENTERPRISE TRUST COMPANY, : | Judge: |
| JOHN H. LOHMEIER, : | |
| and REBECCA A. TOWNSEND, : | Magistrate Judge: |
| : | |
| Defendants. : | |
| : | |

# DECLARATION OF BENJAMIN MOROF

(Filed by Plaintiff in Support of Motion for TRO)

## Declaration of Benjamin Morof

I, Benjamin Morof, do hereby declare under penalty of perjury, in accordance with 28

U.S.C. §1746, that the following is true and correct, and further that this declaration is made on

my personal knowledge and that I am competent to testify as to the matters stated herein:

1.      I am employed as the Chief Compliance Officer of optionsXpress, Inc.

("optionsXpress") and have been employed as such since 2001. As Chief Compliance Officer, I

am a registered principal and in charge of the brokerage regulatory compliance team.

2.      optionsXpress is a retail, online brokerage firm that offers a comprehensive suite

of brokerage services for option, stock, futures, foreign exchange, mutual fund, and fixed income

investors. optionsXpress acts as its own clearing agent. optionsXpress has more than 267,300

customer accounts as of January 31, 2008.

3.      During the course of my employment, I have become familiar with Enterprise

Trust Company ("Enterprise") and its accounts at optionsXpress.

4.      Enterprise, through its President, John Lohmeier, opened two accounts at

optionsXpress in its own name. The first account, no. 0504-7907, was opened on November 16,

2007. The second account, no. 0522-8895, was opened on January 17, 2008. Mr. Lohmeier and

Ms. Townsend were the authorized traders on account no. 0504-7907. Mr. Lohmeier was the

sole authorized trader on account no. 0522-8895. Attached as Exhibit A is a true and correct

copy of the account-opening documents for these two accounts.

5.      When Enterprise opened its retail account at optionsXpress, neither Mr.

Lohmeier, nor anyone else from Enterprise informed optionsXpress that any of the assets in the

Enterprise accounts were owned by any clients of Enterprise. Every indication provided by Mr.

Lohmeier with respect to the opening of Enterprise's margin account was that the assets in the account were corporate assets.

6.      On or about the time of the opening of the first account, Mr. Lohmeier met with optionsXpress' Vice President of Risk and Margins, Gary Morton. During the meeting, Mr. Morton asked Mr. Lohmeier about the nature of his and Enterprise's business.  Mr. Lohmeier told Mr. Morton that he owned several regional banks and some banks out west, and that he was starting up a new bank with Enterprise.

7.      In the online application for Enterprise's accounts, Mr. Lohmeier identified Enterprise as a "corporate" account, and did not indicate on the application that Enterprise would be placing assets in the margin account that were actually owned by clients, and not Enterprise. Mr. Lohmeier also did not indicate when opening or funding these accounts that he would be placing any IRA assets or other "qualified" fund into either of his accounts.

8.      Based on the information supplied by Enterprise, account No. 0504-7907 was an account approved for trading on margin, and was actively used by Enterprise for trading on margin.  For purposes of this declaration, I have termed this account the "margin account."

9.      Enterprise's second account, no. 0522-8895, was inactive until February 2008.  In February 2008 there has been some limited deposits and check-writing activity in this account. For purposes of this declaration, I have termed this account the "checking account."

10.     Attached as Exhibit B is a true and correct copy of optionsXpress' "User/Customer Agreement – Terms and Conditions."

11.     Attached as Exhibit C is a true and correct copy of optionsXpress' "Margin Disclosure Statement," a copy of which was provided to Enterprise in connection with their opening accounts at optionsXpress.

12.     Attached as Exhibit D is a true and correct copy of optionsXpress' "Portfolio Margining Disclosure Statement," a copy of which was also provided to Enterprise in connection with the opening of the Enterprise accounts at optionsXpress.

13.     Beginning on December 4, 2007, Enterprise transferred open short positions, mutual funds and other equities into its margin account at optionsXpress.

14.     Pursuant to the User/Customer Agreement – Terms and Agreements ("User/Customer Agreement"), all of the mutual funds in Enterprise's margin account were pledged as collateral for the short positions in the account.  The User/Customer Agreement includes "Appendix A – Margin Account Terms."  These terms can be found at pages 15 to 18 of the User/Customer Agreement (Ex. B).  The Margin Account Terms make clear that all of the assets in Enterprise's margin account were at risk of and subject to liquidation by optionsXpress.

