## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| v. | : | **Civil Action No.** |
| | : | |
| **ENTERPRISE TRUST COMPANY,** | : | |
| **JOHN H. LOHMEIER,** | : | |
| **and REBECCA A. TOWNSEND,** | : | |
| | : | |
| **Defendants.** | : | |
| | : | |

## PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS EMERGENCY MOTION FOR A TEMPORARY RESTRAINING ORDER, ASSET FREEZE, APPOINTMENT OF RECEIVER AND OTHER ANCILLARY RELIEF

## TABLE OF CONTENTS

INTRODUCTION............................................................................................1

STATEMENT OF FACTS.............................................................................3

     A.    Enterprise's Business Activities ............................................3
     B.    The Advisory Financial Consultants Transaction........................6
     C.    Enterprise's Solicitation of the AFC Customers - False Statements
         and Material Omissions ............................................................7
     D.    Enterprise's Misuse of the Customers' Assets...........................10
     E.    Lohmeier's Misrepresentations to Legent...................................14
     F.    The options Xpress Account: Deception Followed By
         Liquidation................................................................................14
     G.    Concerns Regarding the Dissipation of Investor Funds
         and Continued Fraud.................................................................18

ARGUMENT...............................................................................................19

         I.   Defendants Should be Temporarily Restrained from Further
         Violation of the Securites Laws..................................................20

         II   Enterprise, Lohmeier and Townsend Violated Section 10(b) of
         the Exchange Act and Rule 10b-5 Thereunder............................20

             A.   The Proposed Defendants Made Misrepresentations
         and Omissions of Fact...............................................................21

             B.   The Proposed Defendants' Misrepresentations
         and Omissions of Fact Were Material .......................................22

              C.   The Proposed Defendants Acted With Scienter........................23

               D.   The Misrepresentations and Omissions Were In
                  Connection With the Purchase or Sale of Securities .................24

         III   Lohmeier Aided and Abetted Enterprise's Violations Section
             10(b) of the Securities Exchange Act of 1934 and and Rule 10b-
             5 Thereunder  ...........................................................................25
         IV.   Lohmeier Is Liable For Enterprise's Violations
             as a Control Person ...................................................................26
         V.   The Defendants Are Likely to Continue Their Illegal
         Conduct.....................................................................................27
         VI.   An Asset Freeze and Other Ancillary Relief are

        Necessary and Appropriate Against Lohmeier,
        Townsend and Enterprise............................................................ 29

VII.    Appointment of a Receiver is Necessary
        and Appropriate ........................................................................31

**CONCLUSION** ................................................................................................32

# TABLE OF AUTHORITIES

Basic Inc. v. Levinson, 485 U.S. 224 (1988)...................................................................20

Ernst & Ernst. v. Hochfelder, et. al., 425 U.S. 185 (1976)..............................................20

Harrison v. Dean Witter Reynolds, Inc.,
    974 F.2d 873 (7th Cir. 1992), cert. denied, 509 U.S. 904 (1993)............................26

J.I. Case Co. v. Borak, 377 U.S. 426 (1964)...................................................................31

Makor Issues & Rights, Ltd. V. Tellabs Inc.,
    513 F.3d 702 (7th Cir. January 17, 2008).................................................................20

Monetta Financial Services, Inc. v. SEC,
    390 F.3d 952 (7th Cir. 2004).....................................................................................25

SEC v. Black, 2005 WL 1498893 (N.D. Ill. June 17, 2005)............................................26

SEC v. Bowler, 427 F.2d 190 (4th Cir. 1970).................................................................31

SEC v. Cavanagh, 155 F.3d 129 (2d Cir. 1998).......................................................19, 29

SEC v. CreditBancorp, Ltd., 195 F.Supp.2d 475 (S.D.N.Y. 2002).................................24

SEC v. General Refractories, 400 F. Supp. 1248 (D.D.C. 1975)....................................29

SEC v. Hollnagel, 503 F. Supp.2d 1054 (N.D. Ill. 2007)...............................................19

SEC v. Holschuh, 694 F.2d 130 (7th Cir. 1982).............................................................27

SEC v. Infinity Group Co., 212 F.3d 180 (3rd Cir. 2000)...............................................29

SEC v. International Swiss Inv. Corp.,
    895 F.2d 1272 (9th Cir. 1990).....................................................................................3

SEC v. Keller Corp., 323 F.2d 397 (7th Cir. 1963)........................................................31

SEC v. Koenig, 469 F.2d 198 (2nd Cir. 1972)................................................................31

SEC v. Manor Nursing Centers, Inc.,
    458 F.2d 1082 (2d Cir. 1972)...............................................................................29, 31

SEC v. Materia, 745 F.2d 197 (2nd Cir. 1984)...............................................................31

SEC v. McConville, 465 F.3d 780 (7th Cir. 2006)..........................................................20

SEC v. Randy, 38 F.Supp.2d 657 (N.D. Ill. 1999)..........................................................21

SEC v. Unifund Sal, 910 F.2d 1028 (2d Cir. 1990).........................................................29

SEC v. Wenke, 622 F.2d 1363 (9th Cir. 1980)................................................................29

SEC v. Zandford, 535 U.S. 813 (2002)...........................................................................25

SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301 (2nd Cir. 1971)....................................31

United States v. Kendrick, 692 F.2d 1262 (9th Cir. 1982)..............................................24

Wilhelm v. A.G. Edwards & Sons, Inc.,
    61 Fed.Appx. 272 (7th Cir. 2003)..............................................................................24

## INTRODUCTION

Plaintiff, the United States Securities and Exchange Commission ("Commission"), respectfully submits this memorandum in support of its Emergency Motion for a Temporary Restraining Order, Asset Freeze Order, Order Appointing Receiver, and Other Ancillary Relief ("Emergency Motion"). The SEC brings this Emergency Motion to prevent further dissipation of customer assets and to protect investors from further harm by Defendants.

This action involves fraud in connection with the purchase and sale of securities by Defendants Enterprise Trust Company ("Enterprise"), its president and controlling shareholder, John H. Lohmeier ("Lohmeier") and its vice-president, Rebecca A. Townsend ("Townsend"). This emergency motion arises from Defendants' misuse of millions of dollars of their "custodial" clients' mutual funds as collateral in margin accounts to support a trading strategy for the benefit of Defendants and their preferred clients. Using custodial clients' securities as collateral, Defendants were able to establish or maintain large open short positions and highly leveraged trading in those accounts. Defendants did not disclose to the custodial clients, many of whom were retirees whose holdings consisted primarily of IRAs or other retirement accounts, that Enterprise would be using their mutual funds to create or maintain large trading positions for the benefit of other customers. Defendants paid them no compensation for this use, and did not obtain any written or other authorization for this use. Instead, Defendants provided false assurances to these mutual fund holders that their mutual funds would remain safe, and that Defendants would make no changes to their custodial accounts without the customers prior approval. By placing these mutual funds in an omnibus margin trading account, Defendants put these investors' securities at risk of being liquidated to satisfy margin calls and margin debt.

That risk has now been realized for many of Enterprise's custodial clients. On February 13, 2008, optionsXpress, one of the clearing broker-dealers with whom Enterprise maintained large open short positions and margin deficits secured by collateralizing its custodial clients' mutual funds, became uncomfortable with the nature of the collateral being held in its margin account. After Enterprise failed to provide optionsXpress adequate assurances that Enterprise

had obtained authorization from its clients to use their securities as collateral, optionsXpress liquidated Enterprise's positions. The result: $11 million of custodial clients' assets were liquidated.

This past Friday, February 29, 2008, Defendants, through their counsel, informed the SEC that they have repurchased all of the mutual funds of the liquidated investors. However, this "solution" is likely no solution at all, as the repurchases were made in yet another margin account (this time at Interactive Brokers, LLC), thus putting the custodial clients in exactly the same position that they were in before, with their assets pledged as collateral in a margin account for someone else's benefit. Making matters worse, these securities were purchased in a margin account that already had a large margin deficit and large open short positions, and paid for these purchases by increasing their margin debt, which has grown to more than $20 million as of February 29. And even worse still, the broker-dealer has informed Defendants that it is closing the account on March 11, 2008. With only $4 million in equity in that account, and $20 million in debt, and more than $100 million in open short positions, it is likely that the custodial clients' funds are going to be liquidated once again come March 11. Defendants have provided no indication that they have the cash to satisfy this margin debt.

Also of concern is the fact that Enterprise has hundreds of other custodial clients whose securities Defendants may also be, at present or in the future, pledging as collateral. Defendants have provided no assurances that: (1) no custodial clients' securities are being used as collateral for any margin account; (2) Enterprise has assets available to repay the group of injured custodial clients without causing burden or injury to other of their clients; or (3) Defendants have any intention of ceasing their unlawful use of custodial client securities. All of these recent events have made clear that immediate judicial intervention is necessary to protect Enterprise's custodial clients' assets from further risk of misuse and dissipation, and to intervene to prevent further harm and figure out how to best resolve the problems caused by Defendants unlawful conduct.

For these reasons, and the others discussed below, the SEC respectfully requests this Court for: (1) a temporary restraining order against future violations by all Defendants; (2) an

immediate freeze of all assets of Lohmeier; (3) an immediate freeze of all corporate assets of Enterprise and brokerage and bank accounts held in the name of Enterprise, including all omnibus trading accounts; (4) an order requiring Defendants to provide an immediate accounting of all funds received from investors as well as an accounting of their own assets; (5) an order immediately appointing a receiver over Enterprise; (6) an order prohibiting the destruction of any records; and (7) such further relief as the Court may deem appropriate.

