IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | | |
| Plaintiff, | | No.  08 CV 1260 |
| v. | | Judge James B. Zagel |
| ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER, and REBECCA A.TOWNSEND, | | |
| Defendants. | | |

### RECEIVER'S FIRST STATUS REPORT

In accordance with this Court's Order dated March 5, 2008, Phillip L. Stern, as Receiver ("Stern" or "Receiver") for Enterprise Trust Company ("Enterprise" or the "Company"), submits this initial status report.

On March 3, 2008, the United States Securities and Exchange Commission sought and obtained a temporary restraining order against Enterprise Trust Company, John Lohmeier ("Lohmeier") and Rebecca Townsend.  On the same day, the court entered an order freezing all of Enterprise's assets and customer accounts as well as the personal assets of Lohmeier.  On March 5, 2008, Stern was appointed receiver over Enterprise's operations, funds, assets and property.  The Court order appointing a receiver also required the receiver to file a report within 21 days of his appointment which was to include findings and recommendations as set forth below:

A.  Findings setting forth the assets and liabilities of Enterprise as of January 1, 2006, September 24, 2007 and March 3, 2008;

B.  Findings tracing the flow of funds between Enterprise and clients, including Lohmeier and defendant Rebecca Townsend;

C.    Findings, for each client of Enterprise (including, but not limited to all fee paying clients, all custodial clients, all managed clients, and all persons listed on the Strategy Client List included as Exhibit 20 to the declaration of John Haworth filed on March 3, 2008) identifying and determining the value of all assets (apart from real property) placed under the custody of Enterprise;

D.    Ascertaining the rightful ownership of assets currently within the possession, custody and control of Enterprise;

E.    Findings describing all operations of Enterprise and identifying all persons involved in such operations and the nature of their involvement;

F.    Findings assessing Enterprise's current financial condition and its viability as a going concern;

G.    Findings assessing Enterprise's solvency, liquidity, and ability to return all assets placed with Enterprise by all clients of Enterprise;

H.    Findings assessing Enterprise's ability to continue to fund the Receivership;

I.    Recommendations concerning the maximization of Enterprise's value and the preservation of its assets pending resolution of this lawsuit;

J.    Recommendation concerning the future management of Enterprise, including but not limited to, whether Lohmeier should be permitted retain any control or management authority over Enterprise during the pendency of this lawsuit; and

K.    Recommendations concerning the continuation, if at all, of the Receivership.

As discussed in further detail below, given the complexity of the issues encountered, the unreliability of the Company's books and records, and the fact that the Company's books and records have never been audited, the Receiver is not in a position at this time to answer the questions presented in paragraphs A through E above.

As to "Enterprise's current financial condition and its viability as a going concern," the Company can no longer legally operate as a trust company given the recent suspension of its license by the Commissioner for the State of Nevada Department of Business and Industry. (See discussion below). Even absent the action taken by the State of Nevada, the Receiver does not

believe that Enterprise should be allowed to continue to operate as a going concern in that it appears that there has been a misuse of customers funds entrusted with it.   Similarly, the Receiver does not recommend permitting management or Lohmeier to retain any control over the Company during the pendency of this lawsuit.

The Receivership needs to be continued because of the problems uncovered with the Company's record keeping and accounting practices, because of the need to properly account for the customers assets and in order to develop a plan to distribute same.  Moreover, the Receiver is cooperating with numerous Federal and State agencies which will also necessitate extending the Receivership.

**Marshalling of the Assets of Enterprise Trust Company**

As of March 5, 2008, Enterprise maintained accounts at LPL Financial (cash only), Legent Clearing, LLC (cash only), Leaders Bank (checking), Interactive Brokers, LLC (actively traded securities account), US Bank (custodial accounts), optionsXpress (securities and cash) and Dorman Trading (cash only).  A decision was made to consolidate all securities being held for the benefit of Enterprise customers at US Bank and to orderly liquidate the securities positions at Interactive Brokers.  Accordingly, the securities held at optionsXpress have been transferred to US Bank and, as more fully discussed below, we have commenced an orderly liquidation of the positions at Interactive Brokers.  It was also decided that other than cash held at US Bank, all cash should be consolidated at Leaders Bank.  The process of consolidating the cash at Leaders Bank has been completed.  All accounts at US Bank, Leaders Bank and Interactive Brokers are under the exclusive control of the Receiver.

