IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

               Plaintiff,

        v.

ENTERPRISE TRUST COMPANY,
JOHN H. LOHMEIER, and
REBECCA A.TOWNSEND,
               Defendants.

No.  08 CV 1260

Judge James B. Zagel

## RECEIVER'S PROPOSED PLAN FOR THE ALLOCATION OF THE ASSETS OF ENTERPRISE TRUST COMPANY

### I.    SUMMARY

Phillip L. Stern, as Receiver for Enterprise Trust Company ("Enterprise" or the "Company") hereby submits Receiver's Proposed Plan for the Allocation of the Assets of Enterprise Trust Company (the "Plan" or the "Allocation Plan").

As detailed herein, during the course of Enterprise's operations, Enterprise caused millions of dollars in client losses. The losses, to a large extent resulted from margin trading undertaken on behalf of certain managed accounts. In order to conduct the margin trading, Enterprise pledged as collateral securities that belonged to unmanaged (custodial) accounts. The majority of assets in these custodial accounts consisted of mutual fund holdings in IRA and other qualified retirement accounts.

Enterprise was able to use these custodial assets as collateral for the benefit of its managed clients because it commingled all of its clients' assets in omnibus accounts in

Enterprise's name and then used those assets as though they belonged to Enterprise. Thus, Enterprise effectively misappropriated securities of custodial clients ostensibly to make money for its managed clients. As is alleged in the Securities and Exchange Commission's (SEC) complaint in this case, and corroborated by clients with whom the Receiver has communicated, the custodial clients did not authorize and were not aware of the pledging of their securities as collateral in margin accounts for the benefit of Enterprise's managed clients.

Statements sent out to Enterprise's clients disguised the misuse of custodial account assets, the extent of the losses and the trading activity that caused the losses. Indeed, as of December 31, 2007, Enterprise's client statements and account records collectively overstated net assets by approximately $23 million dollars.

While the allocation methodology, discussed in Section VIII below, attempts to account for the misuse of the custodial assets and the fact that custodial clients did not authorize the pledging of their assets to support the trading activity of other Enterprise clients, evidence obtained by the Receiver also indicates that some of the managed account clients were unaware of the extent of the trading or losses in their accounts. Thus, the Receiver proposes that all Enterprise clients participate in the allocation of the assets that remain at Enterprise although not at the same levels.

As discussed below, in addition to the cash and securities available for distribution to the clients, some clients were also sold illiquid private bank stock and real estate interests, as well as certain illiquid fixed income products. Because of difficulties in liquidating these private interests, the Receiver has determined to return these holdings in kind to the respective purchasers or holders. These assets are valued at fair market value

- 2 -

where possible, or at cost.

Assets in accounts held at Enterprise for the benefit of certain individuals responsible for, or who provided assistance with respect to, the improper trading activity are being withheld pending further order of the Court.

The Receiver is also proposing to withhold approximately $1,000,000, after payment of June fees and expenses, to fund the investigation and pursuit of possible claims against third parties, as well as the costs associated with effectuating the Plan of Allocation.

## II.    BACKGROUND

Enterprise, a Nevada Trust Company, commenced operations on or about November 18, 2005. Enterprise was purportedly headquartered, and maintained a physical address, at 1489 West Warm Spring Road, Suite 110, Henderson, Nevada. Enterprise, however, had only one part-time employee working in the Nevada office. That employee had no responsibility for the management or operation of Enterprise, handled no clients, and was terminated in or about December 2007.

Enterprise conducted its operations, and principally operated out of an office located at 600 Enterprise Drive, Oakbrook, Illinois. Operations in Illinois began in or around January 2006. John Lohmeier was Enterprise's President, founder and sole shareholder. Mr. Lohmeier was responsible for and exercised control over all of the trading and investment decisions made by Enterprise. Rebecca Townsend, Mr. Lohmeier's stepsister, was a co-founder and Vice-President of Enterprise and was the chief client manager for Enterprise. Enterprise had two other full-time employees and several part-time employees. Between January 2006 and March 5, 2008, Enterprise maintained 1198

accounts on behalf of Enterprise clients.[1]

Enterprise used several financial institutions to physically hold client assets. Client funds were commingled in these accounts and held in the name of Enterprise as opposed to being held in the names of individual Enterprise clients. These types of accounts are referred to as omnibus accounts. Enterprise was supposed to maintain a sub-accounting system to track activity for each of its clients. The sub-accounting system was supposed to be used to generate individual client account statements. As discussed herein, the Receiver does not believe that all client assets and trading activity was properly accounted for in the sub-accounting system.

**A.    State of Illinois Proceeding Against Enterprise for the Operation of an Unlicensed Trust Company in the State of Illinois**

Shortly after Enterprise commenced operations in Illinois, on January 24, 2006, the State of Illinois Department of Financial and Professional Regulation (IDFR), issued a cease and desist order to Enterprise, Mr. Lohmeier and Ms. Townsend based on the fact that they were conducting an unlicensed trust business in Illinois and were not duly authorized to act as corporate fiduciaries in Illinois.

