UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | )<br>)<br>) |
| Plaintiff, | )  No. 08 CV 1260<br>) |
| v. | )  Hon. James B. Zagel<br>) |
| ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER and REBECCA A. TOWNSEND, | )<br>)<br>)<br>) |
| Defendants. | ) |

## DECHRISTOPHERS' OBJECTION TO RECEIVER'S PROPOSED PLAN OF DISTRIBUTION

John Lohmeier repeatedly lied to the customers and prospective customers of Enterprise Trust Company ("Enterprise"), misled them in numerous ways, and made a series of risky leveraged investments that generated losses of approximately $27 million. The result is a securities fraud that profoundly injured Enterprise's customers (the "Lohmeier Fraud"). The SEC has frozen assets held by Enterprise. The Receiver, therefore, has the task of recommending how the damage caused by the Lohmeier Fraud is to be shared by the victims – the Enterprise customers. Typically, where, as here, the assets cannot be traced, the loss is shared *pro rata*. The Enterprise Receiver, however, has proposed something different; a series of customer classes with the losses shared unevenly between the proposed classes.[1] While the Proposed Plan of Distribution is undoubtedly well intentioned, it is innately unfair. It assigns the largest losses to the most victimized investors under the mistaken belief that if John Lohmeier

---

[1] The Receiver's Proposed Plan for the Allocation of the Assets of Enterprise Trust Company will be referenced as "Receiver's Plan", and is attached as Exhibit A. The Receiver's accompanying cover letter to Enterprise investors dated July 25, 2008 will be referenced as the "Plan Letter", and is attached as Exhibit B.

514652_2.DOC

assigned risky trades to customers, these customers authorized risky leveraged margin trades, ratified them, or benefited from them. The Receiver assumes these customers not only wanted trades Lohmeier assigned to their accounts, but trades never assigned to any Enterprise customer.

Donald and Martha DeChristopher are two such customers. They never wanted risky leveraged trades and never authorized or approved such trading in their IRA accounts. The Receiver's inherent assumption of approval, ratification or waiver by the DeChristophers is contrary to known facts and is inconsistent with controlling law. The Court should apply the principle of "equality is equity" and deny the Receiver's Plan of Distribution.

## I.   REQUESTED DISTRIBUTION

The DeChristophers accept the Receiver's conclusion that tracing assets is impossible and therefore not a viable alternative. (Exh. A, Receiver's Plan, p. 13; Exh. B, Plan Letter, p. 1) The DeChristophers make two alternative proposals for the distribution of assets:

1. All losses will be shared on a *pro rata* basis between innocent Enterprise customers. The Enterprise customers that assisted this fraud or were aware of it and failed to act should not share in this distribution; *or*

2. The DeChristophers should be placed in the tier of Enterprise customers that are receiving 55% of the funds back without in kind allocations.

## II.   BACKGROUND

### A.   Enterprise Trading and Deception.

The DeChristophers accept the following, which consists of the majority of the key conclusions the Receiver and the SEC have reached concerning the nature of the Enterprise trading and record keeping system:

- Enterprise customer money was commingled in omnibus accounts and not segregated as promised. (Exh. A, Receiver's Plan, p. 4)

- The trading was leveraged through margin arrangements with the brokers and much of the trading established high risk positions. (*Id.* at 1, 8-10)

- Trades were made in Enterprise's name and allocated to customers through a sub accounting system. There was no written plan of allocation and the Receiver cannot determine when any of the allocations to customers occurred. (*Id.*, at 14)

- When the Receiver stepped-in, there was a large block of positions held in Enterprise's name that had not been allocated to any customer. (*Id.*, at 9, 12)[2]

- Statements sent to customers were intentionally inaccurate. The customer statements overstated the value of their accounts. (*Id.*, at 2, 21) The customer statements also did not disclose typical detail about the positions being held. (*Id.*, at 15-16)

