# EXHIBIT B

NEAL ▪ GERBER ▪ EISENBERG

Phillip L. Stern
Attorney at Law

Tel 312.269.8488
Fax 312.980.0720
enterprisereceiver@ngelaw.com

July 25, 2008

Re:      **Enterprise Trust Company**

Dear Enterprise Trust Company Customer:

Enclosed is a copy of the "Receiver's Proposed Plan for the Allocation of the Assets of Enterprise Trust Company" (the "Report"). The Report explains the allocation methodology and your rights under the proposed Allocation Plan (the "Plan"). Set forth below is a brief summary of the Plan.

The Receiver concluded that the condition of Enterprise Trust Company's ("Enterprise") records made it impossible to reconstruct the activity in each client account. Therefore, for purposes of the Plan, an analysis was undertaken of each client's contributions and withdrawals. Contributions include any asset, cash or security that a client transferred or caused to be transferred to Enterprise. Distributions include securities, cash and wire transfers sent by Enterprise directly to a client or to a third-person for the benefit of the client, as well as tax withholdings that were paid for the benefit of a client. (The resulting number is referred to as the "Net Contribution.") Where transfers were made between accounts maintained at Enterprise, the amount of the transfer was treated as a contribution to the receiving account and a withdrawal from the transferring account so as to avoid overstating total contributions and total withdrawals for all clients in aggregate.

The Plan categorized, as either custodial or actively managed, each of the 1198 client accounts at Enterprise that were funded. Custodial accounts are defined as accounts in which Enterprise client assets and securities positions were to be maintained without modification, absent further instruction or authorization from the client, except for the withdrawal of funds, payment of fees or reinvestment of dividends. Actively managed accounts are defined as accounts in which the purchase and sale of securities occurred on a regular basis, including trading on margin, entering into short positions, engaging in options transactions, or trading derivative securities. Where accounts did not meet these specific criteria, they were individually reviewed by the Receiver and categorized based on the Receiver's assessment of the activity in those accounts.

Accounts excluded from participation in the Plan are those (1) that were closed before March 1, 2008 (no accounts were closed between that date and March 3, 2008, the date the Asset Freeze Order was entered); (2) in which distributions exceeded contributions (primarily due to asset appreciation); or (3) that were unfunded. A closed account is defined as an account with a

Enterprise Trust Company Customer
Page 2
July 25, 2008

balance of $250 or less as of March 1, 2008. An unfunded account is one where neither cash nor securities were transferred by the client to Enterprise.

Unfortunately, it is not possible to return to each client the full amount of each client's Net Contribution, due in principal part to massive trading losses occurring in Enterprise's various trading accounts. Accordingly, a determination had to be made as what would constitute an equitable distribution of the assets that remain at Enterprise. In that regard a decision was made not to distribute the assets that remain at Enterprise on a strictly *pro rata* basis. This decision was made due to the differing purposes of the client accounts.

Assets in custodial accounts were supposed to be safeguarded. Instead, they were used, without the clients' knowledge, as security for speculative trading for the benefit of actively managed accounts. The custodial accounts had no interest in that trading and would not benefit if it was profitable. As it turned out, over $8 million of custodial assets were actually liquidated and used to satisfy a debit balance that resulted from the speculative trading. Consequently, a determination was made that custodial accounts should receive a greater percentage of the remaining assets than most actively managed accounts. Custodial accounts are being allocated, subject to market conditions, 65% percent of their Net Contribution.

Actively managed clients are broken down into four categories: (1) accounts actively managed by John Lohmeier that were opened prior to 2008 and that engaged in speculative short selling or options trading; (2) accounts actively managed by Mr. Lohmeier that either did not engage in speculative short selling or options trading or were opened in 2008; (3) accounts managed by David Steckler of LPL Financial, for which Enterprise acted as a custodian; and (4) accounts managed by David Disraeli, in which the trading strategy was different than that which was employed by Mr. Lohmeier for his actively managed account clients.

Since the vast majority of client losses resulted from speculative trading engaged in by Mr. Lohmeier for the benefit of client accounts actively managed by him, those clients should bear a greater percentage of the loss. Accordingly, accounts actively managed by Mr. Lohmeier that engaged in speculative trading will receive, subject to market conditions, 25% of their Net Contribution.

