# EXHIBIT F



## PRIVATE PORTFOLIO
## INVESTMENT AGENCY AGREEMENT

Donald J. DeChristopher IRA

Account Name Designation

Donald J. DeChristopher

Customer Name

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

Social Security Number                Social Security Number

11/9/138

Birthday                                    Birthday

6151                                        Foll

Account Number                          Discretion

Growth

Asset Allocation Model

The Client is opening an asset management account with Enterprise Trust Company, as Agent. Agent will have the following powers with respect to the assets in the account, in addition to those provided by law:

    1.    To keep all assets safely, collect income and the proceeds of sales and maturities; distribute income and principal as directed by Customer, and provide periodic accounting statements.

    2.    To retain, invest and reinvest in assets of any kind and take other investment action it considers appropriate in its sole direction based on the Customer's stated risk profile and investment objectives. Depending on the type of asset, it may be held at a brokerage firm instead of our standard custodian.

    3.    To place orders for the purchase or sale of securities for the account at such price or prices, at such times and with brokers agent may select. It is possible that Agent may pay a higher brokerage commission because of the research services provided by that broker. Some of the strategies used are more active resulting in significant portfolio turnover.

    4.    To vote stock and participate in corporate reorganizations, dissolutions, liquidations or similar transactions; and hold assets in the name of a nominee or in bearer form.

5.   The investments used by the Agent may include options, inverse performance funds, venture capital, private placement securities, and real estate. All of these have higher than normal market and liquidity risks.

It is mutually understood by the Customer and Agent that:

1.   This Agreement may be terminated by either party upon written notice to the other and shall terminate upon Customer's death.

2.   Any designation of Agent in this Agreement shall include its corporate successor.

3.   Agent shall charge against the account its fees in accordance with Agent's fee schedule as published from time to time to Customer.

4.   Agent shall not be liable for any loss or depreciation resulting from any action or inaction of Agent taken in good faith pursuant to the terms of this Agreement or as the result of following a direction or instruction from Customer. Agent is specifically indemnified by Customer against loss, damage, and expense not due to its willful misconduct.

5.   Agent performs similar services for various other clients. Agent may give advice and take action for its other clients that may differ from the assets managed under this Agreement. Nothing in this Agreement shall obligate the Agent to acquire for the Customer a position in any security which Agent, its principals, or employees may acquire for its or their own accounts or for the account of any other client, if in the discretion of Agent, it is not practical or desirable to acquire a position in such security for the Customer.

6.   Agent is authorized to rely and act upon any verbal, written, or electronic communication from the Customer which it believes to be genuine. Agent is further authorized to take any other actions it believes are reasonably in connection with the matter discussed above, including executing necessary documents.

_____   _____
Signature- Customer                        Signature (for Survivor)

_____   _____
Date of Agreement                          Signature- Enterprise Trust Company

18 Baybrook Ln
_____   _____
Customer Street Address                    Routing Number

Oak Brook Il 60523
_____   _____
City, State, Zip Code                      Account Number

_____   _____
Statements- Email/ Mail                    Email Address

Enterprise Trust Company
Lafayette Square at the Lakes Mall
Henderson, NV 89012



PRIVATE PORTFOLIO
INVESTMENT AGENCY AGREEMENT

Donald J. DeChristopher IRA
**Account Name Designation**

Donald J. DeChristopher
**Customer Name**

**Social Security Number**      **Social Security Number**

11/9/38
**Birthday**      **Birthday**

6/49
**Account Number**      Foil
**Discretion**

G. Nowin
**Asset Allocation Model**

The Client is opening an asset management account with Enterprise Trust Company, as Agent. Agent will have the following powers with respect to the assets in the account, in addition to those provided by law:

1. To keep all assets safely, collect income and the proceeds of sales and maturities; distribute income and principal as directed by Customer, and provide periodic accounting statements.

2. To retain, invest and reinvest in assets of any kind and take other investment action it considers appropriate in its sole direction based on the Customer's stated risk profile and investment objectives. Depending on the type of asset, it may be held at a brokerage firm instead of our standard custodian.

3. To place orders for the purchase or sale of securities with or through at such price or prices, at such times and upon such terms as it may direct. It is possible that Agent may pay a higher brokerage commission because of the research services provided by that broker. Some of the strategies used are more active resulting in significant portfolio turnover.

4. To vote stock and participate in corporate reorganizations, dissolutions, liquidations or similar transactions; and hold assets in the name of a nominee or in bearer form.

5.    The investments used by the Agent may include options, inverse performance funds, venture capital, private placement securities, and real estate. All of these have higher than normal market and liquidity risks.

It is mutually understood by the Customer and Agent that:

1.    This Agreement may be terminated by either party upon written notice to the other and shall terminate upon Customer's death.

2.    Any designation of Agent in this Agreement shall include its corporate successor.

3.    Agent shall charge against the account its fees in accordance with Agent's fee schedule as published from time to time to Customer.

4.    Agent shall not be liable for any loss or depreciation resulting from any action or inaction of Agent taken in good faith pursuant to the terms of this Agreement or as the result of following a direction or instruction from Customer. Agent is specifically indemnified by Customer against loss, damage, and expense not due to its willful misconduct.