15.     Attached as Exhibit E is a true and correct copy of the account statement for Enterprise's margin account for the month ending December 31, 2007.  As is reflected in this statement, Enterprise's margin account had open short positions with a market value of negative $16,586,660, and one long position in stock with a market value of $20,412, resulting in a net stock position of negative $16,566,248 as of December 31, 2007.  The Enterprise margin account also had $6,043,727.94 in cash and $15,659,390.32 in mutual funds in its margin account.  The overall value of the account as of December 31, 2007, including the mutual funds, was $5,136,870.26.  With respect to the mutual fund collateral in the margin account, the balances in the statement indicate that approximately $10,520,000 of the short stock value was collateralized by approximately $15,000,000 in mutual funds. In the event that we would have had to close out the short positions, optionsXpress would have been left with a negative balance of approximately $10,520,000 and with only the mutual funds available to satisfy that debit.

16.    Attached as Exhibit F is a true and current copy of the account statement for Enterprise's margin account for the month ending January 31, 2008. As is reflected in this statement, Enterprise's margin account had open short positions with a market value of negative $116,100,222, and long positions in stock with a market value of $514,489, resulting in a net stock position of negative $115,585,733 as of January 31, 2008. The Enterprise margin account also had $1,070,176.56 in bonds $103,995,045.38 in cash, and $13,807,666.02 in mutual funds in its margin account. The overall value in the account as of January 31, 2008, including the mutual funds, was $3,287,154.96. With respect to the mutual fund collateral in the margin account, the balances in the statement indicate that approximately $11,590,000 of the short stock value was collateralized by approximately $14,870,000 in mutual funds and bonds. In the event that we would have had to close out the short positions, optionsXpress would have been left with a negative balance of approximately $11,590,000 and with only the mutual funds and bonds available to satisfy that debit.

17.    Attached as Exhibit G is a true and correct copy of the Account Balance report for the margin account as of 12:25 p.m. (ET) on February 7, 2007. This statement shows that the open short stock position in the margin account had grown to $121,497,532. In the event that we would have had to close out the short positions, optionsXpress would have been left with a negative balance of approximately $11,778,000 and with only the mutual funds and bonds available to satisfy that debit.

18.    On February 6, 2008, optionsXpress' compliance department learned that Enterprise had been submitting numerous transfer requests seeking to move mutual funds and other securities out of its margin account  to accounts in the names of various individual customers (and not of Enterprise) located at various other broker-dealers.

19.    optionsXpress became immediately concerned upon learning this, because Mr. Lohmeier had opened the margin account as a corporate account, and had provided no indication to optionsXpress that the funds belonged to any individuals other than Enterprise at the time the account was opened.  Among the questions and concerns raised by this discovery were: (a) why was Enterprise transferring assets into the names of individual customers given that the account was a corporate account; (b) if these were not Enterprise's assets, then whose assets were they; and (c) if these were not Enterprise's assets, did the beneficial owners of the assets authorize the use of their assets as collateral in Enterprise's corporate margin account?

20.    The compliance department also became aware from its review of these requests that some of the requests sought the transfer out of securities into IRA accounts, 403b accounts and other retirement accounts that are considered "qualified" plans pursuant to IRS regulations. This raised additional concerns about whether Enterprise had pledged "qualified" assets as part of the collateral in its margin account, since it was our understanding that such commingling is generally prohibited pursuant to IRS regulations.

21.    On February 7, 2007, Hillary Victor, optionsXpress' Corporate Counsel, and I contacted Enterprise by telephone to discuss these concerns.  Also participating in the call for optionsXpress was Nathan Goodman, our Head of Institutional Trading.  We spoke with Rebecca Townsend, an Enterprise V.P.  During this conversation, Ms. Townsend informed us that at least some of the mutual funds in the Enterprise margin account at optionsXpress did in fact belong to underlying Enterprise clients, and not to Enterprise.