## STATEMENT OF FACTS[1]

As is alleged in the complaint, the facts below deal with one particular group of clients who were defrauded – termed the "custodial AFC customers." These are the ones who were most injured by the recent developments at optionsXpress. These clients represent less than half of Enterprise's custodial client base of approximately 800 accounts, and it is likely that the same unauthorized pledging of their securities as collateral has been occurring, and may be continuing to occur in other margin accounts.

### A.    Enterprise's Business Activities.

Enterprise Trust Company ("Enterprise") was formed by John H. Lohmeier ("Lohmeier") and Rebecca A. Townsend ("Townsend") and chartered as a trust company by the State of Nevada on or about November 18, 2005. (Haworth Dec., ¶¶8, 9, Ex. 3, 4)  Lohmeier has a 100% ownership interest in Enterprise.  (Haworth Dec., ¶42, Ex. 37)  Enterprise purports to provide several services to its clients, including asset and investment management and custodial services. (Lohmeier Tr., Ex. 1, pp. 40:10-41:9)  In January 2006, Lohmeier and Townsend set up an office for Enterprise in Oak Brook, Illinois. (Lohmeier Tr., Ex. 1, pp.40:10-41:9)  Shortly thereafter, on January 24, 2006, the State of Illinois Department of Financial and Professional Regulation ("DFPR") issued an Order to Cease and Desist to Enterprise, Lohmeier and Townsend.

---

[1]   The facts set forth in this memorandum are supported by the Declarations of SEC staff accountant John Haworth; a separately bound compendium of exhibits thereto; and the Declaration of Scott Morof, the Chief Compliance Office of OptionsXpress, along with exhibits attached to his declaration.  Included among the exhibits to the Hayworth Declaration are sworn testimonies of Defendants Lohmeier (Ex. 1) and Townsend (Ex. 2). The Lohmeier testimony was taken by the SEC on January 16, 2008.  Townsend's testimony was taken by the Financial Industry Regulatory Authority, Inc. ("FINRA") on January 17, 2008.  In those testimonies, Defendants have already admitted to the basic fraudulent conduct. They just don't see anything wrong with it.

(Haworth Dec., ¶10, Ex. 5)  On March 29, 2006, the DFPR issued a Consent Order prohibiting Enterprise from using the word "trust" in its business name unless it obtained authorization from the DFPR.  (Haworth Dec., ¶11, Ex. 6)  The Consent Order also prohibited Enterprise, Lohmeier and Townsend from conducting any activity as corporate fiduciaries or holding themselves out as available to act as fiduciaries in Illinois without authorization from the DFPR.  (Haworth Dec., ¶11, Ex. 6)  The Consent Order was issued because the DFPR found that Enterprise, Lohmeier and Townsend conducted a trust business in Illinois without the authority to do so. (Haworth Dec., ¶11, Ex. 6)  After the Consent Order was issued, Enterprise, Lohmeier and Townsend continued to operate out of Enterprise's Oak Brook, Illinois office.  (Lohmeier Tr., Ex.1, pp. 59:13-62:25)  Enterprise conducts most, if not all, of its business out of its Illinois office given that it does not have any employees in Nevada and has 6 employees in its Illinois office. (Lohmeier Tr., Ex.1, pp 59:13-62:25)[2]

Enterprise purports to have two types of investment accounts: managed and custodial. (Lohmeier Tr., Ex. 1, pp. 40:22-41:17)  For the managed accounts, Enterprise made investment decisions on behalf of the clients.  (Lohmeier Tr., Ex. 1, pp. 41:13-42:21)  According to Lohmeier, the managed clients paid an investment management fee to Enterprise equal to .5% to 1.5% of their assets under management.  (Lohmeier Tr., Ex.1, pp. 50:18-25; 51:11-15)  For the custodial accounts, Enterprise merely acted as a custodian.  As custodian, Enterprise holds the assets, prepares and distributes quarterly statements, and collects and distributes income. (Lohmeier Tr., Ex. 1, pp. 51:17-52:9)  Lohmeier admitted that, for all of the custodial accounts, Enterprise would not change anything about the account without first discussing the change with the client and would not make trades on their behalf.  (Lohmeier Tr., Ex. 1, p. 139:7-22) Lohmeier testified that he was required to act in the custodial clients' best interests "across the board."  (Lohmeier Tr., Ex. 1, pp. 148:3-6)  According to Lohmeier, Enterprise charged the custodial clients between $10 and $85 per year. (Lohmeier Tr., Ex. 1, pp. 50:22-51:4; 148:18-149:5)

(..continued)

---

[2] On January 16, 2008, Lohmeier testified that Enterprise has one part time employee in its Nevada office. However, an official from the State of Nevada Division of Banking has recently informed the SEC that the Division has confirmed that this employee was terminated in December 2007.  (Haworth Dec., ¶¶ 73, 74 )

Throughout most of 2006, Enterprise was challenged by limited cash resources and frequent margin calls in its accounts. (Haworth Dec., ¶¶12, 13, Exs. 7, 8)  In 2006, Enterprise suffered a net loss of $358,620.79. (Haworth Dec., ¶12, Ex. 7)  In 2006, most of Enterprise's clients' securities were held in a trading account at Legent Clearing LLC ("Legent"), an independent clearing broker-dealer. (Haworth Dec., ¶17, Ex. 12)  Enterprise opened this account on April 10, 2006 through Traderight Securities, Inc., an Illinois-based broker-dealer, which served as the introducing broker-dealer for the account. (Haworth Dec., ¶14, Ex. 9)  On or about May 31, 2006, Lohmeier signed Legent's Margin Account Agreement ("Margin Agreement") which permitted Enterprise to trade in the account on margin.[3]  (Haworth Dec., ¶15, Ex. 10)  The Margin Agreement explained that that the "[s]ecurities in a margin account are registered in Legent's name and are collateral for any margin loan" and that "[i]f...adequate collateral does not exist, it may be necessary to issue a call (request) for additional margin collateral (cash or deposit of additional marginable securities)." (Haworth Dec., ¶15, Ex. 10)  It also stated that "[i]f you do not meet a margin call, Legent may liquidate securities in the account to...satisfy the call" and that "Legent can sell your securities or other assets without contacting you." (Haworth Dec., ¶15, Ex. 10)  It further stated that "to satisfy Legent's policy regarding margin maintenance requirements, Legent may, in its discretion, require You to provide additional collateral or liquidate any part of the Property held in Your Account.  Without limitation, any of the following circumstances may give rise to Legent's exercise of this power: ...(vi.) the occurrence of any event which, in Legent Clearing's judgment, operates to impair Client's ability to perform its obligations under this Margin Agreement." (Haworth Dec., ¶15, Ex. 10)

Beginning in June 2006 and continuing through September 2007, Lohmeier engaged in extensive margin trading in the Legent account. (Haworth Dec., ¶13, Ex. 8)  Lohmeier was responsible for all of the trading decisions in the Legent account and all of Enterprise's trading accounts. (Lohmeier Tr., Ex. 1, pp. 42:22-25)  Immediately after beginning this trading, Legent issued numerous margin calls to Enterprise because Enterprise did not have enough collateral in its account to support Lohmeier's trading. (Haworth Dec., ¶¶13, 16, 17, Ex. 8, 11, 12)  During

---

[3] A margin account is an account in which a customer may purchase securities with a loan given by the broker.  The broker's loan is collateralized with the customer's cash or securities in the account.  If the value of the securities in the account decline, the value of the collateral may decline as well.  In such a case, the broker will require the customer to deposit additional cash or securities into the account, or sell some of the positions to generate additional cash.  When a broker asks its customer for additional collateral in the account, this is called a margin call.  A broker's determination of when to require a customer to deposit additional collateral and how much collateral is

the summer of 2006, Lohmeier was seeking to acquire additional assets through the acquisition of a financial advisor. (Haworth Dec., ¶18, Ex. 13)

## B.    The Advisory Financial Consultants Transaction.

In 2006, Ruthe Gomez ("Gomez"), the 83 year-old owner of Advisory Financial Consultants ("AFC"), a San Francisco-based broker-dealer, decided that she wanted to retire soon and began looking for a company to which she could sell her business and transfer her brokerage customers' accounts. (Haworth Dec., ¶21, Ex. 16) At that time, the total value of the assets held in the AFC accounts was approximately $100 million and nearly all of the securities in the accounts were mutual funds. (Lohmeier Tr., Ex.1, pp.101:6-8; 156:19-157:1) A significant number of the AFC brokerage accounts were owned by investors approaching retirement or already retired. (Lohmeier Tr., Ex.1, pp. 89:24-90:14) Additionally, many of the accounts were Individual Retirement Accounts and 403(b) plans. (Haworth Dec., ¶¶ 71, 72) Gomez did not have discretionary authority over the AFC customers' accounts.