With respect to the positions at Interactive Brokers as of the close of trading on March 5, 2008, Enterprise held short positions of approximately $142 million, cash in the amount of $121

million, and long positions of approximately $25 million. This results in a net value for the account as of that date of approximately $4 million. The portfolio included more than 700,000 short security "spreads". While the short positions were intended to be market neutral spreads, they in fact moved away from neutrality in opposite direction from the movement of the market. In other words, as the market moved higher, these positions became shorter and as the market moved lower, they became longer. Thus, any sustained move in the market in either direction would cause these "spreads" to both lose money and assume increasing risk. In fact, the period starting March 6, 2008 proved to be a period of exceptional market volatility. For example, on May 6, 2008, the day before we were able to gain access to the account to begin the liquidation process, the net liquidating valued declined by more that $500,000 due to market volatility. Nevertheless, we were able to liquidate these positions without incurring an additional loss in the net liquidating value of the portfolio between the close of markets on March 6 and the present. Several small illiquid positions with a current combined market value of approximately $200,000 are still being maintained, as the Receiver has not yet been able to liquidate these positions. At present, the net liquidating value of the Company's account at Interactive Brokers is approximately $3.7 million. The cash and any remaining unliquidated securities comprising this account will be transferred to Leaders Bank and U.S. Bank, respectively, when the account is closed.

Based on the initial analysis and information reviewed by the Receiver to date, the Company has, or holds for the benefit of the account holders, the following assets (in approximate numbers): (1) $18.7 million in securities, mutual funds and cash at U.S. Bank; (2) $2,385,708 million in cash at Leaders Bank; (3) $3.7 million net liquidating value of the account at Interactive Brokers (4) $1.6 million in private real estate holdings (cost basis); and (5) $8.3

million in private bank holdings (cost basis). The private equity interests and the real estate investments have not been appraised, and therefore, we do not know the fair market value of those investments.

### Hiring of a Forensic Accounting Service.

A search was undertaken for a consultant to assist the Receiver with: (1) preserving and obtaining computer data needed to track customer assets; (2) conducting an accounting of all customer funds and securities; (3) tracking and apportioning any losses amongst accounts; and (4) evaluating the investments made by the Company. Three proposals were solicited from consulting firms with expertise in data retrieval and forensic accounting. Based on our review of the proposals a determination was made to retain Navigant Consulting ("Navigant"). Navigant was also selected because of it familiarity with the SunGard computer system that was used by the Company to track customer securities.

### Work Performed by Navigant to Date

Navigant has forensically imaged two servers and six computer hard drives belonging to Enterprise. Navigant has custody of the hard drives of additional three computers from the Company's Oak Brook, Illinois location and one (1) laptop from the Company's Nevada office.

The initial review of the Company's records has identified approximately 1270 accounts belonging to more than 700 investors. All of the customer account information was maintained by the Company on an internal accounting software system known as SunGard. The Company's books and records have never been audited. Consequently, Navigant tested the ability of the SunGard system to generate necessary reports in order to assess whether the accounting system properly reflected customer holdings. The hope was that the SunGard system could be used to quickly determine each customer's investment and to allocate assets to customers.

Unfortunately, the data in the SunGard system has been found to have significant reconciliation issues and inaccuracies which are in part due to the fact that much of the information in SunGard was manually inputted without sufficient controls.  Input errors have resulted in instances of securities not being allocated to the proper account.  In some cases customer assets are not reflected in the system.  Additionally, pricing information in the SunGard system is stale making it difficult to estimate each investor's current holdings.  The information in SunGard has also failed to produce a reliable breakdown of custodial and managed accounts.

As a result of these and other inaccuracies in the SunGard system, Navigant has been directed to confirm opening statement balances by means of reference to account opening documents and other financial records.  Using a "top down" approach, Navigant is reconciling total assets per SunGard to bank statements, brokerage statements, and the securities held in the ETC vault, as of the close of business on March 3, 2008, the date the freeze order was entered by the Court.  As part of the accounting process Navigant will be able to update the SunGard system so that the Receiver can properly account for each client's assets.

Ultimately, Navigant's will trace the assets of each account holder, determine whether there is a shortage in any  customer accounts, and if there is, assist the Receiver in developing an equitable plan to allocate losses.  Due to the poor condition and unreliability of Enterprise's records it is anticipated that it will take Navigant at least 60 more days to complete its review.