On or about March 29, 2006, the IDFR issued a Consent Order prohibiting Enterprise from using the word "trust" in its business name without prior approval from the IDFR. The Consent Order also prohibited Mr. Lohmeier and Ms. Townsend from conducting any activity as a corporate fiduciary in Illinois including holding themselves out to the public as available to act as a fiduciary in the State. The Consent Order was issued based on a finding that Enterprise, Mr. Lohmeier and Ms. Townsend were conducting an

---

[1] This includes 5 accounts that were maintained on behalf of Mr. Lohmeier and Ms. Townsend. This figure does not include 99 additional customer accounts that were opened on Enterprise's books but never funded by prospective clients.

unlicensed trust business in Illinois.    There are reasonable grounds to believe that

Enterprise, Mr. Lohmeier and Ms. Townsend continued to do business in Illinois in

violation of the Consent Order.

### B.    State of Nevada Revokes Enterprise's License

Between January 15, 2008 and February 28, 2008, the Commissioner for the State of

Nevada Financial Institutions Division conducted an examination of Enterprise.  As a

result of the examination, Nevada revoked the Company's license to operate as a trust

company effective March 7, and imposed a $30,000 fine.  According to the Commissioner's

report, the overall condition of the Company was unsatisfactory and internal controls were

found to be lacking.

Specifically, the Commissioner found that Enterprise did not have appropriate

controls over the cash, wire or trading activities.   Management was also found to be

lacking.   More particularly, the Commissioner found no evidence of any level of oversight

by, or for that matter the existence of, a Board or Trust Investment Committee over the

selection of investments, investment models, or asset allocation.  Staff training was also

found to be lacking and Enterprise's staff did not demonstrate the experience required to

handle the complexities of conducting business as a trust company.  In reality, Enterprise

had no formal training program.

Numerous record keeping violations were noted including, the lack of client

questionnaire profiles in client files, the lack of 60 day initial asset reviews, the lack of aging

reports for overdrafts and uninvested cash, and the lack of reconciliation reports.

Enterprise also failed to create and implement a Client Identification Program including,

but not limited to, identity verification procedures and client notification procedures. Enterprise's books and records were also never audited.

Based on its findings, the Commissioner determined that the lack of internal controls posed an operational risk and could create potential losses due to misapplication of funds and to conflicts of interest. Among other things, the inspection determined that client assets were used to purchase stock in *de novo* banks in Nevada and Arizona where Mr. Lohmeier served on the Board or had an interest in the bank, creating a significant conflict of interest between Enterprise and its clients. The Commissioner also determined that the Company was engaging in unlicensed trust company activity by operating its business in Illinois without approval from the Commissioner.

The Receiver is hopeful that, in light of the receivership, the State of Nevada will forgo efforts to collect the $30,000 fine imposed on Enterprise.

**C.    The Securities & Exchange Commission Action Against Enterprise for Misuse of Client Assets Transferred to Enterprise from Advisory Financial Consultants.**

On March 3, 2008, the SEC filed a complaint against Enterprise, Mr. Lohmeier, and Ms. Townsend, seeking to enjoin them from violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder. The SEC obtained a temporary restraining order against the defendants and an Order freezing the assets of Enterprise and Mr. Lohmeier. Defendants, without admitting or denying the allegations in the SEC complaint, consented to the issuance of both Orders.

The SEC alleges, among other things, that Enterprise, Mr. Lohmeier and Ms. Townsend fraudulently induced hundreds of clients of Advisory Financial Consultants ("AFC"), a registered broker-dealer, to transfer custody of approximately $49 million in

mutual funds to Enterprise. The complaint further alleges that unbeknownst to and without the authorization of the clients, defendants Enterprise, Mr. Lohmeier and Ms. Townsend placed the AFC clients' mutual funds into margin and other accounts where the AFC clients' securities served as collateral for leveraged margin trading, including options trading and short selling, that was intended to benefit Enterprise's principals, Mr. Lohmeier and Ms. Townsend, and other Enterprise clients. This margin trading was not intended to and did not benefit the AFC clients whose accounts were transferred to Enterprise. The complaint further alleges that on February 13, 2008, more that $8 million of these clients' mutual funds were sold, without their knowledge or approval, to cover Enterprise's margin debt.

On June 20, 2008, the District Court entered a Consent Order by and between the SEC and Mr. Lohmeier in which Mr. Lohmeier consented to the entry of a permanent injunction barring him from further violations of Section 10(b)(5) of the Exchange Act. Mr. Lohmeier's personal assets remain subject to the March 3, 2008 Asset Freeze Order, pending further order of the Court. It is anticipated that Mr. Lohmeier will either agree or be compelled to disgorge for the benefit of Enterprise clients most, if not all, of his personal assets. Since most of his assets consist of illiquid bank stock and real estate, it is not possible to determine at this time the fair market value of those assets.