- John Lohmeier and Rebecca Townsend had personal trading accounts at Enterprise, as did several of their family members and friends. (*Id.*, at 25)

- Lohmeier benefited personally by selling Enterprise customers securities which he purchased at a mark-up over his purchase price. (*Id.*, at 15)

- Lohmeier and Townsend perpetrated a fraud. (*See,* 03/03/08 SEC Complaint)

**B.    The DeChristophers and the Proposed Plan of Distribution.**

Donald and Martha DeChristopher fall into the group of customers that the Receiver asks to absorb the largest percentage share of the Enterprise losses. The DeChristophers had over a million dollars in their three IRA accounts with Enterprise.[3] (Don DeChristopher affid., Exh. C, at ¶ 3); (Martha DeChristopher affid., Exh. D, at ¶ 6). Based on the Receiver records, the total invested in these three accounts was $1,069,955 and the total value of cash and securities the Receiver proposes be returned to the DeChristophers is approximately $152,000 in cash, and an additional in-kind distribution of assets that cannot be valued or liquidated at this time, but with the cost value of $113,900.[4]

---

[2] While the Plan of Distribution is oblique on this point, the Receiver has confirmed it in a number of verbal and written communications with the DeChristophers' counsel.

[3] The basic information concerning the DeChristophers' contact with Enterprise is set forth in the affidavits of Donald and Martha DeChristopher, attached as Exhibits C and D, respectively.

[4] The impact of the Lohmeier Fraud on the DeChristophers is acute. Given the extent of the injury the DeChristophers have sustained, the firm representing them in this proceeding is doing so on a *pro bono* basis. Copies of the account summary information for the DeChristophers provided by the Receiver are attached as group Exhibit E.

The DeChristophers are long time residents of Oak Brook, Illinois. Donald works as a dentist in Elmhurt, and Martha is the alternate charge nurse in the gastrointestinal unit at Good Samaritan Hospital in Downers Grove. (Exh. C, ¶2); (Exh. D, ¶2). The couple planned to retire at the end of the year when Donald turns seventy, but now they are reconsidering as they wait to see how the proposed plan of distribution affects their retirement. *Id.*

John Lohmeier was referred to the DeChristophers before he began Enterprise as someone who could provide professional assistance with their IRA accounts. (Exh. C, ¶4); (Exh. D, ¶4). At that time, Lohmeier headed the Hinsbrook Bank trust department. The DeChristophers gave Mr. Lohmeier discretionary trading authority *subject to* their direction that the accounts be traded for relatively conservative growth. (Exh. C, ¶¶5-19); (Exh. D, ¶¶4-6). When Lohmeier left Hinsbrook to form Enterprise, he and Townsend fraudulently induced the DeChristophers into moving their account to Enterprise by repeatedly promising them that their accounts would be invested conservatively and well protected. (Exh. C, ¶¶7-19, 24); (Exh. D, ¶¶5-6). Throughout the time they were Enterprise customers, the DeChristophers were repeatedly assured that the trading in their accounts were earning small profits and were appropriately invested. (Exh. C, ¶7-19, 24); (Exh. D, ¶4-6, 8).

The DeChristophers never authorized the commingling of their IRA funds and never knew it had occurred. (Exh. C, ¶25); (Exh. D, ¶9). Similarly, they never knew that Lohmeier was trading on margin or that their cash and securities were being posted for margin. *Id.* They never asked for or wanted risky short positions or naked option trading. *Id.* Indeed, even in their personal trading, the DeChristophers never traded on margin or engaged in option trading.

The DeChristophers had no social relationship with Lohmeier or Townsend. The only relationship the DeChristophers had with Lohmeier and Townsend was through Enterprise, and

Hinsbrook before it. (Exh. C, ¶26); (Exh. D, ¶10). The DeChristophers never knew there was a problem with their accounts until the SEC filed its complaint against Enterprise. The DeChristophers immediately sought to transfer their accounts, but it was too late. (Exh. C, ¶¶20-23); (Exh. D, ¶11).