The managed Steckler and Disraeli accounts suffered trading losses; however, those losses were not of the magnitude suffered by Mr. Lohmeier's actively managed client accounts. Additionally, unlike the accounts actively managed by Mr. Lohmeier, it does not appear that custodial assets were used to collateralize trading done for the benefit of the Steckler and Disraeli accounts. Consequently, for distribution purposes, the Steckler and Disraeli managed accounts are being allocated, subject to market conditions, 55% of their Net Contribution. Similarly, the accounts actively managed by Mr. Lohmeier that either did not engage in speculative short selling or options trading, or were opened in 2008 are being allocated, subject to market conditions, 55% of their Net Contribution.

Enterprise invested for certain of its clients in a number of private banks, land deals and promissory notes ("Private Equity"). These Private Equity investments are not readily

Enterprise Trust Company Customer
Page 3
July 25, 2008

marketable and liquidation of these assets could result in significant losses. A number of clients holding these assets have indicated that they would prefer to have them returned in kind. The Private Equity investments are also largely held by the actively managed account clients who, under the proposed Allocation Plan, are receiving a smaller percentage of the remaining allocable funds. Based on these factors, the Receiver proposes the return of the Private Equity investments in kind to their respective account holders. This will result in some Enterprise clients receiving a greater return than what they would have received if they did not own any Private Equity. The amount allocated to any client who owns Private Equities will be reduced by the value of Private Equities returned to them.

Enterprise clients wishing to object to the Plan of Allocation must submit their objections in writing to the Receiver postmarked no later than August 22, 2008. Objections shall be limited to the contribution, distribution or withdrawal amounts reflected on your individual allocation schedule and the allocation category you are assigned. Any objection shall include documentary support demonstrating that there is an error in your contribution, distribution or withdrawal amount or the treatment of your account as either a managed or custodial account. No objection to the allocation methodology shall be considered.

The Receiver will consider the comments, suggestions and objections of clients and revise the Allocation Plan accordingly if the Receiver believes that revision is necessary in order to achieve a reasonable and equitable distribution and allocation of Enterprise assets. The Receiver will file with the Court a summary of the comments received, the comments themselves, and if appropriate, a revised Allocation Plan. A final hearing on the Plan of Allocation has been scheduled by the Court for September 23, 2008 at 11:00 a.m., at which time objections and claims from Enterprise clients and creditors can be considered by the Court and a final Plan will be approved. Any client who has failed to provide a timely written objection to the Plan shall not be permitted to object to the final plan of allocation.

Sincerely,

Phillip L. Stern
Receiver for Enterprise Trust Company

PLS:ap

Enclosures

NGEDOCS: 1550174.1

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 08 CV 1260 |
| ) | |
| ENTERPRISE TRUST COMPANY, ) | Judge James B. Zagel |
| JOHN H. LOHMEIER, and ) | |
| REBECCA A. TOWNSEND, ) | |
| ) | |
| Defendants. ) | |

### AFFIDAVIT OF DONALD J. DECHRISTOPHER

I, Donald J. Dechristopher, being first duly sworn on oath, hereby depose and state as follows:

1.      I have personal knowledge of all the facts set forth in this Affidavit and, if called as a witness, could testify competently about those facts.

2.      I was born in November of 1938.  I attended dental school at the University of Illinois, served in the United States Air Force for three years, and then went into private practice. While I am still actively serving my dental clients, I had hoped to retire at the end of the year. My plan was to step-away at the age of seventy, and spend more time with my wife, Martha, who is 66 years old, and our four children and three grandchildren.

3.      I now have to re-evaluate my retirement plan, and the entire lifestyle I had contemplated, because I am a victim of the fraud committed by Enterprise Trust Company ("Enterprise"), John H. Lohmeier, and Rebecca A. Townsend.  If the Receiver's Proposed Plan of Distribution is accepted, I will receive approximately $152,000 in cash and an additional

distribution of assets that cannot be valued or liquidated at this time, while I thought my wife and I had over one million dollars in our three IRA accounts.