5.    Agent performs similar services for various other clients. Agent may give advice and take action for its other clients that may differ from the assets managed under this Agreement. Nothing in this Agreement shall obligate the Agent to acquire for the Customer a position in any security which Agent, its principals, or employees may acquire for its or their own accounts or for the account of any other client, if in the discretion of Agent, it is not practical or desirable to acquire a position in such security for the Customer.

6.    Agent is authorized to rely and act upon any verbal, written, or electronic communication from the Customer which it believes to be genuine. Agent is further authorized to take any other actions it believes are reasonably in connection with the matter discussed above, including executing necessary documents.

_____          _____
Signature- Customer                       Signature- John (Survivor)

_____          _____
Date of Agreement                         Signature- Enterprise Trust Company

18 Baybrook Ln.
_____          _____
Customer Street Address                   Printed Name

Oav Brook IL 60523                        (630) 325-0700
_____          _____
City, State, Zip Code                     Phone Number

email
_____          _____
Statements- Email/ Mail                   Address

Enterprise Trust Company
1450 W Horizon Ridge Parkway
Henderson NV 89052

## CLIENT QUESTIONNAIRE & INVESTMENT PROFILE

Information about your current situation and investment objectives is designed to assist us in the development of an investment plan that achieves your financial goals.

**Primary Name**

Donald J. DeChristopher

| Birth Date | Social Security Number/Tax ID | Number of Children |
|---|---|---|
| 11-9-1938 | 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 | |

**Home Address**

18 Baybrook Ln  OakBrook IL 60523

| Home Telephone | Business Telephone |
|---|---|
| 630-305-3939 | |

| Employer Name / Address | Position |
|---|---|
| | |

**Spouse Name**

Martha DeChristopher

| Spouse Employer Name / Address | Position |
|---|---|
| | |

Check the type of account you are establishing:

☐ **Individual Investment Account**

☒ **IRA**

☐ **Roth IRA**

☐ Irrevocable Trust

☐ Revokable Trust

☐ Profit Sharing or Pension Plan

☐ Qualified Retirement Plan

Have you ever invested in any type of financial products or other investment services? ☐ Yes ☐ No

How long have you been investing? ☐ 1-5 years ☐ 5-10 ☐ 10-15

Which types of investments owned? (Check all that apply)

| ☐ Stocks | ☐ Mutual Funds | ☐ Bonds | ☐ Annuities | ☐ Other | ☐ |
|---|---|---|---|---|---|

The investment objectives are overall objectives for the entire account and may be inconsistent with a particular holding and the account's performance at a specific time. Our equation to determine recommended stock exposure is to subtract the client's age from 100. Stock exposure should be close to that percentage number to ensure the appropriate risk level. The ratio between fixed income and equity positions in an account may vary from those described due to short-term market fluctuations, special market situations, or other unique circumstances. Select the investment objective that most accurately reflects the goals for this account.

☐ **Maximum Income:** This is a 100% bond portfolio that holds either government or corporate bonds. The emphasis is placed on generation of current income and prevention of capital loss.

☐ **Income:** This is a portfolio holding 70% bond positions and 30% equity positions. While the emphasis remains on the generation of income, we also have a secondary focus on moderate capital growth.

☐ **Growth & Income:** This is a 50% bond and 50% stock mix represents a portfolio equally balanced between capital growth and generation of income.

☒ **Growth:** This is a 70% stock and 30% bond portfolio. Emphasis is placed on modest capital growth with some focus on generation of current income.

☒ **Maximum Growth:** This portfolio is a 100% stock portfolio. See above for current stock mix. The asset allocation of this portfolio has the highest level of risk, with less focus on current income but in return the greatest opportunity for achieving high long-term growth and capital appreciation.

Approximate Value of the Account

Do you wish to restrict certain securities or industry groups from your account because of personal reasons or issues reflected in your investment policy statement?

☐ **Yes**      If yes, please explain.

☐ **No**

Do you have other investments outside this account?     ☐ Yes     ☐ No

How are these other investments being managed?

☐ Focus on conservative investments     ☐ Focus on growth investments     ☐ Focus on aggressive investments

Please ___ fy the amount, if any, of other income or minimum required distributions you would like fro ___ account.

_____ %                               $ _____

☐ M___          ☐ Quarterly          ☐ Annually          ☐ Other

Please ___ de us with your annual income. This should include all sources of income (ie. salary, incom ___ rated from your investments, etc)

|  | Thousands |
|---|---|
| Salar___ ses & commissions |  |
| Pensi___ ributio___s |  |
| Other ___ ___e |  |
| Total |  |

Please ___ de us with information regarding your total net worth. This should include assets being ___ o fund this account

|  | Thousands |
|---|---|
| Checki___ avings Accounts/ CDs |  |
| Bonds |  |
| Stocks |  |
| IRA's/S___ Keogh |  |
| 401(k), ___ t-sharing, Pension |  |
| Real E___ |  |
| Mortga___ |  |
| Other ___ |  |
| Net Wo___ |  |

### Client Acknowledgement

It is full___ understood that I will be responsible for initiating or requesting any changes in the investment objectives for my portfolio.