22.    Ms. Victor, Mr. Goodman, and I contacted Enterprise later that day and spoke again with Ms. Townsend.  During that conversation, we expressed concern about the use of customer assets in a corporate margin account and about the commingling of "qualified"

5

retirement funds with unqualified funds, and questioned whether the customers had authorized

the use of their assets in the account in this manner.  We informed Ms. Townsend that, among

other things, we needed to determine Enterprise's authority to get margin and do what it was

doing in that account.

      23.    Ms. Townsend stated in response that the customers had in fact authorized such

use, and said that she would send optionsXpress a copy of Enterprise's private portfolio

agreement.  She also indicated that Enterprise also maintained risk questionnaires for customers.

      24.    Ms. Townsend sent an email at 10:16 a.m. the next day to optionsXpress attaching

two PDFs, each containing a different version of a document entitled "Private Portfolio

Investment Agency Agreement" that was written on Enterprise letterhead.  Neither version was

filled out or signed.  The two forms were substantially identical, except that the second version

contained a new paragraph 5 at the bottom of the first page, which added to Enterprise's other

discretionary powers the power to pledge or hypothecate securities and commingle them with

"securities carried for other customers in an omnibus account which has margining capability."

One other difference is that the first PDF included an additional one page document, entitled

"Margin Account Disclosure Statement," that appears to have been a document prepared by

Legent Clearing.

      25.    In her email, Ms. Townsend stated that the first form was the basic discretionary

agreement that every Enterprise client signs, and that the second form had been revised for 2008

after a company and legal review.  Attached as Exhibit H is a true and correct copy of this email,

along with true and correct copies of print-outs of the PDFs attached to the email.

      26.    Ms. Victor, Mr. Goodman, and I called Enterprise later same morning to continue

our discussions about the margin account.  Both Mr. Lohmeier and Ms. Townsend participated in

this call. During this second call, Mr. Lohmeier expressed surprise at some of optionsXpress'

concerns, and informed us that he has an identical margin account arrangement at Interactive

Brokers, a different brokerage firm. Mr. Lohmeier also offered that his lawyers would provide a

legal opinion on the legality of commingling "qualified" with unqualified securities in a margin

account.

28.    Mr. Lohmeier stated during the call that the investment agreement expressly

permitted Enterprise to do margins and short selling, and referred us to the two PDFs that Ms.

Townsend had sent us that morning.

28.    Ms. Victor reviewed the documents and noticed that neither of the two forms of

investment agreement included shorting stock among the list of permitted investments in

paragraph 6 of the agreement. She communicated this fact to Mr. Lohmeier. In response, Mr.

Lohmeier stated that Ms. Townsend had sent the wrong form by mistake. He said that the

document Ms. Townsend sent us must have been an old version, and that the new version had the

short language on it. Mr. Lohmeier asked Ms. Townsend to find and send to optionsXpress the

version of the agreement which contained the short sale language.

29.    Later during the morning of February 8, we received another email from Ms.

Townsend. This email attached a PDF containing a new, blank version of Enterprise's

discretionary agreement. This version was substantially similar to the second form, except that,

among the differences, this one added "shorting securities" to the list of permitted investments

set forth at paragraph 6 of that document. Attached hereto as Exhibit I is a true and correct copy

of this third version of Enterprise's discretionary agreement.

30.    Later during this same day, the same group of participants had another telephone

discussion, in which I informed Ms. Townsend and Mr. Lohmeier that optionsXpress remained

uncomfortable with the way in which the account was being used and sought further assurances and documentation relating to the margin account. I indicated to Enterprise that optionsXpress would not be able to continue to allow any risk in the account unless it received sufficient comfort as to the legality and appropriateness of the way in which the account was being used. I asked Enterprise to provide optionsXpress with copies of that third form of investment agreement that had actually been signed by customers whose mutual funds had been placed in the margin account, and also to provide a legal opinion in support of Mr. Lohmeier's contention that Enterprise was legally permitted to co-mingle IRA funds and other "qualified" assets with unqualified assets in the margin account.

31.    Enterprise never provided this requested information.

32.    Attached as Exhibit J is a true and correct copy of an optionsXpress computer screen print taken from the account balances page for the margin account as of 1:30 p.m. on February 12, 2008. This screen print shows that with respect to the mutual fund collateral in the margin account, the balances in the statement indicate that approximately $11,746,000 of the short stock value was collateralized by approximately $14,336,000 in mutual funds and bonds. In the event that we would have had to close out the short positions, optionsXpress would have been left with a negative balance of approximately $11,746,000 and with only the mutual funds and bonds available to satisfy that debit.