AFC and Enterprise were introduced to each other in September of 2006. (Townsend Tr., Ex. 2, pp 50:10-51:15) Gomez conducted the negotiations on behalf of AFC, and Townsend was the main contact person for Enterprise. (Townsend Tr., Ex. 2, p. 39:9-16) Enterprise and Traderight considered a possible joint purchase of AFC after which Traderight would be the broker for all of the AFC customer accounts and Enterprise would solicit these customers to become Enterprise clients who paid a fee to have Enterprise manage their money. (Lohmeier Tr., Ex. 1, pp. 92:20-25; Townsend Tr., Ex. 2, pp. 56:23-60:6) Lohmeier and Enterprise were interested in pursuing this transaction because Enterprise could earn investment management fees from any of the AFC customers who converted to a fee-based account and, as discussed below, use the AFC customers' mutual funds as collateral in Enterprise's margin accounts. (Lohmeier Tr., Ex. 1, pp. 94:24-95:13; Ex. ¶18, Ex. 13) As early as August of 2006, Lohmeier told Traderight that he intended to transfer all securities acquired as a result of the AFC transaction into Enterprise's margin account at Legent. (Haworth Dec., ¶18, Ex. 13) As he put it to a

(..continued)
governed by federal law, rules promulgated by FINRA, and the broker's own margin policies. (*See* Ex. 38 for basic information on what "margin" means.)

Traderight associate in an email on August 22nd, "It is critical that you understand that I want the whole block put into our account, whether managed or not." (Haworth Dec., ¶18, Ex. 13)

In December 2006, the parties consummated the transaction. AFC entered into an agreement to sell approximately 1800 retail brokerage accounts to Enterprise and Traderight, jointly, via a shell corporation that Lohmeier, Townsend and the principals of Traderight formed named Locke Haven, LLC ("Locke Haven"). (Haworth Dec., ¶19, Ex. 14) Locke Haven agreed to pay Gomez up to $450,000; $225,000 up front for the transfer of the AFC accounts to Traderight, and an additional $225,000 if more than 50% of the AFC customers' assets were then transferred to Enterprise. (Haworth Dec., ¶19, Ex. 14) Pursuant to the parties' agreement, in January 2007, all of Gomez's customers' accounts and assets were transferred to Traderight as the new broker-dealer and Gomez became a registered representative for Traderight. (Haworth Dec., ¶19, Ex. 14) AFC was paid $225,000 for the account transfers to Traderight; $77,000 by Enterprise and $148,000 by Traderight. (Haworth Dec., ¶20, Ex. 15)

C.    **Enterprise's Solicitation of the AFC Customers – False Statements and Material Omissions**

Soon after the AFC customer accounts were transferred to Traderight, Enterprise and Gomez solicited many of the former AFC customers to become clients of Enterprise and transfer their mutual funds to Enterprise. (Townsend Tr., Ex. 2, pp. 148:19-150:23; ¶21, Ex. 16) Enterprise and Gomez worked together to prepare materials and mail packets, sometimes from Enterprise's offices, to the AFC customers in order to inform them of the transition from AFC and to induce them to become Enterprise clients and transfer their mutual funds to Enterprise. (Townsend Tr., Ex. 2, pp. 148:19-150:23) The packets typically included a January 2007 letter on AFC's letterhead signed by Gomez, an "Enterprise Trust Co. Private Portfolio Investment Agency Agreement" (the "Investment Agreement"), a Legent "Asset Transfer Form" and a letter from the president of Traderight explaining the transfer from AFC to Traderight. (Townsend Tr., Ex. 2, pp.148:19-150:23) The January 2007 letter included in the customer packet stated that Gomez was pleased to announce "our merger with Enterprise Trust Company." (Haworth Dec., ¶21, Ex. 16) The letter went on to state: "Enterprise will fulfill the role of a successor for me in

the future, but also provide value today.  In order to accomplish this though, we do need to organize somewhat differently how we report your account to you.  *Your current funds will remain unchanged.*  No new fees will be assessed as we make this transition to the new company.  *The only new feature will be Enterprise Trust serving as the new custodian of your account*."  (Ex 16)  (emphasis added) (Haworth Dec., ¶21, Ex. 16)  Townsend assisted in the drafting and reviewed the January 2007 letters before Enterprise sent them to the AFC customers.  (Townsend Tr., Ex.2, pp.172:11-173:9)

Enterprise drafted the Investment Agreement that it included in the packet for AFC customers to sign. (Townsend Tr., Ex. 2, pp. 215:14-216:19)  The Agreement states that "[t]he Client is opening an asset management account with Enterprise Trust Company, as Agent."  (Haworth Dec., ¶22, Ex. 17)  It further stated, in the first paragraph, that Enterprise would have the power to "keep all assets safely, collect income and the proceeds of sales and maturities; distribute income and principal as directed by Customer, and provide periodic accounting statements." (Haworth Dec., ¶22, Ex. 17)  The Investment Agreement provided that Enterprise had the power "to retain, invest and reinvest in assets of any kind and take other investment action it considers appropriate in its sole direction based on the Customer's stated risk profile and investment objectives." (Haworth Dec., ¶22, Ex. 17)  The Investment Agreement did not, however, discuss the use of margin.  And although it did identify various types of investments in which Enterprise could invest, "shorting securities" was not included as one of the permitted investments. (Haworth Dec., ¶22, Ex. 17)  The Investment Agreement did not state or suggest that AFC customers' mutual funds could be placed in margin account where they would be used as collateral *for the benefit of other Enterprise clients.*  (Haworth Dec., ¶22, Ex. 17)  The Investment Agreement included blank spaces for clients to state their investment objective (termed "Asset Allocation Model") and the amount of discretion to be given to Enterprise. (Haworth Dec., ¶22, Ex. 17)  Before sending the Investment Agreement to the AFC customers, Townsend and others at Enterprise typed "Growth & Income" and "Full" discretion on all of the forms.  (Townsend Tr., Ex. 2, pp. 146:4-148:8)

On or about January 29, 2007, and after AFC customers received the packet of information, Gomez and Townsend held a meeting with several AFC customers during which

Townsend answered questions.[4]  (Townsend Tr., Ex. 2, pp. 252:17-253:10; Ex. 18)  Townsend told the AFC customers at the meeting that Enterprise would handle their accounts in the same manner as Gomez did and that the customers would retain the authority to make decisions with respect to their securities.  (Haworth Dec., ¶23, Ex. 18)  Townsend also admitted telling investors that the language in the Investment Agreement was just some standard form and that Enterprise would not exercise discretionary authority in their accounts without obtaining their permission.  (Townsend Tr., Ex. 2, pp. 256:3-257:17)  Additionally, Townsend told the AFC customers at the meeting that "just because you sign this document doesn't mean that we'll sell your fund tomorrow" and that for such a sale to occur there would be further discussions.  (Townsend Tr., Ex. 2, pp. 260:9-16)  Both Townsend and Lohmeier have admitted that Enterprise did not intend to exercise discretion over the AFC customer accounts unless the customer specifically agreed to have a managed, fee-based account with Enterprise.  (Lohmeier Tr., Ex. 1, pp. 155:12-23; Townsend Tr., Ex. 2, pp. 256:23-257:17)  Lohmeier, Townsend and Enterprise misrepresented to the AFC customers in the Investment Agreement that Enterprise would keep their mutual funds safe and make no changes to their accounts without their permission, when in fact, it was the Defendants' intent to place the AFC customers' mutual funds in a margin account to serve as collateral for trading intended to benefit other Enterprise clients, and that the assets could be subject to liquidation in the event of a margin call.  (Haworth Dec., ¶¶18, 22, Ex. 13; 17)

According to Lohmeier, approximately 500 AFC customers opened accounts with Enterprise, but only seven of these AFC customers actually became fee-paying, managed advisory clients.  (Lohmeier Tr., Ex. 1, pp. 145:10-16; Ex. 20)  Lohmeier claimed that as of mid-January 2008, Enterprise had 800 custodial accounts and only 100 managed accounts.  (Lohmeier Tr., Ex. 1, pp. 41:10-17; 144:4-8)[5]

After the AFC customers agreed to open an Enterprise account and signed the Investment Agreement, Enterprise claims to have sent each new client a "welcome letter," along with an Enterprise brochure and a "Margin Account Disclosure Statement" ("Margin Disclosure").  (Haworth Dec., ¶24, Ex. 19)  The Margin Disclosure states that "Legent Clearing ("Legent") is

---

[4]   The SEC has filed the testimony of one investor, Cathy Berwaldt and the declaration of another, Howard Johnson, to give a flavor of the investor testimony that would be adduced in this case concerning the representations that Townsend and Enterprise made to investors in advance of their placing funds with Defendants.  (*See* Exs. 18 and 44)

furnishing this document to you to provide some basic facts about purchasing securities on margin and to alert you to the risks involved with trading securities in a margin account." (Haworth Dec., ¶24, Ex. 19) Lohmeier claims that this document, in conjunction with the Investment Agreement, gave Enterprise the authority to use the custodial AFC customers' mutual funds as collateral for short positions taken for the benefit of other Enterprise clients. (Lohmeier Tr., Ex. 1, 140:25-14) However, the custodial AFC customers did not receive this document until after they opened their accounts and signed the Investment Agreement. Moreover, the Margin Disclosure does not apply to the custodial AFC customers because they did not purchase securities on margin – they were simply custodial clients holding mutual funds. Lastly, Enterprise did not have any of the custodial AFC customers sign a document, or otherwise acknowledge, that they read, understood and agreed with the terms in the Margin Disclosure.