**The State of Nevada has Suspended the Company's License**

Between January 15, 2008 and February 28, 2008, the Commissioner for the State of Nevada Department of Business and Industry conducted an examination of the Company.  As a result of the examination, Nevada suspended the Company's license to operate as a trust company effective March 7, 2008.  Consequently, the Company has ceased operations and is not

conducting any business.

According to the Commissioner's report, the overall condition of the Company was unsatisfactory. Internal controls were found to be lacking. Specifically, the Commissioner did not find any evidence of appropriate controls over the cash, wire and trading activities of the Company.

Record keeping requirements were unsatisfactory. With respect to investor records, there was evidence of incorrect market values in SunGard which impacts customer statements. There was also a lack of investor questionnaire profiles, 60 day initial asset reviews, and a complete failure under the Bank Secrecy Act to develop a suspicious activity monitoring and reporting system. Additionally, there was no evidence that certain clients were aware of the fees being charged.

With respect to asset management, the Commissioner found that investments were under the sole authority of John Lohmeier. Clients were invested in Banks in which Mr. Lohmeier is on the Board, creating a potential conflict of interest. Monitoring for the appropriateness of current investment strategies was also found to be lacking.

With respect to the Company's operations, the Company was found to be engaging in unlicensed trust company activity by operating its business in Illinois without approval from the Commissioner.

Based on its findings, the Commissioner determined that the lack of internal controls posed an operational risk and potential losses due to misapplication of funds. The Company was also found to have violated its fiduciary obligations to investors by depositing money in banking institutions where Mr. Lohmeier had an undisclosed interest.

In addition to suspending its license, the Commissioner also ordered the Company to pay

a $30,000 fine.

## Contacts with Investors

On March 11, 2008, the Receiver provided written notice to all of the account holders at the Company about the Asset Freeze Order and the Appointment of the Receiver. The Receiver also posted a notice on the Company's website directing account holders to contact the Receiver with questions and concerns. The Receiver has been contacted by more than 175 clients of the Company or their representatives seeking information concerning the status of their accounts. The Receiver or his representative has attempted to assure the investors that the Receiver's sole responsibility is to attempt to maximize the return to the investors. In that regard, no determination has been made to liquidate customer assets held at Enterprise, including private equity interests in land developments and banks. If there are insufficient assets at Enterprise to permit the return to its customers of amounts due them, the Receiver will develop a plan of distribution based on the Receiver's determination as to who should equitably bear any such loss. The proposed plan of distribution will be presented to the Court for approval after providing notice to all Enterprise account holders.

## Other Issues

Rents in an amount equal to the monthly mortgage payments, approximately $2474 per month, are being paid on the premises maintained by Enterprise, a condo located at 600 Enterprise Drive, Unit 2B, Oak Brook, Illinois 60523. Lohmeier claims ownership of the condo. The Receiver is currently investigating Lohmeier's claim.

A Financial Consultant responsible for the transfer of approximately 30 investors to the Company has, by way of letter dated March 19, 2008, made a claim for $220,000 in projected "earn-out" payments that were to accrue over a five-year period commencing November 17,

2007, and to which claimant purports to have a right to collect. Claimant additionally demands the release of $45,000 in funds placed in escrow as consideration for the transfer of claimants' client accounts to the Company. The Receiver is investigating this claim. The Receiver is also investigating the transfer of at least $85,000 to said claimant from the Company for his agreement to place his client accounts with the Company.

## Conclusions

Based on the foregoing, the Receiver is not yet in a position to answer many of the questions posed by the Court in its March 3, 2008 Order; and, indeed, the initial accounting has raised additional questions and concerns about the accuracy of the Company's books and records as well as its accounting practices. The Receiver will provide additional status reports as more accurate information becomes available.


By:     /s/  Michael Z. Gurland, Esq.
        Counsel to the Receiver, Phillip L. Stern


ARDC #6274400
Christopher M. Burky, Esq.
Samuel S. Cohen, Esq.
Michael Z. Gurland, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street
Suite 2200
Chicago, IL  60602-3801
(312) 269-8000
(312) 269-1747


Dated: March 25, 2008

NGEDOCS: 021196.0601:1516841.1