In July 2008, the Court entered an order freezing real estate belonging to Ms. Townsend. The order prohibits the sale or encumbrance of Ms. Townsend's home. The Receiver intends to seek from Ms. Townsend the return, for the benefit of Enterprise clients, of any funds improperly received from Enterprise.

### D.    The Appointment of the Receiver

On March 5, 2008, after two days of hearings in the SEC matter, the Honorable James B. Zagel, United States District Court Judge for the Northern District of Illinois, entered an order appointing Phillip L. Stern as Receiver for the assets of Enterprise. The Order appointing Mr. Stern Receiver directed him, among other things, to take possession of the assets of Enterprise, conduct an independent inquiry concerning the company's finances and operations, and prepare an independent accounting and a report and recommendation concerning the disposition of assets held by Enterprise and its viability as a going concern.

### III.    RECEIVER'S MARSHALING OF ENTERPRISE'S ASSETS

As of March 5, 2008, Enterprise maintained cash and/or securities at LPL Financial, Legent Clearing, LLC, Leaders Bank, Interactive Brokers, LLC, US Bank, optionsXpress, LLC and Dorman Trading. The only accounts with actively traded securities as of that date were at Interactive Brokers.

A decision was made to consolidate all securities being held for the benefit of Enterprise clients at US Bank and to liquidate in an orderly manner the securities positions at Interactive Brokers. With the exception of the cash held at US Bank, all cash was consolidated at Leaders Bank.

With respect to the positions at Interactive Brokers, as of the close of trading on March 5, 2008, Enterprise held short positions of approximately $142 million, cash of $121 million, and long positions of approximately $25 million. This resulted in a net value for the account as of that date of approximately $4 million. The portfolio included more than 700,000 short security "spreads." While the short positions were intended to be market

- 8 -

neutral spreads, they in fact moved away from neutrality in opposite direction from the movement of the market. In other words, as the market moved higher, these positions became shorter and as the market moved lower, they became longer. Thus, any sustained move in the market in either direction would cause these "spreads" to both lose money and assume increasing risk. In fact, the period starting March 6, 2008 proved to be a period of exceptional market volatility. For example, on March 6, 2008, the day before the Receiver gained access to the account to begin the liquidation process, the net liquidating value declined by more than $500,000 due to market volatility. Nevertheless, the Receiver was able to liquidate these positions without incurring an additional loss in the net liquidating value of the portfolio. Several small illiquid positions with a current combined market value of approximately $200,000 have been transferred to U.S. Bank.

As of June 30, 2008, Enterprise held for the benefit of the account holders, the following assets (in approximate numbers) (1) $24.3 million in securities, mutual funds and cash at U.S. Bank; (2) $2.5 million in cash at Leaders Bank; (3) $3.6 million in cash at Interactive Brokers; and (4) real estate investments, fixed income securities and private bank stock totaling approximately $13.8 million. Most of the real estate, fixed income securities and private bank stock are valued at cost because these investments are illiquid and it is not possible to determine a fair market value. Also, the value of mutual funds and other publicly traded securities are subject to market fluctuations.

The Receiver has been notified by Howrey LLP, former counsel for Enterprise, Mr. Lohmeier and Ms. Townsend, that it is owed in excess of $300,000 in legal fees and expenses. The Receiver has taken the position that Enterprise is not responsible for legal fees incurred for the benefit of Mr. Lohmeier or Ms. Townsend and that it will only

consider payment of legal fees purportedly owed by Enterprise upon a demonstration that those fees were solely for the benefit for Enterprise and its clients. The Receiver has agreed not to object to payment of $75,000 in legal fees to Howrey LLP in satisfaction of all outstanding claims against Enterprise. Howrey has reserved its right to seek the balance of the sums owed to it for legal fees and expenses from other parties.

## IV.    HIRING OF A FORENSIC ACCOUNTING SERVICE

The Receiver conducted a bidding process for the retention of a forensic accounting service to assist the Receiver with: (1) preserving and obtaining computer data needed to track client assets; (2) undertaking an accounting of all assets held by Enterprise, including client securities and cash; and (3) determining client account balances, and as more fully discussed below, to assist the Receiver in developing a plan for the allocation of assets held by Enterprise.

Proposals were received from three consulting firms with expertise in data retrieval and forensic accounting. Based on the proposals a determination was made to retain Navigant Consulting ("Navigant"). Navigant was also selected because of its familiarity with the trust accounting computer system that was used by Enterprise to, among other things, track client account balances, contributions, withdrawals, and purchases and sales of securities.

Navigant took custody of five hard drives from Enterprise's Oakbrook, Illinois office and recovered one laptop computer from the Nevada office. Navigant forensically imaged the computer hard drives of certain Enterprise employees and officers, and forensically imaged the file and domain servers. Navigant has used these images to locate requested documentation on behalf of the Receiver and agencies investigating Enterprise,

including documents previously deleted from Enterprise's computers, some of which appear to have been deleted after the Court entered the Temporary Restraining Order on March 3, 2008, which mandated that all Enterprise books and records be preserved. Among the documents recovered and provided to the Receiver were, after the elimination of duplicates, over 33,000 emails. The de-duplication process enabled significantly more cost-efficient review of the e-mails by the Receiver and agencies investigating Enterprise.