C.  **General Principles to Be Applied to the Plan of Distribution.**

Unfortunately, the current situation is neither new nor unique. There are several instances where courts have considered plans of distribution because a fraud caused a shortfall of customer funds. Several core principles applicable to this dispute can be identified from that body of case law.

1. The funds to be distributed do not belong to Enterprise. Enterprise is holding the funds in trust for the benefit of the customers. Therefore, the customers are not creditors of Enterprise and the customers take in priority over Enterprise creditors. *In re Possession & Control of Comm'r of Banks,* 327 Ill. App. 3d 441, 476, 764 N.E.2d 66 (1 Dist., 2001).

2. Wrongdoers have no priority and customers take over any wrongdoer asserting a claim or creditors of such wrongdoers. *In re Possession & Control of Comm'r of Banks, supra,* 327 Ill. App. 3d at 482 ("The beneficiaries [trust customers] are entitled to priority over the wrongdoer and his creditors. However, between the several beneficiaries themselves, the general rule is that there is no reason to prefer one claimant over another claimant.")

3. When practical the distribution can be based on a tracing of the customer funds. Where such tracing is impossible or where a fraud means that where the funds happen to reside at any given time is meaningless, the general rule is the funds are distributed on a *pro rata* basis. 5 Scott on Trusts, § 519, at 641 ("The general rule where money held in trust on behalf of more than one beneficiary is commingled into a single fund is that the beneficiary's interest in the commingled fund is in proportion to his contribution, or a *pro rata* share."); *In re Possession & Control of Comm'r of Banks, supra,* 327 Ill. App. 3d at 492; *SEC v. Credit Bancorp, Ltd.,* 2000 U.S. Dist. LEXIS 17171, *44-47, 43 U.C.C. Rep. Serv. 2d 397 (S.D.N.Y. 2000) (discussing courts and circuits that favor *pro rata* distribution even where assets *can* be traced); *In Re Lemons & Associates,* 67 BR 198 (Dist. Nev. 1986).

## III.   ARGUMENT

The Receiver distinguishes between "Custodial Account" and "Managed Accounts", and then proposes that Custodial Account holders should receive a significantly higher percentage of their net contribution than the Managed Account holders.[5] Custodial customers will receive a payout equal to 65% of their net investment. (Exh. A, Receiver's Plan, p. 23) The Receiver breaks down the Managed Accounts into four sub-categories: (1) accounts actively managed by Lohmeier, which will receive 25% of their net contributions, (2) accounts actively managed by Lohmeier that either did not engage in speculative short selling or were opened in 2008, which will receive 55% of their net contributions, (3) accounts for which Enterprise acted as a custodian, which will receive 55% of their net contributions, and (4) accounts managed by David Disraeli with a different trading strategy, which will receive 55% of their net contributions. (Exh. A, Receiver's Plan, p. 23-24) The DeChristophers' IRA accounts are deemed "actively managed" and therefore are to receive only 25% of their net contributions, subtracted by the full cost value of any in-kind assets.

The Receiver's distinctions between Custodial and Managed Accounts and his allocation scheme is unfair and against the weight of Illinois and nationwide laws. The remaining assets should be distributed *pro rata*. In the alternative, the Receiver's classification of the DeChristopher accounts is improper, and they should be reclassified to receive 55% of their net contributions. In addition, the subtraction of the full cost of the DeChristophers' in kind assets is unfair, given the substantial decrease in the actual value of those assets. Furthermore, the

---

[5] The nomenclature used by the Receiver is not standard to the trading community. By definition, all of the customers had custodial accounts because all accounts were trust accounts and all trust accounts are custodial. Certainly, all IRA accounts are by statute and common law, custodial in nature. Moreover, the class of "actively managed accounts" is not a recognized phrase with a standard definition. The Receiver's Plan reveals that he was unable to give an empirical standard to be applied to that phrase. Instead, he made individual judgments based on undisclosed subjective criteria.

proposed settlement with Enterprise's attorneys is inappropriate, because they are 'general creditors'. Finally, this Court should provide more time for the discovery of additional responsible or participating parties before finalizing a distribution plan.