4. My investment strategy has always been conservative. For many years, I invested my and my wife's IRA accounts in safe mutual funds and money market accounts. Even my non-IRA trading was always conservative. In fact, in personal trading, I have never traded on the margin and never engaged in option trading. In the fall of 2004 I decided that, given my limited investment knowledge, I should obtain some professional help to handle our IRA investments. I had been a banking customer of Hinsbrook Bank since 1998, and was told that Hinsbrook's trust department was good. So my wife and I agreed to have Mr. Lohmeier and Ms. Townsend handle our IRA accounts at Hinsbrook.

5. During the time that Mr. Lohmeier and Ms. Townsend handled our IRA investments at Hinsbrook, I had several telephonic and in-person conferences with Ms. Townsend. When these conversations touched on how Martha and I wanted our IRA accounts invested, I told Ms. Townsend that, given our age and proximity to retirement, our investment goals were to be safe, but with some opportunity for growth. My wife's goals were the same. I informed Ms. Townsend that we wanted a "conservative growth" investment strategy, that I had previously implemented this strategy with a variety of mutual funds, and that I would be comfortable if that approach were maintained. We wanted to minimize risk but not be invested exclusively in fixed income assets.

6. Subject to the guidance we gave him and Ms. Townsend, Mr. Lohmeier determined the investment strategy and Ms. Townsend dealt with the day-to-day administrative and customer service issues.

7. On or about January of 2006, Ms. Townsend and Mr. Lohmeier left Hinsbrook

and began Enterprise Trust Company. In the weeks leading up to this time, Ms. Townsend informed me of their impending move and suggested that my wife and I transfer our accounts at Hinsbrook to Enterprise. She also asked that I not tell anyone of her suggestions, because she and Mr. Lohmeier were not permitted to solicit customers prior to leaving Hinsbrook.

8.    After the formation of Enterprise, Ms. Townsend paid a visit to my home in another attempt to convince me and my wife to move our trust assets to Enterprise. Ms. Townsend told me that Hinsbrook Bank was being acquired by Wintrust Financial Corporation and that our investment needs could be better met by continuing to have Mr. Lohmeier handle our IRA accounts.

9.    At that time, I was sixty-eight years old, my wife was sixty-three, and we were both hoping to retire very soon. We wanted to preserve our savings in accordance with a conservative growth strategy. Moving our IRA accounts from Hinsbrook (now Wintrust) to Enterprise, a start-up trust company, made me nervous, but Ms. Townsend repeatedly assured me that it was very safe and that Enterprise was insured and properly licensed for trust business. Moreover, I was led to believe that our investments would be segregated and receive individualized treatment in accordance with our investment instruction, rather than be a part of some larger pool of investments for a group of customers. Although I believed Ms. Townsend and relied upon her statements, I now understand that she was lying.

10.    Ms. Townsend also said that Mr. Lohmeier had taken great care of our assets at Hinsbrook, and that he would do the same at Enterprise. She reviewed my quarterly account statement from Wintrust. She said that Wintrust had performed poorly, and promised me that Enterprise could do better.

11.    In August of 2006, my wife and I completed the documentation, including

Investment Agency Agreements with Enterprise (the "Agreements"), required to transfer our three IRA accounts to Enterprises' management. At that time, we again discussed our trading objectives and risk tolerance with Ms. Townsend. We told Ms. Townsend that we wanted conservative growth investments, and I told her that my current plan was to retire at the end of 2008. These IRA accounts are a meaningful portion of my life savings, my retirement fund, and the inheritance I wanted to leave behind for my children and that is what I told Ms. Townsend. Ms. Townsend assured me that she and Mr. Lohmeier would make investments consistent with our wishes. I believed her.

12.    The transfer of our accounts became effective on August 29, 2006.

13.    I understood that I was giving Mr. Lohmeier trading authority for these IRA accounts. It was my understanding, however, that he had to trade them consistently with our desires and instructions. It was also my understanding that the trading in these accounts would be consistent with the trading that would be appropriate for IRA accounts when the retirement was planned for the end of 2008. Indeed, paragraph 2 of the Agreement specified that Enterprise's investment strategy must be consistent with my stated risk profile and investment objectives.