Client Questionnaire and Investment Profile agreed to on:

_____           _____           _____
Month               Day                 Year

_____
Client Name (please print)                    Client Name (please print)

_____
Client Signature                               Client Signature (print)

_____
Authorized Signature for Enterprise Trust       Date

# EXHIBIT G



# ENTERPRISE TRUST CO.

### PRIVATE PORTFOLIO
### INVESTMENT AGENCY AGREEMENT

*Martha F. DeChristopher IRA*
Account Name Designation

*Martha F. DeChristopher*
Customer Name

*103 - 34 - 7624*
Social Security Number

Social Security Number

*6 | 7 | 42*
Birthday

Birthday

*6150*
Account Number

*Full*
Discretion

*Growth*
Asset Allocation Model

The Client is opening an asset management account with Enterprise Trust Company, as Agent. Agent will have the following powers with respect to the assets in the account, in addition to those provided by law:

    1.    To keep all assets safely, collect income and the proceeds of sales and maturities; distribute income and principal as directed by Customer, and provide periodic accounting statements.

    2.    To retain, invest and reinvest in assets of any kind and take other investment action it considers appropriate in its sole direction based on the Customer's stated risk profile and investment objectives. Depending on the type of asset, it may be held at a brokerage firm instead of our standard custodian.

    3.    To place orders for the purchase or sale of securities for the account at such price or prices, at such times and with brokers agent may select. It is possible that Agent may pay a higher brokerage commission because of the research services provided by that broker. Some of the strategies used are more active resulting in significant portfolio turnover.

    4.    To vote stock and participate in corporate reorganizations, dissolutions, liquidations or similar transactions; and hold assets in the name of a nominee or in bearer form.

5.      The investments used by the Agent may include options, inverse performance funds, venture capital, private placement securities, and real estate. All of these have higher than normal market and liquidity risks.

It is mutually understood by the Customer and Agent that:

1.      This Agreement may be terminated by either party upon written notice to the other and shall terminate upon Customer's death.

2.      Any designation of Agent in this Agreement shall include its corporate successor.

3.      Agent shall charge against the account its fees in accordance with Agent's fee schedule as published from time to time to Customer.

4.      Agent shall not be liable for any loss or depreciation resulting from any action or inaction of Agent taken in good faith pursuant to the terms of this Agreement or as the result of following a direction or instruction from Customer. Agent is specifically indemnified by Customer against loss, damage, and expense not due to its willful misconduct.

5.      Agent performs similar services for various other clients. Agent may give advice and take action for its other clients that may differ from the assets managed under this Agreement. Nothing in this Agreement shall obligate the Agent to acquire for the Customer a position in any security which Agent, its principals, or employees may acquire for its or their own accounts or for the account of any other client, if in the discretion of Agent, it is not practical or desirable to acquire a position in such security for the Customer.

6.      Agent is authorized to rely and act upon any verbal, written, or electronic communication from the Customer which it believes to be genuine. Agent is further authorized to take any other actions it believes are reasonably in connection with the matter discussed above, including executing necessary documents.

_Martha F W Christian_ (signature)
Signature- Customer

_8-8-06_ (handwritten)
Date of Agreement

_18 Baybrook Ln_ (handwritten)
Customer Street Address

_Oak Brook, IL 60523_ (handwritten)
City, State, Zip Code

_mail_ (handwritten)
Statements- Email/ Mail

Signature- Joint (Survivor)

Signature- Enterprise Trust Company

_630-325-5539_ (handwritten)
Primary Phone

Email Address

Enterprise Trust Company
1489 W. Warm Springs Rd Suite 110
Henderson, NV 89104

## CLIENT QUESTIONNAIRE & INVESTMENT PROFILE

Information about your current situation and investment objectives is designed to assist us in the development of an investment plan that achieves your financial goals.

**Primary Name**

Martha F. De Christopher.

| Birth Date | Social Security Number/Tax ID | Number of Children |
|---|---|---|
| 6/7/42 | 103 - 34 - 7624 | 4 |

**Home Address**

18 Baybrook Ln OakBrook, IL 60523

| Home Telephone | Business Telephone |
|---|---|
| 630-325-5539 | |

| Employer Name / Address | Position |
|---|---|
| Advocate - Good Samaritan Hospital | Nurse |

**Spouse Name**

Donald J. DeChristopher

| Spouse Employer Name / Address | Position |
|---|---|
| Same | |

Check the type of account you are establishing:

☐ **Individual Investment Account**

☒ **IRA**

☐ **Roth IRA**

☐ **Irrevocable Trust**

☐ **Revocable Trust**

☐ **Profit-Sharing or Pension Plan**

☐ **Qualified Retirement Plan**

Have you ever invested in any type of financial products or other investment services?    ☐ Yes   ☐ No

How long have you been investing?    ☐ 1-5 years   ☐ 6-10   ☐ 11 to 20   ☐ Over 20

Which types of investments owned? (Check all that apply)

| ☐ Stocks | ☐ Mutual Funds | ☐ Bonds | ☐ Annuities | ☐ Other | ☐ Partnerships |
|---|---|---|---|---|---|

The investment objectives are overall objectives for the entire account and may be inconsistent with a particular holding and the account's performance at a specific time. Our equation to determine recommended stock exposure is to subtract the client's age from 100. Stock exposure should be close to that percentage number to ensure the appropriate risk level. The ratio between fixed income and equity positions in an account may vary from those described due to short-term market fluctuations, special market situations, or other unique circumstances. Select the investment objective that most accurately reflects the goals for this account.