33.    On February 13, 2008, optionsXpress' Risk Management Group determined that it was no longer willing to allow Enterprise to have risk in its account, and issued a margin "risk" call, notifying Enterprise that it was required it to deposit $11,000,000 in cash into the margin account due to optionsXpress' concern as to the risk that the margin account presented, and Enterprise's failure to satisfy optionXpress's compliance department's requests for information

8

concerning the ownership of the collateral used by Enterprise in the margin account. At the time of the margin call, Enterprise had open short positions of approximately $121 million, and cash in the account of only approximately $109 million. Attached as Exhibit K is a true and correct copy of the notification of the risk call.

34.    In response to the margin call, Enterprise informed optionsXpress that it would not be meeting the $11 million margin call.

35.    On February 13, 2008, optionsXpress began to liquidate Enterprise's margin account. To accomplish this, optionsXpress first closed Enterprise's open short positions. To close out these short positions, optionsXpress purchased stock at a cost of approximately $121 million, leaving a negative balance of approximately $11 million dollars in the margin account, as there was only approximately $110 million of cash in the account to pay for the closing out of those short positions.

36.    In order to satisfy Enterprise's $11 million debt to optionsXpress, optionsXpress then liquidated Enterprise's collateral, beginning with orders to liquidate the stocks and bonds, and then the largest mutual fund positions. optionsXpress liquidated $11,155,353 of Enterprise's securities. Attached as Exhibit L is a true and correct copy of a report prepared by optionsXpress which identifies all of the positions that were liquidated by optionsXpress on February 13, 2008.

37.    Of this amount, optionsXpress applied $10,786,283 to satisfy Enterprise's negative balance.

38.    As of 9:36 a.m. on February 14, 2008, after closing out all short positions and liquidating assets to eliminate the debit in the account, the balance of all remaining cash and securities in the Enterprise margin account was $4,250,785.14, which included $3,776,983.43 in securities. This information is set out in the Exhibit M, which is a true and correct copy of an

Account Overview created by optionsXpress showing all account positions for the margin account as of that time.

     39.    optionsXpress has frozen the remaining assets in both of Enterprise's accounts, which consist of bonds and mutual funds that optionsXpress did not need to liquidate to satisfy Enterprise's debt, plus whatever cash remained in the account.

     40.    Attached as Exhibit N is a true and correct copy of an untitled trading activity printout showing all activity in Enterprise's margin for the period from December 5, 2007 through February 15, 2008.

     41.    On February 21, 2008, I notified Enterprise in by email of the restrictions on the accounts. In that email, I restated the reason for the restriction, repeated our prior request for information, and indicated that we would review the information received and may require additional information as we believed necessary to assess our risk and to the extent necessary to resolve it. A true and correct copy of this notification is attached as Exhibit O. As of the date of this Declaration, Enterprise Trust Company has provided us with no information in response to that letter.

     42.    On February 22, 2008, at 5:41 p.m., optionsXpress received a fax titled Trust Custody ACAT Submission. This submission sought the transfer of all of Enterprise's securities held in the margin account to an NSF account of US Bank FBO Leaders & Company FBO Enterprise, account no. U19 303836. Attached as Exhibit P is a true and correct copy of this document.

     43.    optionsXpress did not process the faxed ACAT Submission.

     44.    On February 25, 2008, at 12:26 pm, optionsXpress received an ACAT request electronically through the NSCC System, seeking a transfer of Enterprise's securities holdings

from optionsXpress account 0504-7907 on behalf of NFS account U19303836. A true and correct copy of this ACAT request is attached as Exhibit Q.

     45.    optionsXpress electronically rejected this request the same day.

     46.    Attached as Exhibit R is a true and correct copy of reports created by optionsXpress showing the account balances for the two Enterprise accounts as of the close of business on Friday, February 29, and 2008. As of that time, the value of Enterprise's checking account was $5,000.05, the value of the margin account was $5,069,000.35.