D.     **Enterprise's Misuse of the Customers' Assets.**

Beginning in January 2007 and continuing through June 2007, nearly half of the AFC customers executed the Investment Agreement to open accounts with Enterprise. (Lohmeier Tr., Ex. 1, p. 47:4-8) Lohmeier and Townsend both signed Investment Agreements on behalf of Enterprise. (Townsend Tr., Ex. 2, pp. 146:4-148:8; 148:19-150:23; Haworth Dec., ¶22, Ex. 17) The assets of approximately 500 customer accounts, which were valued at approximately $49 million in total, were transferred from Traderight to Enterprise and deposited into omnibus accounts in Enterprise's name. (Lohmeier Tr., Ex. 1, pp. 47:4-8; 157:24-158:16) Lohmeier and Townsend both participated in effecting the transfers from Traderight to Enterprise. (Townsend Tr., Ex. 2, pp. 146:4-148:8; 148:19-150:23; Haworth Dec., ¶22, Ex. 17) All of the assets transferred to Enterprise were mutual funds. (Lohmeier Tr., Ex. 1, pp. 101:6-8; 156:19-157:1) When the custodial AFC customers had accounts at AFC and then at Traderight, the customers held these mutual funds directly with the mutual fund companies. (Haworth Dec., ¶26, Ex. 21, pp. 117-119) When the custodial AFC customers opened accounts with Enterprise, however, their mutual funds were transferred to one of Enterprise's accounts and held in Enterprise's name, rather than the customer's name. (Haworth Dec., ¶27, Ex. 22) As such, only Enterprise could take action relating to the mutual funds and provide information about the customers'

(..continued)
[5]  The SEC has not been able to verify any of these figures.

investments. Thus, the custodial AFC customers had to rely on Enterprise to provide account information.

The value of Enterprise's margin account at Legent was only $2,875,084 at the end of January 2007. (Haworth Dec., ¶32, Ex. 27) From January 2007 to May 2007, before the bulk of the custodial AFC customers' assets were transferred to Enterprise, Enterprise received 14 margin calls in the Legent Account, ranging from $33,202 to $2,660,479. (Haworth Dec., ¶13, Ex. 8) Between February 2007 to June 2007, a total of $49 million in custodial AFC customer securities were transferred to Enterprise accounts. (Lohmeier Tr., Ex. 1, p. 47:4-8)

Initially, Lohmeier contemplated that all of the custodial AFC customer assets were to be deposited in Enterprise's margin account at Legent. (Haworth Dec., ¶18, Ex. 13) However, only a portion of the custodial AFC customer mutual funds was transferred directly into to the Legent Account. This was because many of the custodial AFC customers had invested in a particular family of mutual funds, which according to Enterprise would not transfer the mutual funds to Enterprise's Legent account. (Lohmeier Tr., Ex. 1, p. 210:8-13) As a result, a large portion of the custodial AFC customers' assets were held in Enterprise accounts at US Bank. (Haworth Dec., ¶28, Ex.23) To maximize the amount of marginable securities that Lohmeier had at his disposal, Lohmeier negotiated a special agreement to permit Enterprise to use the custodial AFC customers' mutual funds in the US Bank account as collateral for short positions taken in the margin account at Legent. (Haworth Dec., ¶29, Ex. 24) On May 31, 2007, Enterprise, Traderight, Legent and US Bank executed a "Special Custody Account Agreement." (Haworth Dec., ¶¶29, 31, Ex. 24, 26) Pursuant to this agreement, all of the assets in the Collateral Account at US Bank account were designated as collateral for the short positions taken by Enterprise in the Legent Account (herein referred to as the "Collateral Account"). (Haworth Dec., ¶29, Ex. 24) As of July, 2, 2007, all of the assets in the Collateral Account at US Bank were Enterprise clients' assets, of which nearly all were custodial AFC customers' mutual funds. (Lohmeier Tr., Ex. 1, p. 156:9-18; Ex. 25) Under this agreement, none of the custodial AFC customers' assets in the Collateral Account at US Bank could be transferred or sold without Legent's approval. (Haworth Dec., ¶¶29, 31, Ex. 24, 26) This side-transaction demonstrates Lohmeier's commitment to maximize the potential leverage offered by these custodial AFC customer's

mutual funds. By July 2007, the Collateral Account at US Bank had approximately $22.5 million in mutual funds and there was only approximately $2.5 million in the other two non-pledged US Bank accounts.

With the addition of the AFC customer assets to the Legent account and Collateral Account at US Bank, in the spring of 2007, Lohmeier began taking large short positions in the Legent Account.[6] (Haworth Dec., ¶33, Ex. 28) Legent required Enterprise to pledge collateral in the margin account in order to take the short positions, in the event that the price of the securities moved against Enterprise and Enterprise did not have the cash resources to cover the short positions. (Haworth Dec., ¶15, Ex. 10) Therefore, Enterprise needed assets, such as the custodial AFC customers' mutual funds, to pledge as collateral in order to take the large short positions in the Legent account. Lohmeier claims that short positions and margin trading were part of the trading strategy that he executed for the managed Enterprise clients. (Lohmeier Tr., Ex. 1, p. 163:3-20) As Lohmeier had hoped, transferring the custodial AFC customers' mutual funds to Legent and the Collateral Account at US Bank, created additional collateral for Lohmeier's trading, enabling Enterprise to take larger short positions and avoid and/or reduce margin calls. (Haworth Dec., ¶¶13, 18, 34, Exs. 8, 13, 29) After the execution of the Special Custody Account Agreement, Enterprise received only two margin calls from Legent between June and November 2007. (Haworth Dec., ¶13, Ex. 8)

As of September 30, 2007, Enterprise had margin debt of $17,411,937, which was collateralized by Enterprise client assets, including the custodial AFC customers' mutual funds. (Haworth Dec., ¶34, Ex. 29) Lohmeier has admitted that only the "managed" accounts, which he claims comprise approximately 100 of Enterprise's 900 clients,[7] including himself and Townsend, participated in Enterprise's trading strategy, meaning they earned profits and

---

[6] A customer takes a short position, or "sells short," when he borrows securities from a broker and then sells those securities in the market. Since the customer did not own the securities he sold to create the short positions, to close the position, the customer must either purchase the same amount of securities which he originally borrowed, then give the securities to the broker to repay the borrowed shares, or pay the broker the equivalent of the market price of the securities which were borrowed. Short positions are profitable when the price of the security decreases, because the customer is able to close out the short position by purchasing securities at a lower price than he originally sold the securities when he initially took the position. (See generally Ex. 39 for basic information on short selling)

[7] The SEC has not been able to verify the actual number of managed clients, or ascertain how much of the managed clients own funds were pledged in Legent or any of the other margin accounts were Enterprise and Lohmeier conducted its margin trading.

sustained losses based on the trading that Lohmeier did in the Legent Account.   (Lohmeier Tr., Ex. 1, p. 41:13-17; Ex. 22)  Of the AFC customers, Lohmeier has conceded that, at most, seven became managed clients and allegedly participated in and received the benefits, if any, of the trading that Lohmeier did in the Legent Account. (Haworth Dec., ¶¶ 25, 27, Ex. 20,22) Approximately 500 of Enterprise's 800 custodial clients are custodial AFC customers. (Lohmeier Tr., Ex. 1, pp. 41:10-17; 144:4-8)  Lohmeier has also admitted that the custodial clients did not participate in or benefit from the trading in the Legent account. (Lohmeier Tr., Ex. 1, pp. 173-175)  Lohmeier knew that many of these customers were approaching retirement age and their accounts were retirement accounts when he used the custodial AFC customers' funds for his margin trading.  (Lohmeier Tr., Ex. 1, p. 90:7-14)

Defendants did not disclose to any of the custodial AFC customers that their mutual funds would be placed in a margin account where they would be used as collateral for margin trading intended to benefit other Enterprise clients, and not the custodial AFC customers themselves. None of the custodial AFC customers authorized Enterprise to place their mutual funds in a margin account; where trading was conducted for the benefit of other Enterprise clients and not themselves.  Enterprise's placing of the AFC customers' mutual funds in margin and other accounts where they would serve as collateral for margin trading intended to benefit other Enterprise clients, and not the AFC customers themselves, was contrary to the representations in the Investment Agreement, the January 2007 letter and Townsend's verbal representations to the AFC customers.  Nothing in the Investment Agreement authorized Enterprise to place the custodial AFC customers' securities in a margin account where they would serve as collateral for highly leveraged trading intended to benefit other Enterprise customers.  Further, placing the AFC customer assets in the margin account of this highly leveraged account was inconsistent with the risk profile of "Growth & Income" that Defendants had placed in the Investment Agreement.  It was also contrary to the representation contained in the Investment Agreement that the AFC customers' funds would remain safe.  It was also contrary to the representation set forth in the January 7, 2007 letter stating that AFC customers' securities holdings "would remain unchanged"  and to Townsends' similar oral representations to custodial AFC clients prior to their executing the Investment Agreement.