Navigant then began the process of reconciling current client holdings as listed within the trust accounting system to third party statements (e.g., bank statements, stock certificates, real estate deeds, and trading accounts). As more fully discussed below, it became evident very early in the accounting process that the records maintained by Enterprise and the statements provided by Enterprise to its clients were unreliable and inaccurate.

## V.   DEFICIENCIES IN ENTERPRISE'S DOCUMENT CONTROLS AND TRUST ACCOUNTING SYSTEM THAT IMPACTED THE DETERMINATION OF CLIENT ASSETS AND THE CHOICE OF AN ALLOCATION MODEL

Navigant's review revealed that Enterprise did not maintain complete daily work files reflecting client trade activity during the month of February 2008 and during the months prior to October 2007. Navigant also identified numerous problems with the trust accounting system and the recording of client assets. These deficiencies impacted the Receiver's ultimate determination regarding appropriate methods of allocating net assets.

### A.   Accounting Errors and Deficiencies Which Prevented the Recreation of Accurate Client Statements and Account Holdings

Navigant performed testing of Enterprise's accounting system in an effort to validate that assets existed, that the recordings in the accounting system were complete and that the valuation accorded to any particular client account was appropriate. During the

testing process, Navigant identified accounting errors that raised concerns about the accuracy of the holdings within the accounting system and the required level of work to correct such errors.

While the majority of the errors identified related to the valuation of securities and accounts in 2008, significant deficiencies were also identified for accounting entries for 2006 and 2007, including the failure to record certain trades, dividends, in-kind transfers, and the receipt and payment of checks and wires. Additionally, certain short positions were accounted for improperly; prices input for many securities were inflated, inaccurate or stale; fees were incorrectly calculated; physical asset locations (as denoted in the accounting system) were inconsistent with the actual location of the custodial account; and holdings recorded in the accounting system did not reflect actual holdings in brokerage and bank accounts.

Other errors included millions of dollars of assets that were recorded in the accounting system as Enterprise assets, which were in fact never received by Enterprise. During the reconciliation process it became evident that Enterprise materially overstated holdings in statements sent to some clients, and that a shortfall existed between what Enterprise told its clients it held for their benefit and what actually remained in the possession of Enterprise.

Other significant deficiencies in Enterprise's accounting system, which frustrated the accounting process included (1) a lack of documentation supporting agreed upon fee structures with the individual clients, which makes impractical recalculating and verifying fee charges on an account by account basis; and (2) a lack of documentation identifying client preferences for the payment of dividends (i.e. dividend reinvestment or cash).

Indeed, Enterprise failed to properly allocate dividends to clients in many instances. As a result of these deficiencies, there was no efficient way to reasonably assess whether each client paid appropriate fees or to determine the proper allocation of dividends that were amassed in Enterprise's general suspense account and never allocated to clients.

Enterprise also did not maintain proper documentation in many client files. These files should have included information about the account type, assets transferred, cash receipts, fee arrangements, and trading history. Without this documentation, it is difficult to know whether accounts were set up in the accounting system correctly and whether assets were allocated to the correct account. The inadequate documentation delayed the accounting process because back-up detail had to be obtained from banks, brokerage firms and certain clients to validate client contributions and withdrawals.

According to Ms. Townsend, the daily work files that were created prior to October 2007 were electronically imaged and loaded onto the Enterprise server. A search of the Company's computer databases, however, did not uncover any such potentially useful information. Ms. Townsend was then asked to locate the daily work files, which she was unable to do. Mr. Lohmeier was similarly asked to provide information showing how trades were or should have been allocated to clients within the trust accounting system. Mr. Lohmeier declined to cooperate with the Receiver and respond to this inquiry.

Based on the significant accounting problems, the Receiver concluded that performing comprehensive testing of the accounting system, and posting corrections to the accounting system in order to recreate all of the activity for each of the 1198 funded client accounts maintained by Enterprise, would have taken well over a year and would have been decidedly cost prohibitive.

**B.      Other Factors Militating Against a Reconstruction of the Precise Holdings in Each and Every Client Account.**

The accounting investigation performed by and at the direction of the Receiver also uncovered a number of other concerns suggesting that client accounts could not be effectively recreated and that trading data (purported gains and losses detailed in client statements) could not be relied upon. Detailed below are some of the observations that impacted the focus of the accounting analysis.

**1.      The Lack of Internal Controls**

Enterprise lacked sufficient internal controls to insure the reliability of its accounting records. Ms. Townsend acknowledged that there were account reconciliation issues existing in the first quarter of 2008 and possible reconciliation issues in much of 2007. When asked if the account balances for each client could be reasonably relied upon for the period ending January 31, 2008 or the period ending February 29, 2008, Ms. Townsend replied no.