### A. The Receiver's Plan is Unfair.

The Receiver characterizes Custodial Accounts on the basis of the instructions provided by their account holders, defining them "as accounts in which client assets and securities positions *were to be* maintained without modification, except for the withdrawal of funds, payment of fees or reinvestment of dividends." Custodial Account holders were also generally opened up later in Enterprise's brief life-span. (*Id.,* at 23) "Managed Accounts", on the other hand, are defined by the activity that *actually* took place, "accounts in which the purchase and sale of securities consistently occurred on a monthly basis, including trading on margin, entering into short positions or trading derivative securities." (*Id.*) This definitional scheme, which is used as the basis for the Receiver's Plan of Distribution, is flawed and unfair because Lohmeier's improper and fraudulent activities of the Enterprise trust accounts were never authorized, ratified, or for the benefit of the DeChristophers' Managed Accounts.

While the visceral reaction that those that were touched by the fraud for a shorter period of time should sustain less of the loss is understandable, that conclusion does not withstand close scrutiny and is contrary to controlling law. The truth is that all Enterprise customers were victims of the Lohmeier Fraud. No one deserves the losses they are going to absorb, and there is no cogent rationale for distinguishing between the various victims of the fraud.

### 1. *The Tiers of Distribution Cannot Be Based on the Grant of Discretionary Trading Authority.*

Although he does not identify it as a justification, the Receiver *could* argue that actively Managed Account customers all gave Lohmeier discretionary trading authority and are therefore

responsible for the losses generated from Lohmeier's risky leveraged positions. For a variety of reasons, that potential justification for the Receiver's position should be rejected.

*First*, a direct grant of authority cannot be the basis for the Receiver's position because *both* types of accounts, including Custodial Accounts, were discretionary. As the Receiver states in the Plan of Distribution, "custodial clients signed documentation giving Enterprise discretion over their accounts". (Exh. A, Receiver's Plan, p. 23). Therefore, the existence of such a grant of trading authority cannot explain the difference in the proposed different tiers of allocation.

*Second*, the Receiver ignores authority limitations by those he defines as Managed Account customers, while basing the distinction between the two types of accounts on the authority limitations provided by the Custodial Account customers. Indeed, the DeChristophers never authorized trading on the margin or any risky short positions or naked option trading. The discretionary authority they granted was explicitly limited by its very terms. Paragraph 2 of the Donald and Martha DeChristophers' Private Portfolio Investment Agency Agreements ("Investment Agency Agreements") grants Enterprise discretionary trading authority "based on the Customer's stated risk profile and investment objectives." (*See* Exhs. F and G, Donald DeChristopher and Martha DeChristopher's Investment Agency Agreements respectively). The DeChristophers limited Enterprise's authority to trading appropriate for an IRA account designed to generate conservative growth. Those limitations were provided in writing and numerous times verbally.[6] (DeChristopher affid. at ¶¶7-19). Lohmeier's trading was inconsistent with the

---

[6] The Receiver seems to suggest that he will only consider trading instructions provided in writing. While we appreciate such a limitation has its efficiencies, it cannot be imposed. The Investment Agency Agreements specifically acknowledge that customers can give Enterprise trading directions verbally. Moreover, Illinois law is clear that oral modifications can be made to contracts granting a power of attorney. *See, Todd v. Corporate Life Ins. Co.*, 945 F.2d 204, 120 Lab. Cas. (CCH) P56778 (7th Cir. 1991); *Park v. Dealers Transit, Inc.*, 596 F.2d 203, 1979 U.S. App. LEXIS 16946 (7th Cir. 1979). It is inappropriate for the Receiver to ignore verbal trading limitations because such verbal instructions were explicitly authorized by contract and are binding under Illinois law.