14.    In addition, Paragraph 6 of the Agreement specified that I could verbally communicate with Enterprise. As a result, I felt secure that I would be able to communicate my desired investment strategy to Enterprise, Mr. Lohmeier, or Ms. Townsend, verbally, without having to do so in writing.

15.    Most of my communications, both before and after the transfer of my trust accounts from Hinsbrook to Enterprise, were with Ms. Townsend. Although my conversations with Mr. Lohmeier were generally brief, I did speak with him on a few occasions. I made sure

when I talked with him in 2007 that he was aware that I wanted my IRA accounts to be invested with the goal of conservative growth. Initially, it appeared as though he honored my preferences, as an account statement I received showed the bulk of my account was in an equity mutual fund, with only substantially smaller amounts in fixed income and individual securities.

16.    In August of 2007, I made a small additional deposit into my IRA account. At that time, I met with Ms. Townsend and we talked about the challenging markets. I told her that these accounts should be invested conservatively and that it would be alright with me if they were placed in money market funds. She assured me that John Lohmeier was a very accomplished trader and that he would invest my accounts so that there was an opportunity for growth while avoiding substantial risks.

17.    On January 12, 2008, my wife and I received a letter from Enterprise, describing their investment returns for the last quarter of 2007. The letter said that Enterprise had outperformed the market, but absolute returns for the market were below long-term averages. The letter also stated that "all-stock performance for the year was up 7.7%, versus the IBD mutual Fund Index, up 5.2%." The account summary also seemed to indicate that the funds were invested in numerous stocks and even one real estate deal.

18.    I met with Ms. Townsend shortly after receiving the January 12, 2008 letter to review my fourth quarter results. I told her that I did not need to hold such a wide variety of stocks and I again reiterated my economic concerns and requested a safe and conservative investment strategy. I specifically told her that I did not want to be included in any real estate investments. She said Mr. Lohmeier was very good at what he did and was doing a great job, but that she would relay my concerns to him.

19.    In February of 2008, I had several small checks to deposit into my accounts. I

went to Enterprise's offices and spoke with Mr. Lohmeier and Ms. Townsend. They assured me that my accounts were in great shape and all my positions were protected.

20.    In March of 2008, I learned, for the first time, that the Securities and Exchange Commission had filed an injunctive action against Enterprise, Mr. Lohmeier, and Ms. Townsend. I had no idea what would become of our trust accounts and became extremely concerned about their status.

21.    I immediately contacted Ms. Townsend to enquire as to what had happened, and asked to transfer all of my and my wife's accounts to another institution. My wife and I filled out all of the appropriate paperwork for a full withdrawal and transfer of all three of our IRA accounts.

22.    Ms. Townsend told me that all of their clients were very happy with their trust accounts, and that the SEC investigation concerned a dispute between Mr. Lohmeier and someone that was trying to take control of Enterprise. She told me that the issues with the SEC were all the product of a big misunderstanding. She said that because Enterprise was so profitable and doing so well for all of its clients, someone else was trying to take control of the company. She repeatedly stated that all of the Enterprise trust accounts were in good hands and doing well.

23.    I continued to be concerned, however, given how close I was to retirement and my reliance upon my trust accounts for my retirement. As a result, I asked Ms. Townsend to go ahead and transfer the accounts. She promised she would do so later that day or first thing the next day. She never did.

24.    Throughout all of my dealings with Mr. Lohmeier, Ms. Townsend, and Enterprise, the only direction I ever provided was that I wanted conservative growth. I was very

close to retirement and desired to limit my investment risk. My wife always provided the same direction.

25.     I never agreed to have my position or moneys comingled with other Enterprise customers. I never asked that my accounts be traded on margin and was unaware that they were traded on margin as stated by the Receiver. I never asked for or agreed to put any short sales in my trading account and am unaware whether any short sales were conducted in my trading accounts. I never requested or wanted leveraged high risk positions. Whatever risky trading was done, it was not done for my benefit or for the benefit of my wife. In fact, I never profited from my accounts with Enterprise in any way, nor did I ever make a withdrawal of any sort.