☐ **Maximum Income:** This is a 100% bond portfolio that holds either government or corporate bonds. The emphasis is placed on generation of current income and prevention of capital loss.

☐ **Income:** This is a portfolio holding 70% bond positions and 30% equity positions. While the emphasis remains on the generation of income, we also have a secondary focus on moderate capital growth.

☐ **Growth & Income:** This is a 50% bond and 50% stock mix represents a portfolio equally balanced between capital growth and generation of income.

☒ **Growth:** This is a 70% stock and 30% bond portfolio. Emphasis is placed on modest capital growth with some focus on generation of current income.

☒ **Maximum Growth:** This portfolio is a 100% stock portfolio. See above for current stock mix. The asset allocation of this portfolio has the highest level of risk, with less focus on current income but in return the greatest opportunity for achieving high long term growth and capital appreciation.

---

Approximate Value of the Account

---

Do you wish to restrict certain securities or industry groups from your account because of personal reasons or issues reflected in your investment policy statement?

☐ Yes        If yes, please explain.

☒ No

---

Do you have other investments outside this account?    ☒ Yes    ☐ No

How are these other investments being managed?

☐ Focus on conservative investments        ☒ Focus on growth investments        ☐ Focus on aggressive investments

# EXHIBIT H

## BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606

Ray G. Rezner
(312) 984-3140
Voice Mail Ext. 4140
ray.rezner@bfkn.com

Telephone (312) 984-3100
Facsimile (312) 984-3150

August 8, 2008

**VIA EMAIL AND U.S. MAIL**

Michael Z. Gurland
Neal, Gerber & Eisenberg LLP
2 N. LaSalle Street
Suite 2200
Chicago, Illinois  60602-3801

Re:    Enterprise Trust Company ("Enterprise") – DeChristopher Accounts

Dear Mr. Gurland:

I appreciated your prompt response to my August 5, 2008 letter to Phillip Stern, the receiver of Enterprise.  As we discussed during our short telephone call today, I still have a few questions that relate to the Proposed Plan of Distribution I am hoping you or Mr. Stern can answer.

My understanding of the information contained in the Plan of Distribution and the accompanying cover letter was that some of the trades that generated the losses were allocated to Enterprise customers and that some of the trades that generated the losses were simply held in Enterprises' name and were never allocated to customers.  Accordingly, in my letter of August 5, I asked for a description or documentation of the trades that produced the losses.  Your August 6 letter provided me with information for certain but not all of the activity in my clients' accounts.  However, it did not provide a description of the losing trades that were never allocated to any Enterprise clients' accounts.  Therefore, it would be helpful if you could tell me how much of the total loss that was sustained by Enterprise customers was in trades that were never allocated to any customer.  Additionally, please provide for me a description of those unallocated trades.

In my August 5 letter to the receiver, I asked how much the DeChristopher accounts were overstated in Enterprise statements as of December 31, 2007.  You responded that you had not performed a specific analysis as to the actual value of the then stated positions in the DeChristopher accounts.  As I understood our telephone conversation, you know the accounts were overvalued by comparing the total value of positions reported to Enterprise customers through Enterprise account statements versus account balances at brokerage companies.  Can you please tell me on what date that comparative analysis was done and the dollar amount of the discrepancy?

514533_1.DOC

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Michael Z. Gurland, Esq.
August 8, 2008
Page 2


Finally, I asked in my August 5 letter whether the receiver could reconstruct the activity in the DeChristopher accounts. You responded by providing me with a variety of account statements and related information for the DeChristopher accounts. Based on the information provided, I am still unable to reconstruct the activity in the DeChristopher accounts, and I would like to verify that it is the receiver's position that it is unable to reconstruct the activity in the DeChristopher accounts even if you chose to do so.

I appreciate your previous assistance and look forward to the additional information you can provide.

Very truly yours,

Ray G. Rezner


RGR:vfk

cc:    Phillip L. Stern, Esq.
       Donald J. DeChristopher
       Shermin Kruse, Esq.

# NEAL ▪ GERBER ▪ EISENBERG

Michael Z. Gurland
Attorney at Law

Tel 312.269.8440
Fax 312.269.1747
mgurland@ngelaw.com

August 6, 2008

**BY EMAIL**

Ray G. Rezner, Esq.
Barrack Ferrazzano Kirschbaum & Nagelberg LLP
200 West Madison Street, Suite 3900
Chicago, Illinois 60606

      Re:    *Enterprise Trust Company, DeChristopher Accounts*

Dear Mr. Rezner:

      I am in receipt of your letter dated August 5, 2008 to Phillip L. Stern, the Receiver for Enterprise Trust Company ("Enterprise") and am following up on that letter as well as your recent conversation with the Receiver.