     47.    With the exceptions of Exhibits P and Q, all of the documents attached to this declaration were (a) made at or near the time of the occurrence of the matters set forth herein by optionsXpress employees with knowledge of those matters, (b) was kept in the course of the regularly conducted activity, and (c) was made by the regularly conducted activity as a regular practice. I am personally familiar with all and understand all of the documents attached to this declaration.

I, Benjamin M. Morof, declare under penalty of perjury that the foregoing is true and correct.

Executed on this 29th day of February, 2008.

Benjamin Morof

## Index of Exhibits to Benjamin Morof Declaration dated February 2, 2008

| | |
|---|---|
| Ex. A | Account opening documents for Enterprise Trading Co. accounts at optionsXpress. (*personal information redacted*) |
| Ex. B | optionsXpress User/Customer Agreement – Terms and Conditions. |
| Ex. C | optionsXpress Margin Disclosure Statement. |
| Ex. D | optionsXpress Portfolio Margining Disclosure Statement. |
| Ex. E | optionsXpress Account Statement for Enterprise's margin account for month ending Dec. 31, 2007. |
| Ex. F | optionsXpress Account Statement for Enterprise's margin account for month ending Jan. 31, 2008. |
| Ex. G | optionsXpress Account Balance report for Enterprise margin account as of Feb. 7, 2008, 12:25 p.m. ET. |
| Ex. H | Email thread including email from Rebecca Townsend to Benjamin Morof and Nathan Goodman, sent Feb. 8, 2008, 10:01 a.m.., and attaching two PDF files. |
| Ex. I | Email thread including email from Rebecca Townsend to John Lohmeier and copying Benjamin Morof and Nathan Goodman, sent Feb. 8, 2008, 11:05 am., and attaching one PDF file. |
| Ex. J | optionsXpress screen print taken from account balance pages of Enterprise margin account as of 1:30 p.m. on Feb. 12, 2008. (*personal information redacted*) |
| Ex. K | Email from Morof to Lohmeier and Townsend, sent Feb. 13, 2008, 11:22 a.m. |
| Ex. L | optionsXpress report identifying all Enterprise margin account positions liquidated on Feb. 13, 2008. |
| Ex. M | optionsXpress Account Overview for Enterprise margin account as of Feb. 14, 2008, 9:36 a.m. ET. |
| Ex. N | optionsXpress activity report showing all activity in Enterprise margin account for the period Dec. 5, 2007 through Feb. 15, 2008. |
| Ex. O | Email from Morof to Lohmeier and Townsend with copy to Enterprise counsel, sent Feb. 21, 2008, 3:22 p.m. |
| Ex. P | Fax from Fidelity Investments to optionsXpress on Feb. 22, 2008 requesting transfer out of optionsXpress of all mutual fund assets in Enterprise's margin account. |
| Ex. Q | Electronic request received by optionsXpress from NFS on Feb. 25, 2008 for automated electronic transfer out of optionsXpress of all mutual fund assets in Enterprise account. |
| Ex. R | optionsXpress Account Balance report and Account Overview for optionsXpress as of Feb. 29, 2008, 4:03 p.m. ET. |

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | :   Civil Action No. |
| ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER, and REBECCA A. TOWNSEND, | : |
| Defendants. | : |

## CERTIFICATE OF SERVICE

I, the undersigned, declare that on this 3rd day of March 2008, I caused copies of the following documents

1.  Emergency Motion for a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief
2.  Memorandum In Support of Its Emergency Motion For a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief
3.  Proposed Asset Freeze Order
4.  Proposed Temporary Restraining Order and Order for Emergency Relief
5.  Motion to File Brief in Excess of 15 Pages
6.  Notice of Emergency Motion
7.  Complaint
8.  Declaration of John Haworth
9.  Declaration of Benjamin Morof
10. Compendium of Exhibits

to be served on the John Letteri and Peter Unger, Esq., at their physical and email addresses as listed below, by electronic transmission and overnight delivery, except for item 10 and the exhibits attached to item 9, which I caused to be served via overnight delivery only.

Peter Unger, Esq.
John Letteri, Esq.

Howrey, LLP
1299 Pennsylvania, Ave, NW
Washington, DC 20004-2402
UngerP@howrey.com
LetteriJ@howrey.com


_____
Steven Levine