E.    **Lohmeier's Misrepresentations to Legent.**

Defendants' deception was not limited to the custodial AFC customers, but extended also to the clearing firms where Enterprise held accounts.  In early March 2007, Legent informed Traderight that the paperwork that Legent had received from Enterprise did not contain sufficient authorization or disclosure regarding the use of margin for the custodial AFC customers and that without further documentation, Legent could not permit the use of margin in connection with the custodial AFC customers' mutual funds.  (Haworth Dec., ¶35, Ex. 30)  Traderight informed Lohmeier of Legent's concern. (Haworth Dec., ¶35, Ex. 30)  In response, Lohmeier prepared, signed and submitted to Traderight a false attestation in a March 5, 2007 letter, in which he stated:

> "[t]he clients who have agreed to transfer their assets into Enterprise Trust Company at Legent Clearing have given Enterprise full discretion. Additionally, they have been provided with, ***and approved***, the required documentation and notification regarding the margin account where their assets will be held. ***They have been given the appropriate disclosures regarding their assets.***" (Haworth Dec., ¶36, Ex. 31)

In truth, and as Lohmeier very well knew, the custodial AFC customers never approved the placement of their assets into a margin account, nor did anyone tell them that their mutual funds would be used as collateral for trading that did not benefit them.  On the basis of Lohmeier's false statement, Legent permitted Lohmeier to continue to use the custodial AFC customers' mutual funds in the Legent account as collateral for short positions. (Haworth Dec., ¶33, Ex. 28)

F.    **The optionsXpress Account: Deception Followed By Liquidation.**

In November 2007, Enterprise was informed by Legent that it would not accept any additional mutual funds as collateral for margin trading.  (Haworth Dec., ¶38, Ex. 33. pp. 182:10-25; 183:1-3)  Shortly thereafter, Enterprise opened a trading account at optionsXpress, Inc., a Chicago-based broker-dealer.  (Morof Dec., ¶4, Ex. A)  When Enterprise opened the margin account, Lohmeier completed an online application and other forms required by optionsXpress. (Morof Dec., ¶4, Ex. A)  In the course of opening the account, Lohmeier selected "corporate" as

the account type. (Morof Dec., ¶¶ 6-7)  OptionsXpress approved margin trading in Enterprise's account. (Morof Dec., ¶4; Ex. A, p.2)  Just as with Legent, as part of that approval, Lohmeier was required to agree to the margin account terms for the account, which made clear that all of the assets in Enterprise margin account were at risk of and subject to liquidation by optionsXpress. (Morof Dec., ¶¶ 12-14; Exs. B-D)  The first page of the application required Lohmeier to acknowledge optionsXpress' right to liquidate securities held in the account "at any time and without prior notice to [Enterprise], in optionsXpress' sole discretion when such an action is anticipated or deemed necessary to protect optionsXpress from potential loss." (Morof Dec., ¶4; Ex. A, p.2)

On December 5, 2007, Enterprise began transferring securities into the optionsXpress account, including some of the custodial AFC customers' mutual funds that were in the accounts at Legent and US Bank. (Haworth Dec., ¶39, Ex. 34; Morof Dec., Ex N)  Lohmeier and Enterprise then began to engage in a trading strategy similar to that which Enterprise had engaged in at Legent, which consisted primarily of taking out large short positions, and receiving, among other things, margin-interest rebates based on those positions. (Haworth Dec., ¶39, Ex. 34)

By the end of January, the open short position had grown to $116 million, and the margin debt had grown to $11.6 million, again secured not with Enterprise's managed client assets, but with the custodial assets of the AFC customers and others. (Morof Dec., ¶16)  In early February, optionsXpress learned for the first time that Enterprise was not trading its own corporate assets, but was instead trading customer assets, and that "qualified" funds were being commingled with nonqualified funds.[8]  (Morof Dec., ¶¶ 18-20)  Both of these facts raised questions about Enterprise's margin account. (Morof Dec., ¶¶18-20)  A series of conversations and emails on February 7 and 8 ensued between Enterprise and the compliance and legal departments of optionsXpress. These conversations are detailed in the declaration of optionXpress's Chief Compliance Officer, Benjamin Morof (Morof Dec., ¶¶ 21-31).   The first conversation took place on February 7 between Townsend and optionsXpress.  During that conversation, Morof and Hillary Victor, optionsXpress's Corporate Counsel, expressed concern

about the use of customer assets in the account, including the commingling of "qualified" retirement funds with unqualified funds, and also questioned whether the customers had authorized the use of their assets in the account in this manner. (Morof Dec., ¶21) Townsend falsely stated in response that the customers had in fact authorized such use, and said that she would send optionsXpress a copy of the Investment Agreement as proof. (Morof Dec., ¶¶ 21-23)

The next morning Townsend faxed to optionsXpress two different versions of the Investment Agreement. (Morof Dec., ¶24; Ex. H) Neither version was filled out or signed. (Morof Dec., ¶24; Ex. H) The first version was the same version that all of the AFC Customers had signed. (Morof Dec., ¶24; Ex. H( The second version was virtually identical to the first, except for a new paragraph 5 at the bottom of the first page that contained a provision that purportedly added to Enterprise's other discretionary powers the power to pledge or hypothecate securities and commingle them with "securities carried for other customers in an omnibus account which has margining capability." (Morof Dec., ¶24; Ex. H) In a cover letter to the fax, Townsend stated that the first version was the basic agreement that everyone signs, and that the second version had been revised for 2008 after a company and legal review. (Morof Dec., ¶24; Ex. H) While it remains in doubt whether this form of agreement even existed prior to February 7, 2008, Townsend omitted to disclose that even if it did, none of the AFC customers whose mutual funds were in the margin account had signed the new form. (Morof Dec., ¶24)

Morof and Victor called Enterprise that same morning to continue their discussions about concerns with the account. (Morof Dec., ¶26) Both Lohmeier and Townsend participated in this call. (Morof Dec., ¶26) During this second call, Lohmeier expressed surprise at some of the optionsXpress's concerns, and informed them that he has an identical margin account arrangement at Interactive Brokers, a different brokerage firm. (Morof Dec., ¶ 25) Lohmeier stated during the call that the Investment Agreement expressly permitted Enterprise to do margins and shorts. (Morof Dec., ¶ 27) optionsXpress noted that neither of the two versions of Investment Agreement included shorting among the permitted investments listed. (Morof Dec., ¶25) In response, Lohmeier falsely stated that Townsend had sent the wrong version by mistake, and Defendants proceeded to send a third form, which was substantially identical to the second

(..continued)
[8] In fact, as the SEC has learned after the liquidation, approximately $8 million of these mutual

version, only this time it miraculously included "shorting securities" language that optionsXpress noted was still missing  (Morof Dec., ¶¶ 28-29; Ex. I)

Even assuming these new versions of the Investment Agreement were not spontaneously created in response to optionsXpress's concerns, neither Lohmeier nor Townsend disclosed to optionsXpress that these second and third versions of the  Investment Agreements were not the ones that the AFC customers in the optionsXpress had signed.  Nor did Lohmeier or Townsend disclose to optionsXpress that all of the AFC custodial customers had in fact signed the first version of Investment Agreement that they had faxed to optionsXpress earlier that day.

In a second conversation later on February 8th, Morof informed Defendants that optionsXpress remained uncomfortable with the way the margin account was being used, and notified Enterprise that if it could not provide optionsXpress with, among other things, proof that the customers in the account had authorized that their funds be used for margin trading in the account, and a persuasive legal opinion for the proposition that IRA funds and other "qualified" assets that had been placed in this margin account could be commingled with non-qualified assets, optionsXpress would not be able continue to allow any risk in the account.  (Morof Dec., ¶30)  To this end, optionsXpress asked Enterprise to provide it with copies of that third version of Investment Agreement that had actually been signed by the customers whose mutual funds had been placed in the margin account, and also to provide the legal opinion.  (Morof Dec., ¶30) Enterprise failed to provide the requested information.  (Morof Dec., ¶30-31)

On February 13, having failed to gain the necessary comfort concerning the risk posed to the account by this questionable collateral, optionsXpress issued a margin "house" call.  (Morof Dec., ¶34) At that time, there was $121 million in open short positions, and only approximately $109 million in cash to cover those positions, plus a small amount of securities, plus the $15 million in mutual funds that was serving as collateral for the negative margin balance.  (Morof Dec., ¶32-33)  When Enterprise failed to meet the margin call, optionsXpress decided to liquidate the account.  (Morof Dec., ¶35-36) First, optionsXpress closed out Enterprise's short positions, which resulted in a deficit in the account of approximately $11 million.  (Morof Dec.,

(..continued)
funds came from AFC customers.  (Haworth Dec., ¶52-68)

¶35) In order to satisfy the negative margin balance, optionsXpress liquidated Enterprise's collateral, beginning with the stocks and bonds, and then moving to the largest mutual fund positions, liquidating approximately $11,115,353. (Morof Dec., ¶36; Ex. L) optionsXpress applied $10,786,283 to cure the deficit in the account. (Morof Dec., ¶37) After optionsXpress closed Enterprise's short positions and liquidated the mutual funds to cure the deficit that existed in the account, a balance of $4,250,785 remained in the account, of which $3,776,983 constitutes securities, and most of the mutual funds. (Morof Dec., ¶ 38) optionsXpress has now frozen the account, with those remaining assets in tact. (Morof Dec., ¶¶ 39, 41)

Most of the liquidated mutual funds belonged to custodial AFC customers, who were not participating in or benefiting from the margin trading in the optionsXpress account. The SEC has determined that approximately $8 million of the mutual funds liquidated by optionsXpress were AFC client assets. (Haworth Dec., ¶¶53-69) None of these custodial clients had authorized that their funds be used a collateral for trading intended to benefit other clients in this or any other margin account and such use was completely contrary to Defendants' representations to the custodial AFC customers.