Furthermore, Enterprise employees had the ability to change or modify historical entries by reversing entries booked in the trust accounting system and inputting or backdating a posting date, making reliance on Enterprise records impractical. The controls at Enterprise did not adequately prevent an employee from recording or reallocating favorable trades to one account over another. The main control that existed was a maintenance log contained within the accounting system to track changes to the accounting system; however, this log was only used for the period after January 31, 2008. The general lack of controls creates a risk that Enterprise improperly recorded or misallocated client assets rendering the client records unreliable.

### 2.    Conflict of Interest

For the most part, the information obtained by the Receiver indicated that investment decisions were under the authority and control of Mr. Lohmeier. Clients were invested in banks in which Mr. Lohmeier either had an economic interest or sat on the Board, creating a potential conflict of interest. The Commissioner for the State of Nevada also found that Enterprise violated its fiduciary obligations to investors by depositing money in banking institutions where Mr. Lohmeier had an undisclosed interest.

Indeed, Mr. Lohmeier sold private equity securities out of his account at inflated prices to clients, one of whom informed counsel for the Receiver that he was unaware of the transactions. Analysis of cash transfers in one of Enterprise's suspense accounts indicates that money generated from such improper activity was siphoned off by Mr. Lohmeier.

### 3.    Lack of Any Audits Conducted During the Entire Operating History of Enterprise

Enterprise never commissioned an independent audit of its financial statements, which would have resulted in tests of assets in custodial accounts and under management, proper calculation and allocation of management fees, and the assessment of the effectiveness of internal controls. Because there were no audited financial statements for Navigant to rely upon, Navigant was required to increase the scope of its testing procedures.

### 4.    The Suppression of Trading Details in Client Statements.

The Receivership uncovered evidence that Enterprise withheld details of trading activity from some of its clients and suppressed such information in the trust accounting system, which meant that certain clients could not view all the activity that was occurring in their accounts. Specifically, based on information obtained from the vendor for the trust

accounting system and from a review of e-mails from Enterprise officials, in March 2006, Enterprise directed the vendor to develop client programming to suppress the transaction details in certain client statements. In June 2007, Enterprise agreed to pay the vendor for custom programming to suppress the transaction details from reports that certain clients would have been able to access over the internet. Additionally, in June 2007, Enterprise made a further request that the vendor suppress certain trading and transaction details on certain client statements, and directed that the suppressed information be replaced with a summary of dividends and interest only.

The suppression of trading details from client statements, which necessarily prevented clients from viewing and verifying, on a real time basis, that the activity occurring in their accounts was authorized, further prevented Navigant from relying on Enterprise's statements in identifying which securities should have been in any individual client account at any particular time. Suppression of transaction detail from client statements is not a common or accepted practice.

### 5. Apparent Destruction of Evidence by Enterprise After the Appointment of the Receiver

At the direction of the Receiver, on March 10, 2008, Navigant went to Enterprise's office in Oakbrook, Illinois and began the process of securing and preserving electronic evidence. Five hard drives were imaged on March 10, including the hard drives used by Mr. Lohmeier, Ms. Townsend and other Enterprise personnel. Navigant returned to Enterprise on March 11 to image the files maintained on Enterprise's server.

Navigant's subsequent analysis of the images obtained from the servers revealed that numerous computer files were deleted between the time Navigant ceased its work on the March 10 and before it resumed its work on March 11. Because the Order appointing

the Receiver permitted Mr. Lohmeier and Ms. Townsend to continue to operate their business, they and the other employees of Enterprise had access to Enterprise's office and computer systems. The apparent destruction of Enterprise records was in violation of the March 3, 2008 Temporary Restraining Order, impeded the process of recreating client accounts and further prevented reliance on Enterprise records.

### 6. Lack of Cooperation from Enterprise Personnel

Although the Order appointing the Receiver required Enterprise's principals and employees to cooperate with and assist the Receiver, the Receiver did not receive all the requested cooperation, which delayed the accounting process and further impaired the ability of the Receiver to rely on any of Enterprise's records in determining the appropriate distribution of client assets and liabilities.

Certain Enterprise employees involved in the accounting process at Enterprise refused to respond to calls from the Receiver and thus did not provide assistance in validating and/or correcting data recorded in the trust accounting system. No one from Enterprise was able to walk Navigant through the daily files to explain how accounting work was performed on a daily, monthly and quarterly basis. Additionally, the Receiver was not provided with any explanation of how trading gains and losses were reallocated to clients given that all of the securities in all of Enterprise's brokerage accounts were purchased with commingled client funds. It should be noted, however, that Ms. Townsend has cooperated to some extent with respect to certain daily operational and document discovery issues. In that regard, Ms. Townsend was interviewed by Navigant regarding her knowledge of the trust accounting system. Neither Mr. Lohmeier nor Ms. Townsend has agreed to be interviewed by the Receiver. This lack of cooperation from Enterprise's

principals and certain employees involved in the accounting process at Enterprise has significantly delayed the accounting process.