authorization limitations imposed by the DeChristophers.[7]

*Third*, inherent limitations imposed on IRA accounts restrict both Enterprise's ability to engage in certain types of trades and practices and limits the DeChristophers' power to authorize such activity. The Internal Revenue Code specifically provides that IRA accounts cannot engage in margin trading or short trading. IRS § 408(e)(4) (providing that IRA assets pledged as collateral - which, by definition, is necessary for margin activities such as selling short or buying on margin - are treated as a distribution to the IRA account holder); *Investment Institute v. Conover,* 252 U.S. App. D.C. 364; 790 F.2d 925 (Columbia Cir., 1986) (bank restricted by 26 U.S.C. 408(e)(4) from pledging IRA assets for margining securities). Moreover, IRA accounts funds must be segregated and cannot be commingled into the type of omnibus account employed by Enterprise. IRS § 408(a)(5). These limitations mean that Lohmeier was never authorized to engage in the trading that produced the losses. In other words, even if the DeChristophers wanted to, they could not authorize Lohmeier to commingle funds, engage in margin trading, or engage in short sales.

    2.    *The DeChristophers' Never Ratified Lohmeier's Risky Leveraged Trading.*

The Receiver never sets forth any legal support for the Proposed Plan of Allocation. From reading between the lines, however, it appears as if the primary argument the Receiver is advancing is that the Managed Accounts ratified the risky trading by their silence when risky trades were placed in their accounts. That position is contrary to controlling law and common sense.

---

[7] Although the Receiver's plan of distribution is not based on the authority granted or limited by the various accountholders, he did subsequently produce copies of the DeChristophers' Investment Agency Agreements to the DeChristophers' counsel. The Receiver's copies, however, conflict with the DeChristopers' copies. It stands to reason that Lohmeier either forged the copies that he gave to DeChristophers (the ones attached as Exhibits E and F), or forged the copies that he gave to the Receiver.

A large portion of the losses that the DeChristophers are being asked to absorb arise from trading losses for positions that were never assigned to anyone's account.[8] The Receiver contends the size of the unallocated positions is immaterial because his allocations proposal does not involve tracing. That argument misses the mark. The DeChristophers could not have approved or ratified the transactions, because these trades, which were never allocated to any customer, never appeared on their (or anyone's) account statements. The Receiver is using ratification in a way never approved by any court. The Receiver is contending that once you have a risky trade in your account and do not complain, you have not only ratified that risky trade but all risky trading done by the trader. The Receiver is, therefore, asking this Court to approve the notion that customers approved trades that were never posted to their accounts because they ratified that type of trading. No support exists for this expansion of the doctrine of ratification.

More importantly, no ratification could occur because Lohmeier actively mislead customers about risk. The Receiver acknowledges that Enterprise and Lohmeier provided false information to its customers. The account statements misreported the value of positions held in their account; the statements failed to disclose certain positions and included positions not held. There can be no ratification in such circumstances. *Am. Nat'l Bank & Trust Co. v. Alps Elec. Co.*, 2002 U.S. Dist. LEXIS 5424, *61-62 (N.D. Ill. 2002) ("Implied" ratification requires that a client knows all of the material facts).

---

[8] There has been a dialogue with Receiver and his counsel on this topic. We asked the Receiver to quantify the dollar amount of the losses that arise from positions that were never assigned to any customer. (Copies of such correspondence are attached as Group Exhibit H). We have been told that the Receiver cannot quantify the losses stemming from such unallocated trades. While we understand why such activity cannot be traced through sub accounts, we do not understand why the losses generated from unallocated trades cannot be quantified.

An example helps to illustrate the point. The DeChristopher's received a letter from Enterprise in January of 2008 that was a recap of the results over the last quarter. (*See* Exh. I). The letter falsely states that their accounts had performed marginally better than some well recognized benchmarks identified by Enterprise. Moreover, the letter reassures the DeChristophers that the small bank stock Enterprise had purchased on their behalf was extremely safe as they did not suffer from the problems being experienced by bigger banks. As the Receiver acknowledges, the DeChristophers never knew their money was being commingled or that their accounts were being used to collateralize other trading.