26.     I have never had a social relationship with Mr. Lohmeier or Ms. Townsend. The only relationship I have had with Lohmeier and Townsend was through Enterprise, and Hinsbrook before it.

27.     Mr. Lohmeier, Ms. Townsend, and Enterprise's fraudulent scheme, of which I had no prior knowledge, has cost me a substantial portion of my retirement savings. Based on the current Plan of Distribution, I will likely have to work several more years before I can retire.

        FURTHER AFFIANT SAYETH NOT.

                                        DONALD J. DeCHRISTOPHER

SIGNED and SWORN to
Before me this 19th day of
August, 2008.

Notary Public

OFFICIAL SEAL
A. KHAMME
Notary Public, State of Illinois
My commission expires 04/16/11

# EXHIBIT D

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No.  08 CV 1260 |
| | ) | |
| ENTERPRISE TRUST COMPANY, | ) | Judge James B. Zagel |
| JOHN H. LOHMEIER, and | ) | |
| REBECCA A. TOWNSEND, | ) | |
| | ) | |
| Defendants. | ) | |

## AFFIDAVIT OF MARTHA F. DECHRISTOPHER

I, Martha F. Dechristopher, being first duly sworn on oath, hereby depose and state as follows:

1.     I have personal knowledge of all the facts set forth in this Affidavit and, if called as a witness, could testify competently about those facts.

2.     I was born in June of 1942.  I attended the Mercy Hospital School of Nursing in upstate New York.  I am currently the alternate charge nurse in the gastrointestinal unit at Good Samaritan Hospital in Downers Grove, IL.  Before my husband and I became victims of the fraud committed by Enterprise Trust Company ("Enterprise"), John H. Lohmeier, and Rebecca A. Townsend, my husband and I hoped to retire at the end of this year and spend more time with our four children and our three grandchildren.  If the receiver's plan of distribution is approved, however, it will significantly delay our retirement, and substantially impact our lifestyle and our ability to leave something behind for our children when we pass away.

3.     My husband and I had some IRA savings, which he invested in a variety of mutual funds.  In the fall of 2004, however, my husband suggested that we obtain professional help with our IRA investments.  We agreed to have Mr. Lohmeier and Ms. Townsend, through the trust department of Hinsbrook Bank, handle our IRA accounts.

4.     While my husband was, and continues to be, the primary contact for our accounts, I did speak with Ms. Townsend from time to time while our accounts were at Hinsbrook.  When these conversations touched on how I wanted my IRA invested, I told Ms. Townsend that, given our age and proximity to retirement, my husband and I sought a "conservative growth" strategy.

5.     Ms. Townsend and Mr. Lohmeier left Hinsbrook and began Enterprise Trust Company in January of 2006.  Soon after that, Ms. Townsend paid a visit to my home in an attempt to convince me and my husband to move our trust assets to Enterprise.  At that time, I was sixty-three years old, my husband was sixty-eight, and we were both hoping to retire very soon.  Ms. Townsend repeatedly assured us that Enterprise was the best institution to deliver on our goals of preserving our savings in accordance with a conservative growth strategy.  My husband ultimately decided to move our IRA accounts from Hinsbrook to Enterprise.

6.     In August of 2006, we completed the documentation, including Investment Agency Agreements with Enterprise (the "Agreements"), required to transfer our three IRA accounts to Enterprises' management.  After that time, my husband and I repeatedly told Ms. Townsend we wanted conservative growth investments, and that our current plan was to retire at the end of 2008.  She always assured us that she and Mr. Lohmeier would make investments consistent with our wishes.

7.     In March of 2008, my husband and I learned that the Securities and Exchange

Commission had filed an injunctive action against Enterprise, Mr. Lohmeier, and Ms. Townsend. We became concerned about our trust accounts and immediately filled out all of the appropriate paperwork for a full transfer to another institution. My husband delivered the documents to Ms. Townsend, but she never made the transfer.

8.    Throughout all of my dealings with Mr. Lohmeier, Ms. Townsend, and Enterprise, the only direction I ever provided was that I wanted conservative growth. I was very close to retirement and desired to limit my investment risk. My husband had occasion to speak with Ms. Townsend and Mr. Lohmeier much more frequently than I, and always provided the same direction.