      The answers to your questions, in the order raised in your letter and to the extent information is available and can be provided at this time, are as follows:

      1.    The losses suffered by your client, and other Enterprise clients, were largely due to trading losses. We are still analyzing the funds received by Mr. Lohmeier from Enterprise to determine amounts that may have improperly been withdrawn.

      2.    Enclosed are schedules reflecting the securities trading, deposits and withdrawals in your clients' accounts based on records available from Enterprise.

      3.    We do not know whether any particular trades in your client's accounts were timely or properly allocated, nor did Enterprise maintain sufficient information upon which such a determination could be made.

      4.    Our search of Enterprise records did not uncover any written instructions, risk profiles, or other account opening documents for the DeChristophers' accounts. To the extent any such documents are found, they will be provided; however, we have searched the client files obtained from Enterprise with no results.

      5.    With respect to the DeChristophers' December 31, 2007 account statement, we have not performed a specific analysis as to the actual value of the then stated positions in the DeChristophers' accounts.

      6.    With respect to the sale of private equity securities at inflated prices to certain Enterprise customers, the DeChristophers purchases of private equity bank stocks were at prices as which the securities were purportedly received by Enterprise, not at higher prices.

NEAL, GERBER & EISENBERG LLP

Ray G. Rezner, Esq.
August 6, 2008
Page 2

     7.      With respect to the speculative trading activity engaged in by Mr. Lohmeier that resulted in the losses, enclosed is the trading detail for your clients to the extent and in the form it exists in Enterprises' trust accounting system.

     8.      As explained by Mr. Stern, the only objection we will not consider relates to the methodology employed to determine the client balance that is used to calculate the client's share of allocable funds.    Objections to the percentage allocation will be considered as well as any disagreement over the contribution, distribution and withdrawal amounts.

                 Sincerely,

                 Michael Z. Gurland

MZG

NGEDOCS: 1554393.1

# BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

200 WEST MADISON STREET, SUITE 3900
CHICAGO, ILLINOIS 60606

**Ray G. Rezner**
(312) 984-3140
Voice Mail Ext. 4140
ray.rezner@bfkn.com

Telephone (312) 984-3100
Facsimile (312) 984-3150

August 5, 2008

**VIA FACSIMILE**

Phillip L. Stern
Receiver for Enterprise Trust Company
Neal, Gerber & Eisenberg LLP
Two North LaSalle Street
Chicago, Illinois  60602-3801

Re:    Enterprise Trust Company ("Enterprise")

Dear Mr. Stern:

As we previously advised you, our firm represents Donald J. DeChristopher and his wife Martha (the "DeChristophers").  We also repeat our previous request that we be copied on any future communication directed to the DeChristophers.

We have had an opportunity to review your letter of July 25, 2008, to the DeChristophers along with the attached Receiver's Proposed Plan for the Allocation of the Assets of Enterprise Trust Company (the "Proposed Plan of Distribution").  We have several questions or requests that arise from your letter and the statements made in the Proposed Plan of Distribution:

- Aside from legitimately authorized investment management fees and expenses, how much money did Lohmeier, and those working with him, take from Enterprise customers?

- Your letter states that you cannot reconstruct the activity in all accounts.  Can you reconstruct the activity in the DeChristophers' accounts?

- Are you able to verify whether any or all of the trades placed in the DeChristophers' accounts were timely allocated – allocated at the time the trade was made rather than after the market had moved and the positions became profitable or unprofitable?

- Please provide a copy of any written instructions signed by the DeChristophers indicating their desired risk profile that the Receiver relied upon when determining the correct allocation for the DeChristophers' accounts.

BARACK FERRAZZANO KIRSCHBAUM & NAGELBERG LLP

Phillip L. Stern
August 5, 2008
Page 2

- Did the account statements sent to the DeChristophers as of December 31, 2007 overstate the value of any of the positions in their accounts?

- On page 15 of the Proposed Plan of Distribution, a paragraph describes Mr. Lohmeier's practice of selling private equity securities at inflated prices. Were any securities placed in the DeChristophers' accounts sold at such artificially inflated prices? If so, please provide all available detail with respect to any transactions involving those assets.

- Both your cover letter and the Proposed Plan of Distribution states that the vast majority of the losses resulted from speculative trading. Please describe in detail the trades that produced these losses or provide a copy of trading records from which we can determine the characteristics of the trades that resulted in these losses.

- Both your cover letter and the Proposed Plan of Distribution provide that no objection to the allocation methodology will be considered; what is the reason for that position, and what support exists for the notion that the investors cannot object to the Proposed Plan of Distribution?

Please respond to these questions at your earliest convenience as the information will be used to guide the DeChristophers in determining what objections and comments they should make to the Proposed Plan of Distribution.

Very truly yours,

Ray G. Rezner

RGR:vfk

cc:    Donald J. DeChristopher
       Shermin Kruse, Esq.