## G.    Concerns Regarding the Dissipation of Investor Funds and Continued Fraud.

In addition to the account at optionsXpress, Enterprise currently holds approximately $32,000,000 in client assets in accounts at Interactive Brokers, US Bank, Linsco Private Ledger, and Dorman Trading, and claims to have millions more in "assets under management." (Haworth Dec., ¶101; Lohmeier Tr., Ex. 1, pp. 47:23-48:3) Lohmeier admitted that Enterprise has hundreds of additional custodial clients, separate and apart from the custodial AFC customers. (Lohmeier Tr., Ex. 1, pp 41:10-17; 144:4-8 ) Additionally, at least one of Enterprise's other brokerage accounts are margin accounts, such that Enterprise may have pledged custodial client assets as collateral for trading without the knowledge or consent of its clients (Haworth Dec., ¶¶40, 41. 42, Exs. 35, 36, 37)

As is set forth in greater detail at paragraphs 74 through 101 of the declaration of Staff Accountant John Haworth, the situation for AFC clients is perilous. Defendants informed the

SEC on Friday that the AFC's customers' lost holdings have been repurchased with the same or equivalent securities.  But this "solution" is no solution at all, as most of the securities appear to have simply been moved from one margin account (optionsXpress) to another margin account (Interactive Brokers), where the securities serve as collateral, just like at optionsXpress.  To make matters worse, this new account has a $20 million margin debt, more than $150 million in short positions, and only approximately $5.6 million in equity as of February 19, 2008. (Haworth Dec., ¶¶93, 94)  Even more troubling is the fact that Interactive Brokers notified Enterprise on February 19 that it is closing Enterprise's account on March 11. (Haworth Dec., ¶97)  Enterprise did not inform the SEC of this fact when it proffered its solution this past Friday. (Haworth Dec., ¶74-85)

Even apart from this, and as is discussed greater detail at Section IV of the Argument below, the likelihood of continuing violations of the federal securities laws remains great, investor funds remain at risk, Defendants unauthorized use of client securities as collateral for trading intended to benefit other clients continues, and there is no indication that Defendants have any intention of ceasing their unlawful conduct, absent judicial intervention.

## ARGUMENT

### I.     Defendants Should be Temporarily Restrained from Further Violation of the Securities Laws.

Section 20(b) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77t(b)] and Section 21(d)(1) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(1)] allow the SEC, "upon a proper showing," to seek a "permanent or temporary injunction."  A "proper showing" of violative activity necessary to obtain a temporary restraining order from further violations of the securities laws consists of a substantial showing of likelihood of success as to (i) a current violation and (ii) the risk of repetition.  SEC v. Hollnagel, 503 F. Supp.2d 1054, 1058 (N.D. Ill. 2007), SEC v. Cavanagh, 155 F.3d 129, 132 (2d Cir. 1998).[9]  As is

---

[9]   Because the SEC is a government agency seeking an injunction in the public interest, it is not required to prove irreparable injury, a balance of the equities in its favor or the unavailability of remedies at law.  *SEC* v. *Unifund Sal*, 910 F.2d 1028, 1035-36 (2d Cir. 1990).  See also SEC v. Randy, 38 F.Supp.2d 657, 672 (N.D. Ill. 1999) (actions for statutory injunction need not meet the requirements for an injunction imposed by traditional equity jurisdiction).

articulated below, the SEC meets this standard. There is substantial evidence that the Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder and that they may do so in the future. Indeed, the evidence shows that if a temporary restraining order is not entered, Defendants violations of the federal securities laws are likely to continue and custodial client funds may continue to be at risk of misuse or loss.

II.    **Enterprise, Lohmeier and Townsend Violated Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder prohibit any person, in connection with the purchase or sale of any security, from, directly or indirectly: (1) employing any device, scheme or artifice to defraud; (2) obtaining money or property by means of an untrue statement of material fact or omission to state a material fact necessary in order to make the statement made, in the light of the circumstances under which they were made, not misleading; or (3) engaging in any transaction, practice, or course of business that operates as a fraud or deceit upon the purchaser or seller.

In order to prove a violation of Section 10(b) and Rule 10b-5, the Commission must show that the proposed defendants: (1) made a false statement or omission; (2) of material fact; (3) with scienter; and (4) in connection with the purchase or sale of securities. SEC v. McConville, 465 F.3d 780, 786 (7th Cir. 2006). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making an investment decision. Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988). Furthermore, scienter is a necessary element of a violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. Scienter has been defined as a "mental state embracing the intent to deceive, manipulate or defraud." Ernst & Ernst. v. Hochfelder, et. al., 425 U.S. 185, 193, n. 12 (1976). Reckless conduct also satisfies the scienter requirement. Makor Issues & Rights, Ltd. V. Tellabs Inc., 513 F.3d 702, 704 (7th Cir. January 17, 2008).

(..continued)

.

**A.      The Proposed Defendants Made Misrepresentations and Omissions of Fact.**

Enterprise, Lohmeier and Townsend made misrepresentations and omitted to disclose material facts to the custodial AFC customers about the nature of their accounts and the safety of their investments. Nothing in the Investment Agreement authorized Defendants to place the custodial AFC customers' securities into margin accounts where they served as collateral for trading that was intended to benefit other Enterprise clients (including Lohmeier and Townsend), and not the AFC customers. Enterprise represented to the AFC customers in the Investment Agreement that it would "keep their assets safely" and that it would retain the assets "based on the customer's stated risk profiles and investment objectives." The January 2007 letter represented that the AFC customers' assets would remain unchanged. Townsend and Lohmeier caused Enterprise to prepare and send these documents to the AFC customers. In addition, in the January 2007 meeting in California, Townsend told several AFC customers that they would retain control over all investment decisions affecting their assets and that except for their receipt of consolidated account statements, nothing about their accounts would change.

These representations were false. The Defendants did not keep the AFC customers' assets safe. Rather, by placing the AFC customers' mutual funds into margin accounts and using the mutual funds as collateral for trading that benefited other clients, the Defendants subjected those assets to the risk. Once placed into the margin accounts, these mutual funds were subject to liquidation in the event that Legent and/or optionsXpress issued a margin call that Enterprise failed to meet. The risk became reality for some of the AFC customer assets when optionsXpress liquidated their mutual funds to satisfy a margin call issued to Enterprise. Also, contrary to the representations in the Investment Agreement, Enterprise did not retain the custodial AFC customers' assets consistent with the customers' risk profiles and investment objectives. A majority of the AFC customers were retirees with conservative investment objectives and many of the accounts were IRAs and 403(b) plans. Placing the AFC customers' securities in an account where short positions were taken on margin was entirely inconsistent with the "growth and income" objective that Enterprise typed on all of the AFC customers' Investment Agreements. In addition, contrary to Townsend's statements at the January meeting, the

custodial AFC customers did not retain control over decisions affecting their assets when, without any notice, Enterprise put their assets in a margin account and pledged them as collateral. In addition to Defendants' affirmative misrepresentations to investors, Defendants omitted to disclose to the AFC customers that Defendants intended to pledge their funds as collateral in margin accounts for trading for the benefit of other Enterprise clients, including Lohmeier and Townsend.

Defendants also made affirmative misrepresentations to the brokerage firms where the custodial AFC customers' mutual funds were being held as collateral. Lohmeier prepared and signed a certification to Traderight falsely stating that Enterprise clients had approved the use of their securities in Enterprise's margin account at Legent. This was to satisfy specific concerns expressed by Legent when it learned that client funds were being used as collateral in Enterprise's corporate account. The evidence also shows that Lohmeier and Townsend later attempted, albeit unsuccessfully, to persuade optionsXpress as to client authorizations, making false statements and by tendering to optionsXpress possibly doctored versions of the Investment Agreement that, in any event, none of the AFC customers had actually signed.

**B.**     <u>The Proposed Defendants' Misrepresentations and Omissions Of Fact Were Material.</u>

A reasonable investor would have found the above misrepresentations and omissions to be material. By Lohmeier's own admission, Enterprise only had a custodial relationship with the custodial AFC customers. The custodial AFC customers were led to believe by Defendants that Enterprise was serving them in a strictly administrative capacity. A reasonable investor would want to know if rather than being custodied for their benefit, their assets were going to be placed into a margin or other account where they would serve as collateral for trading done for the benefit of other Enterprise clients. A reasonable investor would also want to know that his or her securities could be sold in order to satisfy a margin call issued by one of Enterprise's brokers. The custodial AFC customers would have found all of Enterprise's misrepresentations and omissions material because Enterprise put their securities at risk. Had the AFC customers known the truth about what Enterprise was doing with their securities, they likely would have decided

against transferring their assets to Enterprise in the first place. Also material were Enterprise misrepresentations and omissions to the clearing firms concerning whether its clients authorized the use of their mutual funds as collateral in Enterprise's margin account. Indeed, the declaration of Benjamin Morof, the Chief Compliance Officer of optionsXpress, amply demonstrates the materiality of this issue.

### C.    The Proposed Defendants Acted With Scienter.

Lohmeier, Townsend and Enterprise all acted with the requisite degree of scienter. Lohmeier, Townsend and Enterprise knew that the custodial AFC customers were retirees and that they only held mutual funds. They also knew that many of the custodial AFC customers' accounts were retirement accounts. As early as August of 2006, it was Lohmeier's intent to transfer all securities acquired as a result of the AFC transaction into Enterprise's margin account at Legent. Townsend also knew that the custodial AFC customers' assets were to be transferred to the Legent account well before the transaction closed. Both Lohmeier and Townsend knew that the custodial AFC customers' mutual funds were going to be transferred into Enterprise's margin accounts and would be at risk of liquidation. Before the AFC customers signed the Investment Agreement and their assets were transferred, Lohmeier knew that pursuant to the Legent Margin Agreement, the securities in the account were going to be used as collateral for the account and that the securities could be liquidated to satisfy any margin call without notice. Likewise, Lohmeier executed the SCAA so that he could use the custodial AFC customers' mutual funds in the US Bank account as collateral for trading in the Legent account. Lohmeier and Townsend knew that they intended to transfer the custodial AFC customers' mutual funds to Enterprise's margin account at Legent well before Enterprise sent out the January 2007 customer packets and before Townsend met with the AFC customers and assured them that nothing about their investments would change without their prior approval.