## VI.    ASSESSMENT OF CLIENT ASSETS BY ANALYZING CLIENT CONTRIBUTIONS AND WITHDRAWALS

Based on the findings above, the Receiver concluded that Enterprise's records did not accurately reflect either the value of specific securities or the proper distribution of the securities among the client accounts. Because over 360,000 transactions would have had to have been verified and possibly corrected, the Receiver also determined that it would be cost prohibitive to determine with any precision all of the transactions that should have been reflected in each client account. The cost of such a verification process would have involved compiling records to support the transactions in the system, fully reconciling the transactions recorded in the accounting system to the account activity in each client account from January 2006 through March 2008, posting corrections to the trust accounting system, and obtaining records from clients when supporting documentation was not identified. It was estimated by Navigant that such a process would have taken well over a year and would have been cost prohibitive. Moreover, because of the lack of proper sub-accounting and internal controls, it is unlikely that a reliable result could have been obtained or, for that matter, a precise valuation of individual client accounts could have ever been performed.

Consequently, the Receiver limited the scope of the testing conducted by Navigant to an analysis of each client's contributions and withdrawals. This process was made possible by the fact that the Receiver was able to obtain, with the assistance of the SEC, brokerage and bank records enabling the verification of contributions and withdrawals through third

party records. Additionally, while numerous other problems were noted with the trust accounting system and the statements provided to clients, the analysis conducted by Navigant concluded that the information in the trust accounting system regarding client contributions and distributions was sufficiently reliable, after certain safeguards were put in place, to use these fields as a reasonable starting point in the allocation analysis.

For purposes of the Allocation Plan, contributions include any asset, cash or security that a client transferred or caused to be transferred to Enterprise. Distributions include securities, cash and wire transfers sent by Enterprise directly to a client or to a third-person for the benefit of the client, as well as tax withholdings that were paid for the benefit of a client. (The resulting number is referred to as the "Net Contribution.")

Where transfers were made between accounts maintained at Enterprise, the amount of the transfer was treated as a contribution to the receiving account and a withdrawal from the transferring account so as to avoid overstating total contributions and total withdrawals for all clients in aggregate.

Navigant performed testing on the accounting system to calculate the total contributions and distributions on a client-by-client basis from January 2006 through March 5, 2008. As part of the process of determining each client's account value (on the basis of receipts and distributions) Navigant performed the following tasks: (1) verification and reconciliation of cash receipts recorded in the accounting system to bank statements; (2) verification that cash receipts recorded in the bank statements were recorded in the accounting system; (3) verification and reconciliation of cash distributions recorded in the accounting system to bank statements; (4) verification that cash distributions recorded in bank statements were recorded in the accounting system; (5) verification that in-kind

transfers recorded in accounting system were received by the bank; (6) verification that in-kind transfers recorded by the bank were recorded in the accounting system; (7) verification that asset transfers (withdrawals) recorded in the accounting system were delivered by the bank to the respective client; and (8) verification that asset transfers (withdrawals) delivered by the bank, and recorded in bank statements were recorded in the trust accounting system. When errors were identified in the accounting system, balances were appropriately updated.

Navigant verified each contribution and distribution for approximately 56% of the client accounts during the years 2006 and 2007 and found that there was a reasonable degree of accuracy for these types of postings in the trust accounting system. The Receiver and Navigant took additional comfort from the fact that investors received quarterly statements that reported contributions and withdrawals during this period and there did not appear to be any complaints concerning this data. Put differently, while the trust accounting system was found to be unreliable for assessing trading gains and losses, testing confirmed that the system did, for the most part, accurately reflect contributions and withdrawals during this period.

For the period of January 1, 2008 through March 3, 2008, the Receiver directed that Navigant verify customer contributions and withdrawals, recognizing that the contribution and withdrawal records during this period were significantly less reliable and contained a significant number of errors. Navigant ultimately reconciled over 660 transactions during this period.

As part of the forensic accounting process, Navigant corrected errors relating to client contributions and withdrawals, thus creating a database suitable for quickly

analyzing various allocation and distribution models and for use in returning assets to clients.

## VII.    THE RESULTS

During the course of Enterprise's history, client contributions totaled approximately $103.2 million.  Client withdrawals totaled approximately $30.2 million.  Thus, exclusive of any trading gains or losses, the total approximate net assets provided to Enterprise were $73 million.

As detailed in Section III above, as of June 30, 2008, Enterprise held for the benefit of the account holders, liquid securities and cash, in a total approximate amount of $30,400,000.[2]  Enterprise also holds private equity securities, real estate, and certain fixed income securities totaling approximately $13.8 million valued at fair market value where obtainable or at cost.