Because material information was being withheld from the DeChristophers and they were being actively lulled and misled, they could not and did not ratify the trading that generated these losses. *Evanston Bank v. ContiCommodity Services*, 623 F. Supp. 1014 (N.D. Ill 1985) (Silence does not lead to waiver or ratification unless the person has knowledge of all material facts); *Indosuez Carr Futures v. CFTC,* 27 F.3d 1260 (7th Cir., 1994) (Account statements not enough to alert a sophisticated investor of fraud in the face of contradictory representations); *Jakobsen v. Merrill Lynch,* [1984-1986 Transfer Binder] 1985 CFTC LEXIS 91, Comm. Fut. L. Rep. (CCH) P 22,812 at 31,393 (CFTC November 21, 1985) (In reversing Judgment Officer's finding that investor had not made inquiries and therefore was not justified in relying upon broker's misrepresentations, the court held that "a customer does not have a duty to investigate the truth of statements made to him, but may ordinarily rely on the honesty of the account representative's representations"); *Indosuez Carr Futures v. Commodity Futures Trading Comm'n*, 27 F.3d 1260, 1264 (7th Cir., 1994) (citing *Jakobsen v. Merrill Lynch*).

As detailed earlier, IRA accounts cannot be commingled, used in margin trading or used for short trading. Since Lohmeier and Enterprise were well aware of such restrictions, the

DeChristophers had no capacity to approve or ratify such trading. The *Evanston Bank* decision applied that analysis in a stronger factual setting. *Evanston Bank, supra*, 623 F. Supp. at 1014. There, a broker engaged in speculative trading on behalf of the bank, pursuant to the instructions of the bank's president and fraud perpetrator. The court held that the broker's conduct *was not* ratified by the board of directors of the bank, even though they never complained of improper speculative trading, because the broker *knew* banks *may not* engage in speculative trading. *Id.* The inability of banks to engage in such trading, in other words, made ratification of the broker's conduct impossible – the bank had no capacity to ratify such improper conduct. *Id.* Similarly, here, Lohmeier and Enterprise knew of the trading restrictions on IRA accounts, so the abusive traders could never have been authorized or ratified.

        3.    *The Enterprise Trading Was Not For the Benefit of the DeChristophers.*

The Receiver's inability to demonstrate that the losing trades were either authorized or ratified by the DeChristophers is devastating to his Proposed Plan of Distribution. As a result, the Receiver relies on the argument that because these trades were done for the benefit of the Managed Accounts, that category of customers should bear the lion's share of the losses. This position inexplicably ignores the underlying fraud. This is not a situation where a trader was simply unsuccessful and had poor trading results. This was an attempted fraud. The fact that it appears Lohmeier was successful in stealing only a relatively small amount of money does not obviate the stark truth that he was trying to steal more. The trading was never for the benefit of the DeChristophers; it was always for Lohmeier's benefit.

The essence of this fraud is four fold: (1) all the money and positions were commingled; (2) the trades were not timely allocated so that when they were allocated it was the equivalent of assigning profits and losses to customers; (3) the software used to generate account statements allowed inaccurate information to go to the customers so no one would become alarmed; and (4)

Lohmeier and Townsend had their own accounts, as did many of their relatives, so money could easily be moved to favored accounts. The lynch-pin is the ability to do late allocations.