9.    I never agreed to have my position or moneys comingled with other Enterprise customers. I never asked that my accounts be traded on margin and was unaware that they were traded on margin as stated by the Receiver. I never asked for or agreed to put any short sales in my trading account and am unaware whether any short sales were conducted in my trading accounts. I never requested or wanted leveraged high risk positions. Whatever risky trading was done, it was not done for my benefit or for the benefit of my husband. In fact, I never profited from my accounts with Enterprise in any way, nor did I ever make a withdrawal of any sort.

10.    I have never had a social relationship with Mr. Lohmeier or Ms. Townsend. The only relationship I have had with Lohmeier and Townsend was through Enterprise, and Hinsbrook before it.

11.    I never had any knowledge of Mr. Lohmeier, Ms. Townsend, and Enterprise's fraudulent scheme. They have cost me and my husband a substantial portion of our retirement savings, significantly delayed our very ability to retire, substantially impacted our lifestyle and

reduced our ability to leave anything behind for our children after we pass away.

FURTHER AFFIANT SAYETH NOT.

MARTHA F. DECHRISTOPHER

SIGNED and SWORN to
Before me this 19th day of
August, 2008.

Notary Public

"OFFICIAL SEAL"
A. KRAMME
Notary Public, State of Illinois
My commission expires 04/16/11

Martha_DeChristopher#230D29.DOC

# EXHIBIT E

Schedule 1

Account Number: 006149
Account Name: DONALD DECHRISTOPHER
Account Type: IRA TRUST

| Type | Date | CUSIP No | Security Name | Shares | Total Amount |
|------|------|----------|---------------|--------|--------------|
| Contribution | 8/29/2006 | 20029PAJ8 | COMCAST CABLE COMMUN | 12,000.0000 | $12,210.12 |
| Contribution | 8/29/2006 | 370425SE1 | GMAC 6.875% 8/28/12 | 20,000.0000 | $19,524.00 |
| Contribution | 8/29/2006 | 916906AB6 | USFRGHT 8.5% 4/15/10 | 5,000.0000 | $5,373.30 |
| Contribution | 8/29/2006 | 55263ECH6 | MBNA CORP | 12,000.0000 | $12,444.12 |
| Contribution | 8/29/2006 | 524908BF6 | LEHMAN BROS HLDGS IN | 10,000.0000 | $11,887.30 |
| Contribution | 8/29/2006 | 976826BC0 | WISC POWER % LIGHT | 15,000.0000 | $16,021.50 |
| Contribution | 8/29/2006 | 743917AL0 | PRUDENTIAL INSURANCE | 12,000.0000 | $13,525.20 |
| Contribution | 8/29/2006 | 852060AC6 | SPRINT CAP CORP | 10,000.0000 | $10,132.80 |
| Contribution | 8/29/2006 | 097014AD6 | BOEING CAP CORP | 12,000.0000 | $12,390.84 |
| Contribution | 8/29/2006 | 337162AE1 | 1ST TENN NAT 4.5 | 10,000.0000 | $9,265.10 |
| Contribution | 8/29/2006 | 459745EZ4 | INTERNATIONAL LEASE | 12,000.0000 | $12,281.88 |
| Contribution | 8/29/2006 | 093662AB0 | BLOCK 8.5% 4/15/07 | 12,000.0000 | $12,191.52 |
| Contribution | 8/29/2006 | 337160AA3 | FST TN 8.07% 1/6/27 | 12,000.0000 | $12,553.20 |
| Contribution | 8/29/2006 | 26439RAF3 | DUKE CAP 7.5 10/1/09 | 10,000.0000 | $10,605.70 |
| Contribution | 9/14/2006 | | CHECK/WIRE | | $684,394.20 |
| Contribution | 9/20/2006 | 97650W108 | WINTRUST FINANCIAL C | 1,395.0000 | $70,098.75 |
| Contribution | 7/30/2007 | | CHECK/WIRE | | $716.38 |
| Contribution | 8/21/2007 | | CHECK/WIRE | | $1,101.46 |
| Contribution | 8/21/2007 | | CHECK/WIRE | | $6,159.93 |
| Contribution | 2/4/2008 | | CHECK/WIRE | | $32.36 |