513778_1.DOC

# EXHIBIT I



## ENTERPRISE
## TRUST CO.

January 12, 2008

Donald & Martha DeChristopher
18 Bay Brook Lane
Oak Brook, IL 60523

Dear Donald & Martha,

There are many clichés that can be used during a healthy market such as, "Buy to the sound of cannons; sell to the sound of trumpets" or "Stocks climb a wall of worry". In contrast, it's difficult to think of any slightly amusing descriptions of an unhealthy market environment, so I tried to think of my own after a movie I saw recently called 'The Brothers Solomon'. When describing the kind of attitude their always positive father would have if he knew that he slipped into a coma, the brothers decided that, "Dad would just be thinking that he's half alive because that is the way he looks at things." Whether you believe in faith, positive thinking, or the law of attraction, how you look at the way things are will dictate how you live or even invest.

The market faced some really difficult news flow this year and was only "half alive", at least at the end of the year. We have not begun the year with much in the way of a positive view. Wall Street, the Federal Reserve, and the U.S. government are engaged in a precarious game of who blinks first. Wall Street has convinced itself that both the Fed and the government are not doing enough to stave off a recession. When you expect something and you don't get it, you can throw tantrums like any child would, and don't get me wrong, sometimes a tantrum is appropriate.



Source: www..ntrade.com

Here are five of the major news events that the stock market and economy faced and survived up to the end of 2007 and will continue to affect 2008.

### EVENT ONE: THE HOUSING CRUNCH CONTINUES...

Existing home sales have plunged 31% from their 2005 peak. New home sales are down even more - at around 48%. Meanwhile, single family housing construction activity has tanked 55%. And the decline isn't over - the issuance of new building permits - an indicator of future housing starts - has dropped to its lowest level since 1991.

The outlook has worsened as empty homes keep stacking up:  An index that measures home builder optimism, buyer traffic, and expected sales has plunged from the 70's during the boom to 19, a record low.  And the nationwide home vacancy rate has surged to a near-record 2.7%, a testament to the dramatic glut of empty, depreciating homes sitting on the market.

Homeowners are defaulting at an alarming rate.  5.6% of the nation's homeowners have fallen behind on their mortgage payments - up from roughly 4.7% a year earlier and the most since 1986.  The percentage of homes in any stage of foreclosure has jumped to 1.7%, the highest since the Mortgage Bankers Association began tracking it in 1972. We've already seen the price of an American home lose 6.1% from a year ago, according to research group S&P/Case-Shiller.  The Census Bureau shows the price of new homes down even more - 13% in October, the sharpest drop in 37 years.  This coming year, home values will likely fall by the mid-single digits nationwide and more in select markets.

Longer-term, the downturn in construction activity will eventually cut housing inventory to a more manageable level, while lower prices will entice more buyers to step up to the plate. It'll take a while to get housing supply and housing demand into better alignment. Don't expect the overall market to start a gradual recovery until late 2008 at the earliest- more than likely, it will take until 2009.

## EVENT TWO: THE LAST BASTIAN OF STRENGTH IN THE REAL PROPERTY SECTOR COMMERCIAL REAL ESTATE-IS WEAKENING

Third-quarter delinquency rates on commercial real estate loans surged to a nine-year high of 1.94%, up from 1.11% a year earlier, and they're poised to rise even higher in 2008.  The result:  Commercial property values will likely deteriorate in 2008, and commercial foreclosures will escalate.  Heck, the process is already underway - as the Wall Street Journal reported recently:

"For the past few months, the commercial real estate sector has been in a state of near-paralysis, as financing has nearly dried up. The number of major properties sold is down by half, and many worry that the market will continue to deteriorate as property sales remain slow, prices continue to drop and deals keep falling apart."

After all, office, industrial, and retail vacancies are starting to rise, and rental growth is never going to live up to the extremely optimistic projections promoted during the boom.

## EVENT THREE:  THE DEVASTATION OF THE FINANCIAL SECTOR

The financial industry is by far the biggest sector of the S&P 500, generating hundreds of billions of dollars in profit over the past few years.  Originating, bundling, buying, selling, and trading residential mortgages, corporate debt, leveraged buyout loans, and more was a gigantic cash cow.

This unprecedented boom created an explosion in the packaging and trading of complex, hard-to-value derivatives. Talk about a bubble - the face value of global over-the-counter derivatives soared to a stunning $516.4 TRILLION in the first half of 2007!  That was up 40% in a year and up almost six-fold since 2000, according to the Bank for International Settlements.  Unfortunately, for many financial firms, that business model is now shot. Complex debt securities are blowing up left and right-and it's not limited to just the U.S. markets.  The risk of parties to derivatives transactions actually failing to meet their obligations - known as "counterparty risk" - is rising fast. And the origination and packaging of all kinds of debt is grinding to a halt.

A couple key examples...

Commercial real estate bond issuance plunged to $4.9 billion in October from a peak of $26.9 billion in August.