Thus, Lohmeier, Townsend, and thus Enterprise, knowingly, or at least recklessly, misrepresented to the custodial AFC customers that Enterprise: (1) would handle the customer accounts in nearly the same way as when the accounts were at AFC; (2) allow the customers to retain control over investment decisions affecting their assets; (3) would retain assets and take

investment actions consistent with the customers' risk profiles and investment objectives; and (4) would keep their assets safe.  They also knowingly or recklessly failed to disclose that Enterprise was going to and did place the AFC customers' securities into margin or other accounts where they would serve as collateral for short positions taken for the benefit of other Enterprise clients. Finally, Defendants knew that there was nothing in the Investment Agreement that authorized Enterprise to use custodial AFC customers' securities as collateral for the benefit of others, without their knowledge or authorization.

**D.     The Misrepresentations and Omissions Were In Connection With the Purchase or Sale of Securities.**

The Defendants' misrepresentations and omissions were in connection with the purchase or sale of securities as required by Section 10(b) of the Exchange Act.  The Defendants fraudulently induced the custodial AFC customers to transfer custody of their mutual funds to Enterprise by misrepresenting that their accounts would be handled the same as they were at AFC, their investments would be safe and that Enterprise would not make any changes to their investments without the customers' prior approval.  Instead, the proposed defendants placed the custodial AFC customers' securities into a margin account where they served as collateral for short positions taken for the benefit of other Enterprise clients without disclosing this fact to the custodial AFC customers.

In addition, the Defendants' act of pledging the securities as collateral for short positions constituted a sale of securities.  United States v. Kendrick, 692 F.2d 1262, 1264-5 (9th Cir. 1982) (holding that a pledge of securities to secure a margin brokerage account which was subsequently subjected as collateral for loans constituted a purchase and sale for purposes of Section 10(b) of the Exchange Act); see also, Wilhelm v. A.G. Edwards & Sons, Inc., 61 Fed.Appx. 272 (7th Cir. 2003) (holding that pledge of stock in a margin account to secure trading and other transactions was a sale of securities under the Illinois Securities Laws).  Moreover, the proposed defendants' false representations to the AFC customers, made with scienter, cannot be separated from the subsequent pledge or sale of customers' assets placed under the control of Enterprise.  SEC v. CreditBancorp, Ltd., 195 F.Supp.2d 475, 492 (S.D.N.Y. 2002)(defendant's false promise to safeguard investors' assets in segregated accounts under his control, made with scienter, could

not be separated from the subsequent pledge or sale or other liquidation of investors' assets placed under his control); see also, SEC v. Zandford, 535 U.S. 813, 824 (2002) (where there is a fraudulent scheme in which securities transactions and breaches of fiduciary duty coincide, those breaches are in connection with securities sales within the meaning of Section 10(b)).

### III.    Lohmeier Aided and Abetted Enterprise's Violations of Section 10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 thereunder.

The SEC is also substantially likely to prevail in its aiding and abetting claim against Lohmeier.  Section 20(e) of the Exchange Act imposes aiding and abetting liability for any person who knowingly provides substantial assistance to another person in violation of any Exchange Act provision.  The Seventh Circuit has held that one is liable for aiding and abetting where: (1) there is a primary violation, (2) the aider and abettor generally was aware or knew that his or her actions were part of an overall course of conduct that was improper or illegal; and (3) the aider and abettor substantially assisted the primary violation. Monetta Financial Services, Inc. v. SEC, 390 F.3d 952, 956 (7th Cir. 2004).

These elements will be easily met in this case.  As discussed above, the SEC is likely to establish a primary violation against Enterprisee. Lohmeier certainly knew that his actions were part of an overall course of conduct that was improper.  As early as August of 2006, well before the AFC customers were solicited to join Enterprise, it was Lohmeier's intent to transfer all securities acquired as a result of the AFC transaction into Enterprise's margin account at Legent. Lohmeier also substantially assisted Enterprise's primary violation.  Lohmeier executed on behalf of Enterprise the account opening documents and margin agreements for the Legent and OptionsXpress account.  Additionally, Lohmeier was responsible for the transfer of the custodial AFC customers' mutual funds into the margin account at both Legent and optionsXpress, as well as, the short positions taken in the margin account at both brokerage firms. Thus, Lohmeier aided and abetted Enterprise's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.

**IV.          Lohmeier Is Liable For Enterprise's Violations as a Control Person.**

The SEC is also substantially likely to prevail in its control person liability claim against Lohmeier.  Section 20(a) of the Exchange Act provides that every "person" who directly or indirectly controls any person liable under the Exchange Act or a rule thereunder is liable to the same extent as the controlled person, unless the controlling person acted in good faith and did not directly or indirectly induce the violation.[10]  15 U.S.C. § 78t(a).  As such, Lohmeier is liable as a control person for Enterprise's violations of Section 10(b) of the Exchange Act and Rule 10b-5.  Exchange Act Rule 12b-2 defines "control" as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." 17 C.F.R. 240.12b-2.  Control person liability exists where (1) there is a primary violation of the securities law; (2) the defendant exercised general control over the operations of the violating entity; and (3) the defendant "possessed the power or ability to control the specific transaction on which the primary violation is predicated, whether or not that power was exercised." SEC v. Black, 2005 WL 1498893, *7 (N.D. Ill. June 17, 2005)(quoting Harrison v. Dean Witter Reynolds, Inc., 974 F.2d 873, 881 (7th Cir. 1992), cert. denied, 509 U.S. 904 (1993)).

As discussed above, Enterprise violated Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by making material misrepresentations and omitting to disclose material facts to the custodial AFC customers.  As the president and sole shareholder of Enterprise, Lohmeier directly participated in and exercised control over Enterprise's operations.  Lohmeier was the person at Enterprise responsible for trading in the Enterprise brokerage accounts and pledging securities as collateral in the margin accounts.  Additionally, Lohmeier executed the account opening documents and related margin agreements for all of Enterprise's brokerage accounts, including the accounts at Legent, US Bank and optionsXpress.  Moreover, Lohmeier executed the Special Custody Account Agreement on behalf of Enterprise, which enabled him to pledge custodial AFC customers' mutual funds held (in a non-margin account) at US Bank as collateral for margin trading in the Legent account.  As president of Enterprise, Lohmeier possessed the power

---

[10] Lohmeier directly and indirectly induced the violations by, among other things, transferring the custodial AFC customers' assets into the margin accounts and engaging in the trading activities which created the margin debt.  As discussed above, Lohmeier did not act in good faith but rather acted with scienter.

or ability to control Enterprise's representations to the custodial AFC customers and Enterprise's activities in connection with the custodial AFC customers' assets. For these reasons, the SEC is likely to establish control person liability against Lohmeier for Enterprise's primary violation of the federal securities laws.

**V.      The Defendants Are Likely to Continue Their Illegal Conduct.**

In determining whether there is a likelihood of future violations, courts consider the totality of circumstances. SEC v. Holschuh, 694 F.2d 130, 144 (7th Cir. 1982). Relevant factors include (1) the gravity of the harm caused by the offense; (2) the extent of the defendant's participation and his degree of scienter; (3) the isolated or recurrent nature of the infraction and the likelihood that the defendant's customary business activities might again involve him in such transactions; (4) the defendant's recognition of his own culpability; and (5) the sincerity of his assurances against future violations. *Id.*

Under this test, a temporary restraining order is not merely appropriate, but necessary against Defendants. Their conduct was repeated and egregious, and they acted with a high degree of scienter. From the outset, Enterprise, Lohmeier and Townsend sought to acquire the AFC customer accounts to increase the collateral and decrease or eliminate margin calls resulting from Enterprise's trading and margin debt incurred for the benefit of other clients, including Lohmeier and Townsend. The Defendants misrepresented to the custodial AFC customers that it would keep their assets safe, allow them to retain the authority to make decisions over their securities, and not make material changes their accounts. Defendants failed to disclose to custodial AFC customers in the Investment Agreement or elsewhere that they intended to use their mutual funds as margin collateral for others' benefit, and Defendants did not obtain authorization to use the AFC customers' mutual funds in this manner.

Once they took control of the custodial AFC customers' accounts, the Defendants deposited the assets into margin accounts and pledged them as collateral for trading that only benefited Enterprise's other clients. The Defendants knew that doing so exposed the custodial AFC customers' assets to a risk of being liquidated to meet margin calls. The Defendants knew

that once the custodial AFC customer assets were placed in the margin accounts they, in effect, gave up control of these assets to the brokerage firms pursuant to the firms' margin policies. Additionally, the fact that Lohmeier knew that many of the custodial AFC customers were retirees or held retirement accounts makes his actions particularly egregious. This knowledge of such risks did not dissuade the Defendants from misusing client funds in this fashion. At optionsXpress the risk became a reality when optionsXpress liquidated a majority of the mutual funds in Enterprise's account when Enterprise was unable to meet a margin call. As a result, all $8 million of the custodial AFC customers' accounts at optionsXpress were liquidated.

When confronted by not one, but two, different clearing firms after discovery of commingled client funds in Enterprise's corporate accounts, Defendants made false statements and attempted to mislead the clearing firms too, falsely certifying to Legent that the custodial AFC customers had in fact approved the use of their funds as collateral in Enterprise's margin account, and providing optionsXpress with new versions of Investment Agreements that the custodial AFC customers had not signed.