Enterprise's assets, available for distribution, thus total approximately $44.2 million indicating a loss of roughly 40% in client assets.  On-going market fluctuations will affect the final value of assets available at the time of the distribution as well as deductions for expenses occurred in allocating and redistributing assets to the Enterprise clients and funds retained in connection with investigation of others who may have contributed to client losses.

The shortfall in client assets is largely a result of trading losses.  These losses were not reflected in the statements provided to clients.

---

[2] The value of mutual funds and other publicly traded securities are subject to market fluctuations.

## VIII.  DISTRIBUTION METHODOLOGY

### 1.    **Client Classifications (Custodial v. Managed)**

At the direction of the Receiver, the 1198 funded client accounts were analyzed in order to categorize them as either custodial or actively managed.  Custodial accounts were defined as accounts in which client assets and securities positions were to be maintained without modification, exept for the withdrawal of funds, payment of fees or reinvestment of dividends.  Actively managed accounts, for purposes of the distribution methodology, were defined as accounts in which the purchase and sale of securities consistently occurred on a monthly basis, including trading on margin, entering into short positions or trading derivative securities.  Where accounts did not meet these specific criteria, they were individually reviewed by the Receiver and categorized based on his assessment of the activity in those accounts.

Enterprise clients are excluded from participation in the Allocation Plan if (1) their accounts closed before March 1, 2008 (no accounts were closed between that date and March 3, 2008, the date the Asset Freeze Order was entered); (2) their distributions exceeded contributions (primarily due to asset appreciation); or (3) their accounts were unfunded.  A closed account is defined as an account with a balance of $250 or less as of March 1, 2008.  An unfunded account is one for which neither cash nor securities were transferred by the client to Enterprise.

### 2.    **Distribution Percentages**

Navigant calculated, for each client account, total contributions (deposits) less withdrawals to determine the total value of net contributions for each client account provided to and maintained at Enterprise.  The net contribution number was used in

determining the allocation to each account.

A determination was made not to distribute the assets that remain at Enterprise on a strictly *pro rata* basis, but instead to allocate each participating client account into one of several tiers. This decision was made for a number of reasons. Custodial client assets were used, without the clients' knowledge, as security for speculative trading in managed accounts. The custodial accounts had no interest in that trading and would not benefit if it was profitable. As it turned out, over $8 million of custodial assets were actually liquidated and used to satisfy a debit balance that resulted from the speculative trading. Consequently, a determination was made that custodial accounts should receive a greater percentage of the remaining assets than most actively managed accounts. Nevertheless, since Enterprise lacks sufficient funds to return to clients what is owed to them, and since custodial clients signed documentation giving Enterprise discretion over their accounts, a determination was made that the custodial accounts should receive, subject to market conditions, 65% per cent of their net contribution, which represents a higher percentage than the percentage to be received by clients with managed accounts.

Managed clients are broken down into four categories: (1) accounts actively managed by Mr. Lohmeier; (2) accounts actively manage by Mr. Lohmeier that either did not engage in speculative short selling or were opened in 2008; (3) accounts managed by David Steckler of LPL Financial, for which Enterprise acted as a custodian ("Steckler accounts"); and (4) accounts managed by David Disraeli, in which the trading strategy was different than that which was employed by Mr. Lohmeier for his actively managed account clients ("Disraeli accounts"). The managed Steckler and Disraeli accounts suffered trading losses; however, those losses were not of the magnitude suffered by Mr. Lohmeier's

managed client accounts.   Additionally, unlike the accounts manage by Mr. Lohmeier, it does not appear that custodial assets were used to collateralize trading done for the benefit of the Steckler and Disraeli accounts.  Consequently, for distribution purposes, the Steckler and Disraeli managed accounts are being allocated 55 percent of their net contribution. Similarly, the accounts actively manage by Mr. Lohmeier that either did not engage in speculative short selling or were opened in 2008 are being allocated, subject to market conditions, 55 percent of their net contribution.

Since the vast majority of client losses resulted from speculative trading engaged in by Mr. Lohmeier for the benefit of client accounts managed by him, those clients should bear a greater percentage of the loss.  Accordingly, accounts managed by Mr. Lohmeier that engaged in speculative trading will receive, subject to market conditions, 25 percent of their net contribution.

Enterprise invested for certain of its clients in a number of private banks, land deals and promissory notes ("Private Equity").  These Private Equity investments are not readily marketable and liquidation of these assets could result in significant losses.  A number of clients holding these assets have indicated that they would prefer to have them returned in kind. The Private Equity investments are also largely held by the managed account clients who, under the proposed Allocation Plan, are receiving a smaller percentage of the allocable funds.  Based on these factors, the Receiver proposes the return of the Private Equity investments in kind to their respective account holders.  This will result in some Enterprise clients receiving a greater return than what they would have received if they did not own any Private Equity.  The percentage allocated to any client will be reduced by the amount of Private Equities returned to them.

In order to preserve the financial privacy of each individual Enterprise client, a spreadsheet detailing all of the individual client contributions and withdrawals will be made available only to the Court, on an *ex parte* basis, upon the Court's request.