This same basic formula of late allocations between customers has been used in numerous Ponzi schemes. *See e.g., In the Matter of GNP Commodities, Inc.,* Comm. Fut. L. Rep. (CCH) ¶ 25,360 (C.F.T.C. Aug. 11, 1992) (affirming a determination that the FCM, the broker and others had committed fraud by operating a late allocation scheme), *aff'd as modified*, 996 F.2d 852 (7th Cir. 1993); *CFTC v. Goldinger*, 99-11543-WMB (BQRx) (C.D. Cal) (1999) (cash to futures arbitrage program in which customers lost $100 million through a late allocation Ponzi). *See also, Stephens, Inc. v. Geldermann, Inc.,* 962 F.2d 808, 810 (8th Cir. 1992) ("In direct violation of the CFTC regulations, Geldermann employees permitted Markle to assign his trades ... at the end of the day, after he knew which trades had been profitable."); *Knight v. First Comm. Fin. Group, Inc.,* Comm. Fut. L. Rep. (CCH) ¶ 26,515 (ALJ Oct. 5, 1995) (FCM liable for late assignment scheme; "There is a reason for memorializing orders on receipt and on execution. Written orders, properly time stamped and identified, discourage 'mix and match' schemes whereby winning trades are funneled to favored accounts, and losing trades are marked for less favored accounts."); *Olson v. Heinold Commodities, Inc.,* Comm. Fut. L. Rep. (CCH) ¶ 24,206 (ALJ March 29, 1988) (IB liable for the late allocation scheme); *Moak v. Lincolnwood, Inc.,* Comm. Fut. L. Rep. (CCH) ¶ 22,448 (ALJ Dec. 17, 1984) (FCM liable for late allocation scheme); *Wilke v. Winchester-Hardin-Oppenheimer Trading Co.,* Comm. Fut. L. Rep. (CCH) ¶ 20,605 (ALJ Dec. 29, 1977) ("Fills were allocated so that accounts showing losses were given better fills to bolster equity and accounts showing gains were given poorer fills because those accounts could 'afford to take the loss.'").

This trading could not have possibly benefited the DeChristophers as it was managed in a way that they may face large tax penalties because their IRAs were not properly managed. The trading is also totally at odds with the goals and objectives of a middle class couple hoping to retire at the end of the year. The most telling fact is that Lohmeier and Townsend consistently lied to the DeChristophers. If the DeChristophers had really wanted risky leverage trading, there would have been no need for the long trail of deception.

### B. The Law Requires A Pro Rata Distribution – Not Classes of Customers.

The strong majority of courts that have faced similar situations have concluded that there should be no distinction made between the victims of a fraud when funds have been commingled. Courts have advocated a pro rata distribution and have invoked the old expression "equality is equity".

- The general rule where money held in trust on behalf of more than one beneficiary is commingled into a single fund is that the beneficiary's interest in the commingled fund is in proportion to his contribution, or a pro rata share. 5 Scoot on Trust Sec., § 519 at 641; *In re Possession & Control of Comm'r of Banks, supra,* 327 Ill. App. 3d at 492.

- To allow any individual to elevate his position over that of other investors similarly victimized by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others would receive substantially less… In the context of [a]…receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy." *SEC v. Elliott,* 1989 U.S. Dist. Lexis 19096, *4 (S.D. FL 1989).

- It is certain that the commingled fund represent an inextricable compound that no alchemist would dare the attempt to unscramble. *First State Trust & Sav. Bank v. Therrell,* 103 Fla. 1136, 1148-49, 138 So. 733 (1932).

By contract we have not seen any decision where classes of special depositors were created to justify unequal distributions between victims of a fraud. That is particularly true since the

differing tiers are not the result of some customers being able to trace while others could not trace. There is no case law that supports swag allocations between accounts to reach some subjective view of rough justice.