Confidential - Updated on 8/4/2008

Schedule 1

| Account Number: | 006149 |
| Account Name: | DONALD DECHRISTOPHER |
| Account Type: | IRA TRUST |

| Type | Date | CUSIP No | Security Name | Shares | Total Amount |
|------|------|----------|---------------|--------|--------------|
| Contribution | 2/4/2008 | | CHECK/WIRE | | $46.79 |
| Contribution | 2/4/2008 | | CHECK/WIRE | | $267.39 |

| | |
|---|---|
| Total Net Contributions: | $933,223.84 |
| Allocation Percentage Depending on Market Conditions: | 25.00% |
| Gross Amount Due to Customer: | $233,305.96 |
| Less Private Investments to be Distributed In Kind: | ($103,000.00) |
| Balance: | $130,305.96 |

Confidential – Updated on 8/4/2008

Schedule 2

Account Number:    **006149**

Account Name:    **DONALD DECHRISTOPHER**

Account Type:    IRA TRUST

| CUSIP No | Security Name | Shares | Total Amount |
|----------|---------------|--------|--------------|
| 124000993 | CARSON RIVER BANK | 3,000.0000 | $30,000.00 |
| 750001992 | REPUBLIC NATIONAL BK | 1,200.0000 | $12,000.00 |
| 750004996 | ROYAL ASSETS LAND FD | 25,000.0000 | $25,000.00 |
| 921000998 | VALLEY CAPITAL BANK | 3,000.0000 | $36,000.00 |
| | **Total Holdings:** | | $103,000.00 |

Confidential - Updated on 8/4/2008

Schedule 1

Account Number:    006150
Account Name:      MARTHA DECHRISTOPHER
Account Type:      IRA TRUST

| Type | Date | CUSIP No | Security Name | Shares | Total Amount |
|---|---|---|---|---|---|
| Contribution | 8/29/2006 | 15189YAB2 | CENTERPOINT ENERGY | 3,000.0000 | $3,308.19 |
| Contribution | 8/29/2006 | 337160AA3 | FST TN 8.07% 1/6/27 | 1,000.0000 | $1,046.10 |
| Contribution | 8/29/2006 | 345370BQ2 | FORD MTR 7.25 10/1/8 | 1,000.0000 | $992.50 |
| Contribution | 8/29/2006 | 441812GE8 | HSHD FIN 5.875 2/1/9 | 1,000.0000 | $1,014.92 |
| Contribution | 8/29/2006 | 20029PAJ8 | COMCAST CABLE COMMUN | 1,000.0000 | $1,017.51 |
| Contribution | 8/29/2006 | 976826BC0 | WISC POWER % LIGHT | 1,000.0000 | $1,068.10 |
| Contribution | 8/29/2006 | 013104AG9 | ALBERTSN 8.35 5/1/10 | 2,000.0000 | $2,088.48 |
| Contribution | 8/29/2006 | 459745EZ4 | INTERNATIONAL LEASE | 1,000.0000 | $1,023.49 |
| Contribution | 8/29/2006 | 860831AL8 | STLWELL 7% 11/1/06 | 1,000.0000 | $1,001.03 |
| Contribution | 8/29/2006 | 743917AL0 | PRUDENTIAL INSURANCE | 1,000.0000 | $1,127.10 |
| Contribution | 9/14/2006 | | CHECK/WIRE | | $46,161.28 |
| Contribution | 9/20/2006 | 464287622 | ISHARES RUSSELL 1000 | 20.0000 | $1,440.60 |
| Contribution | 7/30/2007 | | CHECK/WIRE | | $712.83 |
| Contribution | 7/30/2007 | | CHECK/WIRE | | $21.42 |
| Contribution | 2/4/2008 | | CHECK/WIRE | | $32.20 |