Sales of asset-backed bonds, like those comprised of home equity, auto, and credit card loans, plummeted to $29.1 billion in November from a peak of $140 billion in March. Loss rates on previously originated loans are also poised to rise sharply.

### EVENT FOUR:  ELECTION YEAR POLITICS WILL SPAWN A HAILSTORM OF WILD-EYED BAIL-OUT SCHEMES

The 2008 election kicking into high gear ramping up into one of the most pivotal presidential election years in decades - not only because no incumbent is running, but also because the biggest days of the campaign are likely to coincide with some of the worst shocks of the housing bust.

There is no greater issue for politicians than the prospect of millions of voters losing their homes. It's the American Dream turned into the American Nightmare, and by gosh, they're going to do something about it. Unprecedented pressure on Washington officials and politicians - whether coming, going, or staying - to keep voters happy and the government bailout machine is in overdrive. Already, the White House has announced an "FHA Secure" reform plan designed to make it easier for troubled borrowers to refinance with a government-backed mortgage. In December, we also got the much-heralded "Paulson Plan" - a separate program to freeze interest rates for certain borrowers. Democratic politicians are pushing even more aggressive plans. Hillary Clinton, for example, wants to institute a 90-day moratorium on foreclosures.

Connecticut Senator Chris Dodd, who is also Chairman of the Senate Banking Committee, recently spearheaded an effort to go further down the path of FHA reform.

Meanwhile, on the monetary policy front, the Fed is jumping into the game with both feet. Late in 2007, it cut the federal funds rate ... slashed the discount rate ... and made other sweeping changes to the way it channels funds to the banking system. You can expect policymakers to continue competing for bailout supremacy on the monetary policy and legislative fronts. We could even see additional tax bills targeted at stressed consumers and borrowers.

### EVENT FIVE:  DESPITE AN UNPRECENTED INFLATION OF THE MONEY SUPPLY, THE US ECONOMY IS STILL CAREENING TOWARD RECESSION

When an iceberg pierced the hull of the Titanic nearly a century ago, nothing could keep the 46,000-ton ship afloat. Likewise, once the credit crunch began piercing the U.S. economy in 2007, there was nothing on the foreseeable horizon that could prevent a recession. Never forget that lenders provide the lifeblood of an economic expansion. Companies borrow money to build factories. Developers take out loans to put up apartment complexes and strip malls. Consumers use credit cards and home equity loans to finance their spending. But now, that flow of credit is being squeezed everywhere.

It's also getting tougher and tougher for businesses to obtain commercial and industrial loans. In fact, half the lenders recently polled by the Fed say that they're tightening standards on commercial real estate loans. That's double the level a year ago, and the highest reading since 1990, when the Savings & Loan crisis was crippling the banking system. With the "housing ATM" spitting out fewer and fewer dollars ... and standards tightening across a wide range of loan products ... the economy is starting to roll over.

Consequently, it looks like 2007 could end up being the auto industry's worst sales year since 1998, and despite the hype, the just-completed holiday shopping season was a real disappointment.

It's clear that Wall Street expects the federal government and the Federal Reserve to do everything they can to fight the recession threat - but they are likely to fail if action is not accelerated, with the economy shrinking for at least part of 2008. Although recessions have been a normal part of our economic growth through the years, they are still painful on many levels, especially in its impact on the stock market.

### Major Index Performance During Recessions
*NBER Defined Contractions, 1950 - 2007*

| Index | Entry | Exit | % Return | Max Loss | Max Gain |
|---|---|---|---|---|---|
| DJIA | Jun 1953 | May 1954 ⬆ | 19.0 | -4.8 | 19.0 |
| DJIA | Jul 1957 | Apr 1958 ⬇ | -12.4 | -17.5 | 0.0 |
| DJIA | Mar 1960 | Feb 1961 ⬆ | 5.3 | -8.2 | 6.5 |
| DJIA | Nov 1969 | Nov 1970 ⬇ | -6.7 | -22.8 | 0.9 |
| DJIA | Oct 1973 | Mar 1975 ⬇ | -21.3 | -40.4 | 0.6 |
| DJIA | Dec 1979 | Jul 1980 ⬆ | 4.0 | -13.0 | 9.5 |
| DJIA | Jun 1981 | Nov 1982 ⬆ | 3.0 | -21.2 | 7.7 |
| DJIA | Jun 1990 | Mar 1991 ⬆ | 1.0 | -18.6 | 5.0 |
| DJIA | Feb 2001 | Nov 2001 ⬇ | -11.7 | -23.2 | 9.0 |
| **Average** | | ⬇ | -2.2 | -18.8 | 6.5 |

| Index | Entry | Exit | % Return | Max Loss | Max Gain |
|---|---|---|---|---|---|
| NASDAQ | Oct 1973 | Mar 1975 ⬇ | -33.0 | -50.2 | 0.0 |
| NASDAQ | Dec 1979 | Jul 1980 ⬆ | 4.7 | -17.9 | 9.3 |
| NASDAQ | Jun 1981 | Nov 1982 ⬇ | -0.6 | -26.2 | 0.0 |
| NASDAQ | Jun 1990 | Mar 1991 ⬇ | -1.2 | -30.2 | 1.7 |
| NASDAQ | Feb 2001 | Nov 2001 ⬇ | -18.9 | -35.5 | 8.2 |
| **Average** | | ⬇ | -9.8 | -32.0 | 3.9 |