Further, it is likely that Enterprise, Lohmeier and Townsend, if not enjoined, will continue to violate the federal securities laws. The Defendants have denied any wrongdoing and have made no assurances against future violations. Enterprise claims to have hundreds of other clients in addition to the AFC customers, and Defendants may at this very moment be engaged in the same unauthorized use of some or all of these other custodial clients' securities as collateral to support Enterprise's trading strategies for its preferred clients. Lohmeier and Townsend are 43 and 46 years old, respectively, and have been in the investment management business for most of their careers. Thus, it is likely that that Lohmeier and Townsend, through Enterprise, will continue their fraudulent activities unless restrained and enjoined from doing so.

As to the level of harm, these facts are still evolving. As stated above, $8 million dollars of AFC customer mutual funds were liquidated by optionsXpress when their accounts were sold to satisfy optionsXpress's margin call. This past Friday, Defendants' counsel informed the SEC that it had repurchased these securities or replaced with other securities of equivalent value. But this "solution" for at least certain of the Enterprise client customers is likely no solution at all,

and has again put their and other Enterprise clients' assets at risk. First, most of these repurchased securities are sitting in yet another margin account, this time at Interactive Brokers. This firm has now informed Enterprise that it is closing the account on March 11. The funds were purchased not with cash, but by increasing the margin debit in the account, which is now more than $20 million. That means that when all of the open positions are closed in the account on March 11, unless Enterprise comes up with the cash to pay this huge debit, Interactive will likely be liquidating Enterprise clients' securities once again to pay for Enterprise's debts. And even if Enterprise did come up with the money, the SEC has profound concerns that they will be doing so on the backs of other investors, by taking out loans or pledging as collateral assets of other clients who likely would not voluntarily authorize their assets being used in such a manner.

## V.    An Asset Freeze and Other Ancillary Relief are Necessary and Appropriate Against Lohmeier, Townsend and Enterprise

Pursuant to their general equity powers, courts may order ancillary relief to effectuate the purposes of the federal securities laws and to ensure that wrongdoers do not profit from their unlawful conduct. See, e.g., SEC v. Unifund Sal, 910 F.2d 1028, 1041 (2d Cir. 1990); see also, SEC v. Wencke, 622 F.2d 1363, 1369 (9th Cir. 1980); SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103-04 (2d Cir. 1972); SEC v. General Refractories, 400 F. Supp. 1248, 1260 (D.D.C. 1975). To obtain an asset freeze, the Commission must establish only that it is likely to succeed on the merits. SEC v. Cavanaugh, 155 F.3d at 132. Moreover, where there are concerns that defendants might dissipate assets, a court need only find some basis for inferring a violation of the federal securities laws in order to impose an asset freeze. See e.g. SEC v. Infinity Group Co., 212 F.3d 180, 197 (3rd Cir. 2000).

The SEC is seeking to freeze all of Enterprise's corporate assets and any assets, including custodial assets, held in bank and brokerage accounts in Enterprise's name until such time as a receiver can be placed in control of Enterprise's assets.[11] The primary purpose for the asset freeze is to prevent Enterprise from placing additional client securities at risk and from dissipating them. Enterprise transferred the custodial AFC customers' securities into corporate

---

[11] The SEC is not seeking a freeze on other custodial assets held by Enterprise in segregated accounts See e.g., SEC v. Black, 163 F.3d 188, 196-98 (3rd Cir. 1998)(freeze was properly lifted as to segregated accounts and/or accounts that were not within defendants' control).

accounts opened in Enterprise's name where they served as collateral for margin trading and other margin debt incurred for the benefit of other Enterprise customers and were subject to being sold to satisfy this margin debt. As a result, the former AFC customers lost more than $8 million. And while Defendants may have caused those positions to be re-established, at least for the time being, as discussed above, these new purchases are likely only a temporary fix and themselves a cause of additional violations of the federal securities laws. Enterprise also has several other brokerage accounts in its name which contain approximately $30 million in customer securities. The assets of Enterprise's other customers are currently at risk of being used as collateral for debt incurred to reimburse the custodial AFC customers, or to pay for the margin call that looms on March 11 in the Enterprise account. The one thing that is for sure is that Enterprise client funds remain at risk. The staff is also seeking to freeze all of the assets of Lohmeier, the control person jointly and severally liable for Enterprise's violations and a perpetrator and intended beneficiary of the fraudulent scheme, to preserve his assets for disgorgement.

To determine accurately the scope of a fraud and a defendant's ability to disgorge illicit proceeds, courts frequently require defendants to provide an accounting of all monies or property obtained as a result of any fraudulent activity, as well as their current financial resources or assets. See, e.g., SEC v. International Swiss Inv. Corp., 895 F.2d 1272, 1276 (9th Cir. 1990). An accounting is necessary to determine the current nature, location and use of the Enterprise clients' assets, including the custodial AFC customers, held by Enterprise; the extent of the fraud perpetrated on and losses suffered by all of Enterprise's clients; the ill-gotten gains that Enterprise, Lohmeier and Townsend may have obtained; and the proposed defendants' ability to repay them.

The Court should also order expedited discovery. In appropriate circumstances, expedited discovery is authorized under Rules 26(d), 30(a), 33(b) and 34(b) of the Federal Rules of Civil of Procedure. The SEC has brought this action expeditiously to immediately halt this fraudulent scheme and has not had an opportunity to subpoena all relevant documents nor examine all persons who have essential information.

The staff is also seeking an order prohibiting the destruction or alteration of Enterprise's books and records. Such an order is necessary to identify the location of the remaining assets or accounts being held by Enterprise and to preserve other possible evidence. The staff is further seeking expedited discovery as to the proposed defendants. Such orders are necessary for the staff to take meaningful discovery in anticipation of a hearing on an application for a preliminary injunction. See F.R.C.P. 65(b).

## VI.    Appointment of a Receiver is Necessary and Appropriate

Section 27 of the Exchange Act confers general equity powers upon the Court in a Commission action brought pursuant to these provisions. SEC v. Manor Nursing Centers, Inc., 458 F.2d 1082, 1103 (2nd Cir. 1972); SEC v. Texas Gulf Sulphur Co., 446 F.2d 1301, 1307 (2nd Cir. 1971). Once the equity jurisdiction of the district court has been properly invoked, the full panoply of equitable remedies is available to the Court to effectuate the statutory purpose, including the ordering of non-injunctive relief in a variety of forms. See J.I. Case Co. v. Borak, 377 U.S. 426, 433 (1964); SEC v. Materia, 745 F.2d 197, 200 (2nd Cir. 1984). Courts regularly appoint receivers to manage corporate assets when there has been fraud and mismanagement and a receiver is necessary to identify, marshal, preserve, and protect the assets. See e.g., SEC v. Keller Corp., 323 F.2d 397, 403 (7th Cir. 1963); SEC v. Koenig, 469 F.2d 198, 202 (2nd Cir. 1972); SEC v. Bowler, 427 F.2d 190, 198 (4th Cir. 1970). Here, a receiver should be appointed to identify, marshal, preserve and protect the clients' assets being held by Enterprise. Enterprise is still in possession of approximately $30 million in client securities, including custodial AFC customer securities. A receiver, not Lohmeier or Townsend, should be appointed to manage these clients' assets, and to assist the Court in obtaining a better understanding of Defendants' assets, operations, books and records and can determine the most efficient and fairest way in which to provide relief to the custodial AFC customers while still protecting Enterprise's other clients, some of whom may be exposed to the same undisclosed and unauthorized risks that have resulted in this debacle. This Court should exercise its equitable powers by appointing a receiver in this matter to ensure that the Defendants do not cause further harm to its clients.

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant the SEC's motion and enter the proposed orders submitted in connection with this motion.

Respectfully submitted,

Steven J. Levine (IL Bar No. 6226921)
Steven L. Klawans (IL Bar No. 6229593)
Allison M. Fakhoury (IL Bar No.6281486)

Attorneys for Plaintiff
Securities and Exchange Commission
175 W. Jackson Blvd., Suite 900
Chicago, IL 60604
Telephone: (312) 353-7390
Facsimile: (312) 353-7398

Dated: March 3, 2008

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : |
| Plaintiff, | : |
| v. | : |
| ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER, and REBECCA A. TOWNSEND, | : |
| Defendants. | : |

Civil Action No.

## CERTIFICATE OF SERVICE

I, the undersigned, declare that on this 3rd day of March 2008, I caused copies of the following documents

1.  Emergency Motion for a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief
2.  Memorandum In Support of Its Emergency Motion For a Temporary Restraining Order, Asset Freeze, Appointment of a Receiver, and Other Ancillary Relief
3.  Proposed Asset Freeze Order
4.  Proposed Temporary Restraining Order and Order for Emergency Relief
5.  Motion to File Brief in Excess of 15 Pages
6.  Notice of Emergency Motion
7.  Complaint
8.  Declaration of John Haworth
9.  Declaration of Benjamin Morof
10. Compendium of Exhibits

to be served on the John Letteri and Peter Unger, Esq., at their physical and email addresses as listed below, by electronic transmission and overnight delivery, except for item 10 and the exhibits attached to item 9, which I caused to be served via overnight delivery only.

Peter Unger, Esq.
John Letteri, Esq.

Howrey, LLP
1299 Pennsylvania, Ave, NW
Washington, DC 20004-2402
UngerP@howrey.com
LetteriJ@howrey.com

Steven Levine