### 3.      The Accounts of Lohmeier, Townsend, Pyle and Ruthe Gomez

Under the proposed Allocation Plan, assets belonging to Mr. Lohmeier, Ms. Townsend, Judiann Pyle (Assistant Vice President, Chief Systems Officer and Head of Operations), and Ruthe Gomez, the owner of AFC are not being distributed at this time. With respect to Mr. Lohmeier and Ms. Townsend, the Receiver intends to seek a court order authorizing the distribution of these assets to Enterprise clients. With respect to Ms. Pyle and Ms. Gomez, the Receiver is still assessing whether they have responsibility for the losses suffered by Enterprise clients.

### 4.      Hold Back

The Receiver proposes holding back approximately $1,000,000 of distributable assets, after payment of June fees and expenses, in order to fund ongoing investigation and potential litigation against various third parties that may be partially responsible for the losses suffered by the Enterprise clients. More specifically, the Receiver believes that certain broker dealers and clearing firms which did business with Enterprise may have assisted Mr. Lohmeier in the improper use of assets of custodial clients, especially IRA and ERISA accounts, as security for speculative securities trading engaged in by Mr. Lohmeier. The Receiver intends to continue his investigation of this conduct to determine whether one or more of these firms share responsibility for the losses incurred by Enterprise clients and if appropriate, institute litigation to pursue such claims.

Assets recovered from any judgments or settlements would be distributed to the Enterprise clients in accordance with the proposed Allocation Plan. To the extent that the Receiver determines that potential litigation is not viable, unlikely to merit the cost associated with pursuit of the claim, or believes that his efforts would be duplicative of any actions that may be brought by government agencies, the Receiver will distribute to clients, after completion of his investigation, any remaining funds.

## IX.    DISTRIBUTION PROCEDURE

The Receiver shall:

(a)    Cause to be mailed by first class United States mail, a letter (1) detailing for each Enterprise client their total contributions, withdrawals and payout consistent with the proposed Allocation Plan, and (2) explaining the claims process;

(b)    Cause to be mailed by first class United States mail a copy of this Report;

(c)    Post a copy of this Report on the Enterprise website; and

(d)    Provide a copy of this Report to any known creditors of Enterprise.

Objections to the Plan of Allocation must be submitted in writing to the Receiver and postmarked no later than August 22, 2008. Objections should be sent to:

Phillip L. Stern
Receiver for Enterprise Trust Company
c/o Neal Gerber & Eisenberg
2 N. LaSalle Street
Suite 2200
Chicago, Illinois 60602

Objections shall be limited to the contribution, distribution or withdrawal amounts reflected on their individual allocation schedule and the allocation category they are

assigned.  Any objection shall include documentary support demonstrating that there is an error in the client's contribution, distribution or withdrawal amount or their treatment as either a managed or custodial account.  No objection to the allocation methodology will be considered.

The Receiver will consider the comments, suggestions and objections of clients and revise the Allocation Plan accordingly if the Receiver believes that revision is necessary in order to achieve a reasonable and equitable distribution and allocation of Enterprise assets. After the close of the objection period, the Receiver shall file with the Court a summary of the comments received, the comments themselves, and if appropriate, a revised Allocation Plan.

A final hearing to approve a Plan of Allocation shall be held on September 23, 2008, at 11:00 a.m., before the Honorable James B. Zagel, in Court Room 2503 of the United States Courthouse, 219 South Dearborn Street, Chicago, Illinois, at which time any Enterprise client objections, and claims from creditors, shall be considered. Any client who has failed to provide a timely written objection to the Plan of Allocation shall not be permitted to object at the September 23, 2008 hearing.

Date:  July 21, 2008                              Respectfully submitted,


                                                  /s/ Michael Z. Gurland
                                                  Counsel to the Receiver Phillip L. Stern

Michael Z. Gurland, Esq.
Christopher M. Burky, Esq.
Samuel S. Cohen, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL  60602-3801
(312) 269-8000
(312) 269-1747

## CERTIFICATE OF SERVICE

The undersigned, an attorney, states that on the 21st day of July, 2008 he electronically filed **Receiver's Proposed Plan for the Allocation of the Assets of Enterprise Trust Company** with the Clerk of the Court using the CM/ECF system which sent notification to the following:

| | |
|---|---|
| Steven J. Levine | levines@sec.gov |
| Steven L. Klawans | klawansse@sec.gov |
| Allison M. Fakhoury | fakhoury@sec.gov |
| Pravin Rao | prao@perkinscoie.com |
| Amy Lum | alum@perkinscoie.com |
| Patrick William Blegen | pblegen@blegenlaw.com |
| John J. Conway | johnconway@shlawfirm.com |
| Matthew P. Barrette | mattbarrette@shlawfirm.com |

/s/ Michael Z. Gurland
Counsel to the Receiver Phillip L. Stern

NGEDOCS: 1547251.1