### C. The DeChristophers' Accounts Should Be Reclassified.

The Receiver's classification of the DeChristopher accounts is improper, and, in the alternative to a *pro rata* distribution of the assets, the DeChristopher accounts should be reclassified to receive 55% of their net contributions. The DeChristophers, two elderly individuals on the verge of retirement, explicitly and repeatedly requested that their accounts be invested in accordance with a conservative growth model. (Donald DeChristopher affid., Exh. C, at ¶¶2-19, 24); (Martha DeChristopher affid., Exh. D, at ¶¶2-6, 8). They never authorized the commingling of their IRA funds and never knew it had occurred. (Exh. C, ¶20-25); (Exh. D, ¶9-11). Similarly, they never knew that Lohmeier was trading on margin or that their cash and securities were being posted for margin. (Exh. C, ¶25); (Exh. D, ¶9). They never asked for or wanted risky short positions or naked option trading, and did not authorize or ratify such trading. *Id.* Nor did they benefit from Lohmeier's risky trading. (Exh. C, ¶¶25, 27); (Exh. D, ¶¶9,11). They never withdrew any money from their accounts and have lost their retirement savings. *Id.*

### D. The Proposed Distribution of Illiquid Securities is Unfair.

The Receiver's proposal to distribute the DeChristophers' Private Equity investments at cost and offset their total cash recovery by that full cost basis is fundamentally unfair. The Receiver readily admits the assets are not liquid and sale would generate substantial losses, yet they are being valued at their full cost price. (Exh. A, Receiver's Plan, p. 24). As already explained, this allocation cannot be supported by the notion that the DeChristophers authorized or ratified these illiquid trades. Lohmeier and Townsend lied about these types of securities by misrepresenting the risk and attributes of these securities.

The net effect of this feature of the proposed plan of distribution is that the DeChristophers would receive far less than 25% of the funds they contributed to their three IRA accounts.

E.   **The Proposed Settlement with Enterprise's Attorneys is Inappropriate.**

The proposed settlement with Enterprise's (and Lohmeier's) former counsel is inappropriate. The amount of money involved is not significant, but the arrangement highlights that the distribution is based on expediency and not controlling legal principles. As explained above, the customer funds do not belong to Enterprise but instead are being held by Enterprise for the benefit of its customers. *In re Possession & Control of Comm'r of Banks, supra,* 327 Ill. App. 3d 441, 476 (1 Dist., 2001). Enterprise's law firm is a general creditor of Enterprise. The Receiver cannot use customer money to satisfy obligations to Enterprise creditors. All special depositors take before Enterprise creditors. By ignoring this core legal principle, the Receiver demonstrates a lack of care in his analysis.

F.   **Discovery is Required Before a Plan of Distribution Can Be Finalized.**

One of the core principles that set forth above is the precept that victims of the fraud take their funds before any wrongdoers or persons that had knowledge of the fraud. The Receiver does not address this important issue. The only acknowledgement of the issue was a statement that Lohmeier, Townsend and two other individuals would not receive distribution for their accounts. (Exh. A, Receiver's Plan, p. 25). That statement tacitly suggests, however, that no other customer participated in the wrong doing or had knowledge of the fraud. There are a number of customers that have personal or family relations with John Lohmeier and Rebecca Townsend. For example, John Lohmeier's father is one of the customers. The DeChristophers make no accusation of wrongdoing by these individuals; however, discovery should be taken to

ensure that innocent customers' distributions are given priority over wrongdoers. Discovery is required on this issue before funds are distributed.

## IV. CONCLUSION

The DeChristophers request that this Court either deny the Receiver's Proposed Plan of Distribution and distribute the remaining Enterprise assets on a *pro rata* basis between innocent Enterprise customers *or* place the DeChristophers in the tier of Enterprise customers that are receiving 55% of the funds back. The DeChristophers further request that this Court deny the Receiver's attempts to deduct the full cost value of in-kind assets from the allocations, deny settlement with Enterprise's attorneys to supersede the rights of Enterprise's clients, and/or permit time for additional discovery prior to finalizing a plan of distribution.

Dated: August 25, 2008

Respectfully submitted,
DONALD DECHRISTOPHER
MARTHA DECHRISTOPHER


By: s/ Shermin Kruse
      One of their Attorneys

Ray G. Rezner
Shermin Kruse
BARACK FERRAZZANO
 KIRSCHBAUM & NAGELBERG LLP
200 W. Madison
Suite 3900
Chicago, IL 60606
(312) 984-3100