Confidential - Updated on 8/4/2008

Schedule 1

Account Number: 006150
Account Name: MARTHA DECHRISTOPHER
Account Type: IRA TRUST

| Type | Date | CUSIP No. | Security Name | Shares | Total Amount |
|------|------|-----------|---------------|--------|--------------|

|  |  |  | Total Net Contributions: | $62,055.75 |
|  |  |  | Allocation Percentage Depending on Market Conditions: | 25.00% |
|  |  |  | Gross Amount Due to Customer: | $15,513.94 |
|  |  |  | Less Private Investments to be Distributed In Kind: | ($5,500.00) |
|  |  |  | Balance: | $10,013.94 |

Confidential - Updated on 8/4/2008

Schedule 2

**Account Number:** 006150

**Account Name:** MARTHA DECHRISTOPHER

**Account Type:** IRA TRUST

| CUSIP No | Security Name | Shares | Total Amount |
|----------|---------------|--------|--------------|
| 124000993 | CARSON RIVER BANK | 200.0000 | $2,000.00 |
| 750001992 | REPUBLIC NATIONAL BK | 80.0000 | $800.00 |
| 750004996 | ROYAL ASSETS LAND FD | 300.0000 | $300.00 |
| 921000998 | VALLEY CAPITAL BANK | 200.0000 | $2,400.00 |
| | **Total Holdings:** | | $5,500.00 |

**Account Number:** 006151
**Account Name:** DONALD DECHRISTOPHER
**Account Type:** IRA TRUST

| Type | Date | CUSIP No | Security Name | Shares | Total Amount |
|------|------|----------|---------------|--------|--------------|
| Contribution | 8/29/2006 | 976826BC0 | WISC POWER % LIGHT | 1,000.0000 | $1,068.10 |
| Contribution | 8/29/2006 | 345370BQ2 | FORD MTR 7.25 10/1/8 | 1,000.0000 | $992.50 |
| Contribution | 8/29/2006 | 860831AD8 | STILWELL 7% 11/1/06 | 1,000.0000 | $1,001.03 |
| Contribution | 8/29/2006 | 337160AA3 | FST TN 8.07% 1/6/27 | 1,000.0000 | $1,046.10 |
| Contribution | 8/29/2006 | 441812GE8 | HSHD FIN 5.875 2/1/9 | 1,000.0000 | $1,014.92 |
| Contribution | 8/29/2006 | 459745EZ4 | INTERNATIONAL LEASE | 1,000.0000 | $1,023.49 |
| Contribution | 9/14/2006 | | CHECK/WIRE | | $62,300.15 |
| Contribution | 9/27/2006 | 743917AL0 | PRUDENTIAL INSURANCE | 1,000.0000 | $1,133.33 |
| Contribution | 7/11/2007 | | CHECK/WIRE | | $1,075.01 |
| Contribution | 7/30/2007 | | CHECK/WIRE | | $21.52 |

**Total Net Contributions:** $70,676.15

**Allocation Percentage Depending on Market Conditions:** 25.00%

**Gross Amount Due to Customer:** $17,669.04

**Less Securities to be Distributed In Kind:** ($5,400.00)

**Balance:** $12,269.04

Confidential

**Account Number:** 006151

**Account Name:** DONALD DECHRISTOPHER

**Account Type:** IRA TRUST

| CUSIP No | Security Name | Shares | Total Amount |
|----------|---------------|--------|--------------|
| 750001992 | REPUBLIC NATIONAL BK | 130.0000 | $1,300.00 |
| 750004996 | ROYAL ASSETS LAND FD | 500.0000 | $500.00 |
| 921000998 | VALLEY CAPITAL BANK | 300.0000 | $3,600.00 |
| | | **Total Holdings:** | $5,400.00 |

Confidential

**Account Number:** 006151

**Account Name:** DONALD DECHRISTOPHER

**Account Type:** IRA TRUST

| CUSIP No | Security Name | Shares | Total Amount |
|---|---|---|---|
| 750001992 | REPUBLIC NATIONAL BK | 130.0000 | $1,300.00 |
| 750004996 | ROYAL ASSETS LAND FD | 500.0000 | $500.00 |
| 921000998 | VALLEY CAPITAL BANK | 300.0000 | $3,600.00 |
| | **Total Holdings:** | | $5,400.00 |

Confidential