| Index | Entry | Exit | % Return | Max Loss | Max Gain |
|---|---|---|---|---|---|
| S&P 500 | Jun 1953 | May 1954 ⬆ | 16.9 | -5.9 | 17.1 |
| S&P 500 | Jul 1957 | Apr 1958 ⬇ | -12.5 | -18.6 | 0.0 |
| S&P 500 | Mar 1960 | Feb 1961 ⬆ | 11.9 | -5.7 | 12.0 |
| S&P 500 | Nov 1969 | Nov 1970 ⬇ | -11.0 | -26.9 | 0.7 |
| S&P 500 | Oct 1973 | Mar 1975 ⬇ | -23.3 | -43.7 | 0.8 |
| S&P 500 | Dec 1979 | Jul 1980 ⬆ | 6.5 | -12.7 | 11.4 |
| S&P 500 | Jun 1981 | Nov 1982 ⬆ | 3.3 | -22.1 | 7.0 |
| S&P 500 | Jun 1990 | Mar 1991 ⬆ | 3.5 | -17.7 | 3.6 |
| S&P 500 | Feb 2001 | Nov 2001 ⬇ | -12.6 | -23.8 | 6.1 |
| **Average** | | ⬇ | -1.9 | -19.7 | 6.5 |

www.sentimenTrader.com

On average, the nine "official" recessions we have experienced since 1950 have lasted approximately one year. The S&P 500 was able to find a reasonable bottom about six months after the recession started. The S&P 500 declined an average of 19% from the recessions' start to its six month lows, with a range from down 6% to 42%. The earliest low was found about three months into the recession (1953-1954) and the latest was found about 9 months into the recession (1981-1982). If a recession started in the fourth quarter of 2007, which is possible, then the first quarter is likely to establish a trading low with potential additional downside of about 6%, although we may just chop around here and bide time. We still have a long bias but need stimulus to maintain a positive stance going forward. However, if the S&P 500 fails at 1375, we likely have entered a bear market where hedging becomes critical.

On the other hand, there are several contrarian signs that are present that encourage us if coupled with appropriate government action.

The Banking Index is nearly 25% below its 200 day moving average which is a historical marker that signals market outperformance ahead. The American Association of Individual Investors survey is at its most pessimistic level since August 1992, at a Bull Ratio of only 25% who believe the market will go up. In the past, when it's been that low, the S&P 500 had a three-month positive return 93% of the time and an average performance gain of 8.0%. The Fed model for stock market valuation is also showing the high expected returns and significant undervaluation. This was the model that created the Greenspan "irrational exuberance" comment before 2000. The effects of Fed rate cuts are not fully reflected in the economy for six to nine months. As such, sequential cuts have a compounding effect. The first cut was September 18th, followed by October 31 and December 11. Fed cuts have never failed to be effective in boosting stock prices, especially in interest rate sensitive sectors (banking). This is where the expression "Don't fight the Fed" came from. It is critical that with a new Fed chairman, action is aggressive and matched with a government response of stimulus from both sides of the aisle. The logical compromise is tax rebates from the Democrats and tax cuts, preferably capital gains, from the Republicans. A multi-prong approach of stimulating spending, saving, and investment, along with Fed cuts, should be enough to avoid a deep recession or avoid it altogether. It is still possible to have a 1998 style soft-landing instead of a 1989-style recession led by financials on the downside.

The private equity investments in portfolios performed well and the private banks continue to grow and prosper even in the midst of the sub prime crisis. Since smaller banks do not generally participate in the kind of loan activity that has created difficulty for other financial institutions, their loan portfolios are not as affected by the financial meltdown we've seen these last few months. The commercial real estate venture in Sugar Grove is also progressing with two buildings in the office park under contract and additional offers on the out lots. We will continue to evaluate opportunities for our clients to add small percentages of unique investments to their overall portfolios.

2007 goes down in the record books as a "coma" year. Even though we outperformed, the absolute returns for the market were below long term averages. Our pairing of longs versus shorts helped along with our energy overweighting. We were stopped out of almost all of our smaller banking names and now stand to the side for the time being. Our hedging techniques with ETFs and inverse funds honestly were a great deal of work with little value added. Our all-stock performance for the year was up 7.7%, versus the IBD Mutual Fund Index, up 5.2%. The Dow was up 6.4%, the Nasdaq was up 9.8%, the S&P 500 was up an anemic 3.5%, and the Russell 2000 was down 2.8%. All in all, a year that would depend on your viewpoint whether it was half alive or not.

On a side note, we will be upgrading to a new operational platform in the first and second quarters that will greatly improve our ability to service you, the client. This is a significant investment in infrastructure that we are able to make because of your confidence, trust, and referrals over the past year. Thank you for that as we strive to be the best provider of service we can be for all of our clients.

Sincerely,

John Lohmeier
President & CEO