IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | No.  08 CV 1260 |
| v. | |
| ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER, and REBECCA A.TOWNSEND, | Judge James B. Zagel |
| Defendants. | |

**RECEIVER'S RESPONSE TO THE OBJECTIONS OF CERTAIN
ENTERPRISE CLIENTS AND REQUEST FOR APPROVAL
OF THE FINAL PLAN OF ALLOCATION**

## I.      BACKGROUND

Phillip L. Stern, as Receiver for Enterprise Trust Company ("Enterprise" or the "Company") hereby submits the Receiver's Responses to the Objections of Certain Enterprise Clients (the "Responses") and requests approval of a final plan of allocation (the "Final Plan").

### A.      Procedural Background.

In accordance with the proposed plan of allocation (the "Proposed Plan") and as directed by the Court, the Receiver sent to each Enterprise client or their representative by first class United States mail a letter explaining the Proposed Plan (Exhibit A), a schedule detailing the client's total contributions, distributions, withdrawals and payout per account (a sample allocation sheet is attached as Exhibit B), and a copy of the Proposed Plan (Exhibit C, Docket No. 98).  As explained in the mailings to the clients, objections to the Proposed Plan were required to be submitted in writing to the Receiver and postmarked no later than August 22,

2008.  On three occasions the Receiver agreed to extend the deadline for submitting objections by a few days at the request of attorneys recently retained to represent different groups of Enterprise clients.  The Receiver did not deny any requests for an extension of time.

The Receiver received approximately 67 objections on behalf of approximately 98 objectors, some of whom have multiple accounts.[1]  Responses were provided by the Receiver to each objector or their counsel.  All of the objections and the individual written responses that were made by the Receiver are appended as exhibits to, and are addressed throughout, this Response.

The Receiver considered the comments, suggestions and various objections of the respective groups of clients and their representatives.  Revisions and corrections were made to the allocation analysis, based upon information objectors provided to the Receiver.  As discussed in more detail in Section IV below, the Receiver reclassified several accounts and the assets in three other accounts based upon information provided by certain objectors.  Errors in pricing of certain securities were also identified and corrected.  Objectors were informed of any changes to the allocation that they are to receive pursuant to the Proposed Plan.  The Receiver, however, has not revised his proposed distribution methodology, which the Receiver continues to believe is the fairest and most equitable under the unique circumstances of this case.

The Receiver now asks the Court to enter an Order approving the Final Plan which reflects the adjustments that have been made in response to objections the Receiver has received. Simultaneously with the filing of these Responses, the Receiver has provided to the Court, under seal, a copy of the Final Plan reflecting the categorization of each account and what each Enterprise client would receive under the Final Plan.

---

[1] There are a total of 1198 Enterprise accounts.

B.    **Relevant Factual Background.**

As detailed in the Proposed Plan filed with the Court on July 21, 2008 (Exhibit C), Enterprise caused tens of millions of dollars in client losses, mostly through unsuccessful speculative trading in margin accounts.  In order to engage in trading of this magnitude, Enterprise had to pledge as collateral securities that belonged to clients who maintained custodial accounts with Enterprise.  The majority of the assets in these custodial accounts consisted of mutual fund holdings, many of which were held in IRA and other qualified retirement accounts. The custodial clients neither knew of nor approved of the margining of their assets.

Enterprise was able to use these custodial assets as collateral for the benefit of its managed clients because it caused all securities entrusted to it to be placed in Enterprise's name. The assets were then commingled in omnibus accounts and used as though they belonged to Enterprise.  As a result, Enterprise effectively misappropriated securities of custodial clients, ostensibly to make money for its managed clients.  Statements sent to custodial clients disguised the misuse of their assets, their losses and the trading activity that caused the losses.

While the allocation methodology chosen by the Receiver primarily accounts for the misuse of the custodial assets and the fact that custodial clients did not authorize the pledging of their assets to support the trading activity of other Enterprise clients, evidence obtained by the Receiver also indicates that some of the managed account clients were unaware of the extent of speculative trading or losses in their accounts.  Thus, the Receiver has proposed that all Enterprise clients participate in the allocation of the assets that remain at Enterprise although not at the same levels.

C.    **Account Classifications Under The Plan.**

1.    **Client Classifications (Custodial v. Managed).**

The 1198 funded client accounts were analyzed in order to categorize them as either custodial or managed.[2]  Custodial accounts are defined as accounts in which client assets and securities positions were to be maintained without modification, unless instructed otherwise by the client, except for the withdrawal of funds, payment of fees or reinvestment of interest and dividends ("Custodial accounts").

Managed accounts are broken down into subcategories: (1) accounts actively managed by John Lohmeier, which are defined as accounts in which the purchase and sale of securities consistently occurred on a monthly basis, including trading on margin, entering into short positions or trading derivative securities (the "Lohmeier Actively Managed accounts"); (2) accounts actively manage by Mr. Lohmeier that either did not engage in speculative short selling or were opened in 2008 (the "Lohmeier Other" accounts); (3) accounts brought to Enterprise by David Steckler of LPL Financial, in which the trading strategy was different than that which was employed by Mr. Lohmeier for his actively managed account clients ("Steckler accounts"); and (4) accounts brought to Enterprise by David Disraeli, in which the trading strategy was different than that which was employed by Mr. Lohmeier for his actively managed account clients ("Disraeli accounts").  Where accounts did not meet any of these criteria, they were individually reviewed by the Receiver and categorized based on his assessment of the activity in those accounts.

Enterprise clients were excluded from participation in the Final Plan if: (1) their accounts closed before March 1, 2008 (no accounts were closed between that date and March 3, 2008, the

---

[2] There were also approximately 99 unfunded client accounts at enterprise.  An unfunded account is an account in which neither cash nor securities were transferred by the client to Enterprise.

date the Asset Freeze Order was entered); (2) their distributions exceeded contributions (primarily due to asset appreciation); or (3) their accounts were unfunded.  A closed account is defined as an account with a balance of $250 or less as of March 1, 2008.  As discussed below, accounts belonging to John Lohmeier, Rebecca Townsend and Ruthe Gomez are also excluded from participating in the distribution.

### 2.    Client Allocation.

As fully detailed in the Proposed Plan (Ex. C at 11-16), deficiencies in Enterprise's trust accounting system and poor record keeping procedures made it impossible to trace and verify the actual value of each account at the time of the Receivership.  Indeed, because of the lack of a proper sub-accounting system, it is unlikely that a reliable valuation of client accounts based on trading activity could ever be performed.  Client contributions and withdrawals, however, were verifiable based on third-party brokerage and bank records.  Consequently, Navigant Consulting ("Navigant") calculated, for each client account, total contributions (deposits) less withdrawals and distributions to determine the total value of net contributions for each client account ("Net Contributions").  The Net Contribution number was used in determining the allocation to each account.

Having settled on the valuation methodology, a determination was made not to distribute the assets that remain at Enterprise on a strictly *pro rata* basis, but instead to allocate each participating client account into one of several tiers.  The primary consideration in classifying an account was the different purposes for which accounts were maintained at Enterprise.  Custodial client assets were to be held by Enterprise and not put at risk beyond the market risk associated with owning any security.   Instead, Enterprise used custodial assets, without the clients' knowledge, as security for speculative trading in managed accounts.  Unlike managed clients,

who were generally willing to take on trading risk and for whose benefit the speculative trading was conducted, the Custodial accounts had no interest in that trading and would not have benefited if it was profitable.  On the other hand, they stood to lose their entire investment if there was a margin call that Enterprise could not meet using assets from managed accounts.   As it turned out, over $8 million of custodial assets were liquidated and used to satisfy a debit balance that resulted from the speculative trading.  Consequently, a determination was made that Custodial accounts should receive a greater percentage of the remaining assets than managed accounts.  Indeed, given that Enterprise lacks the funds to fully compensate the Custodial accounts, the Receiver initially considered an allocation plan that would have provided no distributions for managed clients.  Upon reflection, and recognizing that all Enterprise clients were defrauded to some extent by Mr. Lohmeier and Ms. Townsend, the Receiver determine it would be more equitable to permit all Enterprise clients to participate, albeit at different levels, in the allocation of the assets that remain at Enterprise.

In the opinion of the Receiver, custodial clients suffered the greatest harm by reason of Enterprise's fraud and hence, it was originally determined that custodial clients should receive the largest percentage recovery, to wit, approximately 65 percent of their Net Contributions. Since it does not appear that custodial assets were used to collateralize trading done for the benefit of the Steckler and Disraeli accounts but recognizing that they were to engage in active trading, a determination was made that they should receive an allocation, subject to market conditions, of approximately 55 percent of their Net Contributions.  Similarly, the accounts actively manage by Mr. Lohmeier that either did not engage in speculative short selling or were opened in 2008 are being allocated, subject to market conditions, the same percentage of their Net Contributions.

As the vast majority of client losses resulted from speculative trading engaged in by Mr. Lohmeier for the benefit of the actively managed clients, and as custodial assets were liquidated to satisfy margin obligations relating to that trading, the Receiver believes that is reasonable and equitable for the Lohmeier Actively Managed accounts to bear more of the loss.  Accordingly, accounts managed by Mr. Lohmeier that engaged in speculative trading were to receive, subject to market conditions, approximately 25 percent of their Net Contributions.

Due to the reclassification of certain managed accounts, corrections to the allocation analysis that were based on objections made, and evidence presented, by certain investors, as well as fluctuations in the market price of the securities, the overall amount of funds available to each category of investor has been reduced proportionately.  Based on asset values as of August 31, 2008, the Custodial accounts will receive approximately 60.4 percent; Stecker, Disraeli and Lohmeier Other accounts will receive approximately 51.1 percent; and the Lohmeier Actively Managed accounts will receive approximately 23.2 percent.  As of that date, Enterprise assets available for distribution, excluding Private Equities, and net of the proposed holdback are approximately $27 million.[3]  Due to continuing fluctuations in the market price of the securities held by Enterprise, the actual percentage recovery may vary at the time of the distribution of remaining securities.

Enterprise also invested in a number of private banks and in real estate for certain of its clients (the"Private Equity").  These Private Equity investments are not readily marketable and liquidation of these assets could result in significant losses and harm to the issuers.

---

[3] In the report filed on July 21, 2008, there was a mathematical error in calculating the Leaders Bank balance in the approximate amount of $600,000.  The error does not change the allocation percentages as reflected in the July report.  As noted in this report, the allocation percentage has been reduced primarily due to market decline in the value of securities still held by the Receivership and the reclassification of certain accounts.

Consequently, the Receiver proposes the return in kind of the Private Equity investments, valued at approximately $9.3 million, to their respective account holders.  The Receiver proposes that the amount to be allocated to an Enterprise client be reduced by the amount of Private Equities, valued at cost, returned to them.   The return of Private Equity investments in kind will result in some Enterprise clients receiving a greater return than what they would have received if they did not own any Private Equity.

### 3.       Accounts of Lohmeier, Townsend, and Ruthe Gomez.

The Receiver proposes making no distributions to defendants Mr. Lohmeier and Ms. Townsend, because they were primarily responsible for fraudulently inducing clients to transfer their accounts to Enterprise, preventing certain Enterprise clients from removing their assets from Enterprise, engaging in the speculative margin trading that resulted in millions of dollars of client the losses, the false and misleading representations that were made to clients to cover up the losses, and because they caused Enterprise to operate as an unlicensed trust company in the State of Illinois in violation of a Cease and Desist Order from the Illinois Department of Professional Regulation (as detailed in Sections II (A) and (B) of the Final Plan), and in violation of Nevada law, which required Enterprise to obtain approval of the Nevada authorities to maintain an office out of state.  Thus, it is the Receiver's position that any allocation otherwise due either Mr. Lohmeier or Ms. Townsend be made available to the Enterprise clients whom they defrauded.

Ruthe Gomez, the owner of American Financial Corporation, who sold her client accounts to Enterprise, has agreed to waive any claim to her remaining assets at Enterprise and has consented to the inclusion of those assets in the pool of assets to be allocated to the Enterprise clients in accordance with the Plan.

4.      **The Hold Back.**

Under the Final Plan, the Receiver proposes holding back approximately $1,000,000 of distributable assets to fund ongoing expenses, including distributing assets pursuant to the Final Plan, responding to Enterprise client and governmental inquiries, defending appeals, if any, of this Court's order approving a final allocation plan, and investigating and prosecuting potential litigation against various third parties that may be partially responsible for the losses suffered by the Enterprise clients.  More specifically, the Receiver believes that certain broker dealers and clearing firms which did business with Enterprise may have assisted Mr. Lohmeier in improperly using custodial assets, especially IRA and ERISA accounts, as security for speculative securities trading engaged in by Mr. Lohmeier.  Subject to the Court's approval, the Receiver intends to continue his investigation of this conduct to determine whether one or more of these firms share responsibility for the losses incurred by Enterprise clients and if appropriate, institute litigation to pursue such claims.

Assets recovered from any judgments or settlements would be distributed to the Enterprise clients in accordance with the Final Plan.  The Receiver will not pursue any litigation if the Receiver determines that potential litigation is not viable, unlikely to merit the cost associated with pursuit of the claim, or believes that his efforts would be duplicative of any actions that may be brought by government agencies or private litigants. In any event, the Receiver will distribute to clients, any remaining funds.

## II.    LEGAL DISCUSSION

It is well recognized that "the district court has broad power and wide discretion to determine the appropriate relief in an equity receivership." *SEC v. Elliot,* 953 F.2d 1560, 1566-67 (11th Cir. 1992).  Indeed, the fundamental principle governing adoption of a distribution plan is that it should be equitable and fair with similarly situated investors being treated alike. *Id.* at 1569.  Any reasonable plan of distribution can be ordered by the Court. *SEC v. Wang,* 944 F.2d 80, 83-84 (2d Cir 1991). *See also, SEC v. Basic Energy & Affiliated Resources, Inc.,* 273 F.3d 657, 670-71 (6th Cir. 2001); *SEC v. Hardy,* 803 F.2d 1034, 1037-39 (9th Cir. 1986) ("[I]t is a recognized principal of law that the district court has broad power and wide discretion to determine the appropriate relief in an equity receivership.").

An allocation plan may provide different treatment for different classes of investors. *Wang,* 944 F.2d at 85-88; *See also, Elliot,* 953 F. 2d at 1573 ("If relevant facts differ then the law will treat the claimants differently").  Such treatment is particularly appropriate when the aggregate losses suffered due to the scheme cannot be fully compensated by the available assets. *Id*. at 86-87.  A plan of allocation does not need to compensate class members equally to be acceptable.  "A reasonable plan may consider the relative strength and values of different categories of claims." *In Re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D. 436, 462 (S.D.N.Y. 2004).

"An equitable plan is not necessarily a plan that everyone will like." *SEC v. Credit Bancorp Ltd, et al.,* 2000 U.S. Dist. LEXIS 17171 at *95 (S.D.N.Y 2000*), reversed in part on other grounds,* 297 F.3d 127 (2nd Cir 2002).

Disqualifying defendants and related parties, as well as those who participated in the development, operations or marketing of the scheme, from participation in distributions has been

upheld as reasonable because it allows proceeds to be redistributed to those who are most innocent. *SEC v. Basic Energy & Affiliated Resources, Inc.,* 273 F.3d 657, 670-71 (6th Cir. 2001).

A district court also has broad powers to determine the scope of, and appropriate procedures to be followed in the review of a plan for the distribution of assets. *Hardy,* 803 F.2d at 1040 ("The use of summary proceedings to determine appropriate relief in equity receiverships, as opposed to plenary proceedings, . . . is within the jurisdictional authority of a district court."). Such procedures "avoid formalities that would slow down the resolution of disputes. This promotes judicial efficiency and reduces litigation costs to the receivership." *SEC v. Wenke,* 783 F.2d 829, 837 n.9 (9th Cir. 1986). As is required to insure due process protections, the Enterprise clients have received notice, an opportunity to raise objections and present evidence in support of their objections and, to the extent they choose, they can appear at the September 23, 2008 hearing on the implementation of a Final Plan.

## III.    THE OBJECTIONS AND THE RECEIVER'S RESPONSES.

The objections, for the most part, fall into categories that are unique to each class of investor. Thus, for the Court's convenience, the objections are being responded to by category within each distribution group.

A list of the Enterprise clients who raised objections, and the classification of each such objector for distribution purposes under the Plan, is attached as Exhibit D. Copies of each of their objections, along with all supporting documentation, if any, that was provided by the client; the Receiver's response to and communications with the client; account opening agreements; quarterly account statements; transaction detail logs; and any other relevant documents contained in the respective client files at Enterprise, have also been provided to the Court in electronic

format.  As these materials are voluminous, the Exhibits have been filed in hard copy as an Appendix to this motion, and not electronically.  Electronic copies of all of the back-up materials provided to the Court will be made available on disk to any Enterprise client who requests same.

### A.    Custodial Account Objectors.

Under the Final Plan, Custodial accounts are to receive the largest percentage recovery. As originally proposed, Custodial accounts would have received approximately 65% of their Net Contributions subject to market conditions.  However, as a result of adjustments made to Plan based upon certain of the objections as well as changes in the market value of the securities, Custodial accounts will receive, subject to market conditions, approximately 60.4% under the Final Plan.

In general, Custodial accounts: (1) objected to the Proposed Plan because it does not provide them with a full recovery; (2) objected to any recovery by managed clients; and (3) believe they could trace their assets thought that they should receive 100% of any traceable securities.

The first objection is academic because Enterprise lacks sufficient funds to make the Custodial accounts whole.  Excluding the Private Equities, the most Custodial accounts would receive, if no other accounts were permitted to participate in the distribution, is approximately 93% of their Net Contributions.

Regardless, the decision to make a distribution to the clients managed by defendant Lohmeier was the result of an equitable balancing of several factors.  The Receiver initially considered distributing funds only to the Custodial accounts, premised upon the fact that these account holders had not agreed to take on any trading risk.  Moreover, given that the speculative trading was undertaken solely for the benefit of managed clients, there is an initial appeal to the

proposal that funds should be distributed to managed clients if, and only if, Custodial accounts are first made whole. However, while managed clients wanted to take on greater trading risk than other Enterprise clients, there are indications that the trading that took place in these accounts was more speculative than these clients intended. As a result, the Receiver ultimately determined that the managed clients should participate in the allocation, although at a far lesser percentage. Finally, there is no basis to exclude the Steckler, Disraeli and Lohmeier Other managed accounts from participating in the allocation since the activity in those accounts differs from that in the Lohmeier Actively Managed accounts.

As to the issue of tracing, "to allow any individual to elevate his position over that of other investors similarly 'victimized' by asserting claims for restitution and/or reclamation of specific assets based upon equitable theories of relief such as fraud, misrepresentation, theft, etc. would create inequitable results, in that certain investors would recoup 100% of their investment while others [who are similarly situated] would receive substantially less . . . . In the context of this Receivership the remedy of restitution to various investors seeking to trace and reclaim specific assets as originating with them is disallowed as an inappropriate equitable remedy." *SEC v. Elliot,* 953 F.2d 1560, 1569 (11th Cir. 1992). (district court did not abuse its discretion by disallowing tracing). *See also, SEC v. Forex Asset Management LLC et al.,* 242 F.3d 325 (5th Cir. 2001) (Even though claimant was able to trace his $800,000 investment to a separate account, district court did not abuse its broad discretion in determining it would be inequitable to permit a single investor to benefit from tracing at the expense of the other investors.).

Here, it would be unfair to allow one client to benefit from the fortuity that their securities were not the ones that were liquidated to cover margin trades, meet Enterprise expenses or otherwise improperly used. If tracing was applied as an allocation methodology,

some Custodial accounts would be left with nothing, while others would walk away with the full value of their original investment. Given that the Custodial accounts were all victimized in the same manner, and all of their commingled securities were equally at risk, tracing would result in an arbitrary and complete denial of any recovery to those victims whose securities were improperly used. Thus, while some Enterprise clients may believe they could do better under an asset tracing methodology, their improved position could only come at the expense of others who are similarly situated and equally deserving. Tracing will result in inequity. The Receiver, therefore, strongly opposed and did not apply a tracing methodology.

**B.    The Disraeli Accounts.**

Under the Final Plan, subject to market conditions, the Disraeli accounts are to receive approximately 51.1 percent of their Net Contributions. These clients: (1) object to not receiving return of 100% of their assets because their assets were transferred to Enterprise near the very end of the fraud, and their assets, although commingled, where not significantly impacted by the fraud; (2) object to the proposed methodology and ask that assets which are traceable to them be returned; and (3) propose as an alternative to tracing that the remaining assets be distributed *pro rata* to them and to Custodial Account clients, with no other group of investors participating in the distribution.

The Disraeli accounts' late arrival at Enterprise is not a reason to elevate their claims above other investors by Enterprise. As is the case in every scheme to defraud, there are victims who come to the table late in the game. Indeed, in many ponzi schemes the only victims who are left with nothing are the ones who joined last.

Likewise, as explained in more detail in Section III(A), above, the Receiver believes that the tracing of assets would be particularly inequitable in this case in light of the way client assets

were misused. *See, e.g., SEC v. Credit Bancorp, Ltd.,* 2000 U.S. Dist. LEXIS 17171 (S.D.N.Y. 2000) (a key reason tracing is often disapproved of in an equity receivership, is that not all assets are immediately consumed by the perpetrator of the scheme.  Rather some of the assets are retained for a time before being used in connection with the fraud.  Thus, whether a particular customer's assets are still traceable at any given moment is a mere fortuity.)

 As to the Disraeli objectors' alternative proposal that they share *pro rata* with the Custodial accounts and, thus, that Lohmeier's and Steckler's managed clients receive nothing, the Receiver does not believe that such a plan takes all of the equities into account.  The Disraeli accounts, unlike the custodial accounts, moved their accounts to Enterprise with the expectation that their assets would be actively managed.  Therefore, the Receiver does not believe that these two groups of clients are similarly situated.  Consequently, the Receiver believes that equity requires Custodial accounts to receive a greater percentage of the remaining assets than the Disraeli clients.  Finally, nothing provided in the Disraeli accounts' objections justifies treating them any differently than the Steckler accounts or the other clients of John Lohmeier whose accounts were not actively managed.

### C.    The Steckler Accounts.

Under the Final Plan, subject to market conditions, the Steckler accounts are to receive approximately 51.1 percent of their Net Contributions.  In general, they: (1) object to being treated differently than custodial clients; and (2) object to any distributions to the Lohmeier Actively Managed clients, whom they feel should receive nothing having allowed Lohmeier to take the risk that resulted in the losses to all of the account holders.

As to the first objection, the Receiver distinguishes between Custodial accounts and the Steckler accounts based on the fact that the Custodial accounts never authorized any trading in

their accounts. Their assets were to be held in safekeeping, albeit subject to market risk. The Steckler accounts on the other hand were to be actively traded. Consequently, the Receiver does not believe that the Custodial and Steckler accounts are similarly situated. At the same time, the Receiver recognizes that the trading in the Steckler accounts differed from the trading in the Lohmeier Actively Managed accounts. Therefore, the Receiver believes that it is reasonable and appropriate to allot the same allocation percentage as other customer accounts managed by Lohmeier (the Lohmeier Other accounts) as opposed to treating them as an actively managed account and assigning them a lower allocation percentage.

As to the second objection to the proposed allocation to the Lohmeier Actively Managed accounts, while these accounts appear to have wanted to take on greater trading risk than other Enterprise clients, there are indications that the trading that took place in these accounts was more speculative than these clients intended. As a result, the Receiver ultimately determined that they are entitled to participate in the allocation, although at a far lesser percentage.

> **D.    The Lohmeier Actively Managed Accounts That Did Not Engage In Speculative Trading (the Lohmeier Other Accounts).**

Under the Final Plan, subject to market conditions, the Lohmeier Other account customers are to receive approximately 51.1 percent of their Net Contributions. Only one Lohmeier Other account customer raised an objection to the Plan. That objection argued for a *pro rata* distribution of the estate to all Enterprise account holders. If funds were are distributed *pro rata* to all clients, those categorized as Lohmeier Other account holders would (along with the Steckler, Disraeli and Custodial account holders) receive approximately 50% of their Net Contributions, which is less than they are currently scheduled to receive under the Plan. Regardless, for the reasons explained in Section III(E)(1) below, the Receiver does not believe

that a *pro rata* distribution is the most reasonable and equitable distribution proposal under the circumstances of this case.

### E.    The Lohmeier Accounts That Engaged In Speculative Trading.

Under the Final Plan, subject to market conditions, the Lohmeier Actively Managed accounts are to receive approximately 23.2% of their Net Contributions.  In general, the Lohmeier Actively Managed accounts objected to the following: (1) receipt of only 25% of Net Contributions, contending in some cases that they should either be treated the same as the Lohmeier Other accounts or be treated in the same fashion as the Custodial accounts, as they claim that they did not want the level of risk taken on by John Lohmeier; (2) the proposed methodology because it neither allows for a *pro rata* distribution among all of the investors, nor does it allow for the investors to trace their assets; and (3) the proposal to distribute the Private Equity investments in kind, in that while they do not object to receiving the Private Equities, they do not want the Receiver to deduct the value of any Private Equities received from the total distributions to be made to any such client.

Additionally, Julie Lohmeier, the wife of defendant Lohmeier, has filed an individual objection based upon her purported spousal interest in the Lohmeier accounts that are not being distributed.  Mrs. Lohmeier has also objected to the classification of her and her childrens' accounts as Lohmeier Actively Managed accounts.

### 1.    Lohmeier Actively Managed Account Objection Responses.

With respect to the objection to classifying accounts managed by Lohmeier in a separate group that receives a smaller percentage recovery than other clients, the level and type of trading activity in the accounts guided the Receiver's determination as to whether to treat an account as actively managed.  With respect to the particular objectors, the Receiver reviewed the quarterly

statements and transaction details for those accounts to reassess the classifications.    The
transaction histories for these account reflected very active accounts with extensive short selling,
options transactions and margin.    The trading activity in these accounts, as reflected on the
quarterly statements received by these clients, is inconsistent with the notion that these clients
wanted conservatively managed accounts or that they were unaware of the activity in their
accounts.    With rare exception, as discussed in Section IV, below, none of the Lohmeier
Actively Managed account clients provided any written documentation to the Receiver showing
that they objected to the trading activity.    Thus, based on the trading activity, these accounts
were classified as Actively Managed.

As to the chosen methodology, and as discussed more fully above, the decision to treat
custodial accounts differently from managed accounts, an allocation plan may provide different
treatment for different classes of investors.    *See e.g., Elliot,* 953 F. 2d at 1573 ("If relevant facts
differ than the law will treat the claimants differently").    A plan of allocation does not need to
compensate class members equally to be acceptable and "may consider the relative strength and
values of different categories of claims."    *In Re Global Crossing Sec. & ERISA Litig.,* 225 F.R.D.
436, 462 (S.D.N.Y. 2004).

Here, the Receiver has determined that the custodial clients do not stand in the same
position as the managed clients.    While custodial clients' assets were subject to market risk, they
were not supposed to be subject to trading risk.    Custodial account assets were misappropriated
and liquidated to, among other things, finance trading engaged in solely for the benefit of the
managed clients.    While the speculative trading strategy engaged in by Lohmeier ultimately
failed, the only clients who were to profit from the speculative trades were the Actively Managed
accounts.    Custodial accounts stood to gain nothing.    Because the custodial accounts were the

primary victims of the fraud, and never agreed to take on any trading risk, the Receiver determined that they be placed in a separate class and should receive the largest percentage recovery.

In contrast, the Actively Managed accounts agreed to take on risk and they received statements that showed speculative trading activity including trading in options, short sales and margin. Because of this significant difference between the Custodial accounts and the Actively Managed accounts, the Receiver contemplated refunding monies to Actively Managed accounts, if and only if, the Custodial accounts were first made whole. The Receiver ultimately determined that the Actively Managed accounts should participate in the recovery, although to a lesser extent, because it is evident that the degree of risk taken on by Mr. Lohmeier was greater than that which many of his managed clients were willing to bear.

With respect to the objection regarding Private Equities, the Receiver disagrees that clients should be able to obtain these securities in kind (and thus a return of their original investment) without a commensurate reduction in their allocable share. All accounts, custodial and managed, are assessed in their entirety. Consequently, it is only equitable that in kind distributions be deducted from the amount an account holder is entitled under the Plan. Otherwise, those receiving in kind distributions would receive a return in excess of the allocation given to others similarly situated under the Plan.

### 2.     Julie Lohmeier's Objection Responses.

Julie Lohmeier, John Lohmeier's wife, objects to the classification of her account and her children's accounts as Lohmeier Actively Managed accounts. Her objections to the classification of these accounts as Lohmeier Actively Managed are the same as the objections made by other similarly situated accounts holders, which are addressed above.

Mrs. Lohmeier also asserts that she is entitled to receive a half interest in a joint account with her husband, defendant John Lohmeier. The clients of Enterprise who are the victims of John Lohmeier's fraud also claim these assets as creditors of Enterprise. Mrs. Lohmeier will have to demonstrate that she contributed the funds to acquire the assets in this account in order to even arguably have a claim to any distribution from this account. It is the Receiver's position that the claim of the Enterprise clients who were defrauded by Lohmeier takes priority over the claim of Mrs. Lohmeier.

Even assuming Mrs. Lohmeier could prevail on her claim, she would only be entitled to her share of Private Equities held in the joint since the account is a Lohmeier Actively Managed account that would only be entitled to a distribution of approximately 23.2 percent of Net Contributions. Almost the entire account is comprised of Private Equities. Consequently, under the Final Plan there would not be a distribution from this account beyond a return of Private Equities in kind. The Private Equities in the account consist of Desert Hills Bank stock and other privately held securities with a cost basis of $4.1 million. The Desert Hills stock (which is the primary holding in the account) has been pledged as collateral for a loan to John and Julie Lohmeier at Leaders Bank. The loan is in default and the Bank is trying to liquidate the stock to satisfy the Lohmeiers' obligation. At this time it is not possible to determine how much, if anything, will be realized from the sale of the stock beyond what is owed to the Bank. Thus, assuming Mrs. Lohmeier can demonstrate that she contributed to the Private Equities remaining in the account, her claim would be limited to a share of those assets.

###    F.    Objections from John Lohmeier and Rebecca Townsend.

Defendants John Lohmeier and Rebecca Townsend, who were primarily responsible for the fraud and the losses suffered by the Enterprise clients, have objected to the Receiver's

determination that their assets be withheld for redistribution to the clients they defrauded. In support of their blanket objections (copies of which are attached as Exhibits E (Objection of John Lohmeier dated August 22, 2008) and F (Objection of Rebecca Townsend dated August 22, 2008)) defendants have provided no evidence contradicting the allegations of fraud in the SEC complaint. Rather Lohmeier and Townsend have each entered into agreements with the SEC consenting to the entry of permanent injunctions. As part of the consents, defendants Lohmeier and Townsend have agreed not to contest the facts of the underlying SEC case against them. Specifically, defendants Lohmeier and Townsend have each agreed that they "will be precluded from arguing that [they] did not violate the federal security laws as alleged in the Complaint . . . , [and that] the allegations in the Complaint shall be accepted as and deemed true by the Court."*See,* Consent of Defendant John H. Lohmeier, dated June 12, 2008 (docket no. 78-3) (Exhibit G); *see also,* Consent of Defendant Rebecca A. Townsend, dated July 23, 2008 (docket no. 101) (Exhibit H). On the basis of the allegations of fraud, which allegations defendants do not contest, it is the position of the Receiver, that defendants do not deserve a distribution as they are primarily responsible for the harm inflicted upon the Enterprise clients.

Disqualifying defendants and related parties, as well as those who participated in the development, operations or marketing of the scheme, from participation in distributions has been upheld as reasonable because it allows proceeds to be redistributed to those who are most innocent. *SEC v. Basic Energy & Affliated Resources, Inc,* 273 F.3d 657, 670-71 (6th Cir. 2001).

In addition to the facts alleged in the SEC complaint, the Receiver has determined that defendants also do not merit a distribution because they perpetrated their fraud by hiding material information from their clients to whom they owed a fiduciary duty. Defendants fraudulent conduct also included, among other things: (1) operating an unlicensed, and therefore

illegal, trust company in Illinois made possible only by maintaining a sham office in Nevada where defendants' business was licensed; (2) operating a business in violation of a cease and desist order from the Illinois Securities Department; and (3) hiding millions of dollars in losses from clients by means of false statements and material omissions. Additionally, Mr. Lohmeier misappropriated money from certain client accounts by selling Private Equities to clients at inflated prices and then transferring the ill gotten gains to his personal account. Also, while many clients were unable to transfer their accounts out of Enterprise, defendants took hundreds of thousands of dollars out of Enterprise to fund construction for Ms. Townsend's home.

Additional considerations that factored into the Receiver's decision to provide no distribution to defendant John Lohmeier include his failure to provide any meaningful cooperation or explanation for his conduct. Similarly, while defendant Townsend initially assisted the Receiver with respect to certain housekeeping and operational matters, she ultimately failed to provide any explanation of her conduct.

### G.    General Objections Unrelated to Classifications or Distribution Percentages.

In addition to the above class-specific objections, Enterprise clients also made the following general objections: (1) certain Enterprise clients object to the payment of legal fees to creditor Howrey LLP; (2) several Enterprise clients object to the hold-back of $1 million for investigating and prosecuting potentially liable third parties; and (3) a few Enterprise clients have demanded discovery of certain records.

With regard to the objection to the payment of fees to Enterprise's creditor, Howrey LLP, the Receiver has agreed not to object to any motion made by Howrey LLP for payment of $75,000 from the Enterprise estate, with the understanding that any such payment would be in satisfaction of all outstanding claims Howrey may have against Enterprise. The Howrey law

firm originally submitted a bill of approximately $300,000 to Enterprise. The Receiver expects that counsel for Howrey will move for payment of $75,000 in fees at the September 23, 2008 hearing.

As to the investors' reasonable concerns about the cost of any ongoing investigation, the Receiver expects to be in a position to address those concerns to the Court at the hearing on September 23, 2008. While there may be third parties worth pursuing, the Receiver also requires some form of a hold-back to pay for the remaining costs associated with the administration of the receivership. Specifically, funds are needed to complete the distribution of assets under the Plan. These costs will include the expense of reregistering securities in clients' names, working with the banks and mutual fund companies to distribute assets to investors, handling any mailings related to distributions, responding to appeals, if any, addressing investor questions and working with investors and the authorities to address issues involving IRA and 403(b) accounts and related tax problems. There are also a number of ongoing investigations by various governmental agencies that have been seeking assistance from the Receiver with respect to Enterprise and its principals.

While some have objected to the Receiver expending resources to bring claims against third-parties, others have taken an opposite view and requested that the Receiver conduct certain investigations, including investigating Mr. Lohmeier's and Ms. Townsend's friends, family members and associates to determine if they participated in the fraud. At this time, the Receiver does not have any information that would indicate their participation in the fraud. Moreover, none of these individuals appear to have withdrawn funds from Enterprise in advance of the SEC lawsuit which resulted in the freezing of Enterprise accounts. As a result the Receiver is not proposing to expend resources on an investigation of Mr. Lohmeier's and Ms. Townsend's

friends, family members and associates.

As to the requests for discovery, to the extent it was relevant to an objection, the Receiver provided each objector with the trading details, account records and statements that were relied upon in classifying such objectors' accounts. Many of these records have been filed in hard copy with the Court and provided in electronic format to the Honorable Judge Zagel.

Beyond these documents, it is the position of the Receiver that the requests for discovery, most of which seek to review the mass of information assembled and analyzed by the Receiver and Navigant during the entire course of the Receivership, are inappropriate. First, responding to such discovery requests would serve only to waste the assets of the estate. Second, the discovery is totally unnecessary in determining the reasonableness of the Final Plan. Finally, gathering information to enable clients to trace their assets would be a waste of resources as the Receiver has already determined that tracing would cause inequitable results. Thus, there can be no reason to justify the expense of such discovery, if the Net Contributions methodology that has been proposed by the Receiver is accepted by the Court. In that regard, it should be noted that, to the extent a client objected to the accuracy of the Net Contribution calculations for their account, all details upon which such calculations were made were provided to the respective objector and corrections made where appropriate. With the exception of two contested withdrawals amounting to approximately $5,500, and which the Receiver is still investigating, there are no complaints about the accuracy of the Net Contribution calculations.

Discovery has also been requested as to any insurance bond maintained by Enterprise. In response, the Receiver states that the only "bond" Enterprise appears to have maintained was a dishonesty bond, no 70040547, with Western Surety Company which provides $50,000 for each covered person, but only if there has been criminal conviction. A claim was made to the

insurance company, which denied the claim as premature on the basis that there has been no criminal conviction.   A copy of the bond, along with correspondence from the insurance company dated September 2, 2008, is attached as Exhibit I.


IV.    **CORRECTIONS AND RECLASSIFICATIONS OF ACCOUNTS BASED UPON CERTAIN OF THE OBJECTIONS.**

As a result of the objections and information received from the Enterprise clients, the Receiver has made a number of revisions to the Final Plan of Allocation.  All of the revisions, reclassifications or corrections are detailed in Exhibit J hereto.

Changes made to the distribution analysis include, among others, the return of assets to certain account holders based on the timing of their deposits.  For instance, a cash deposit that was received by Enterprise after the Court entered an order freezing the assets held by Enterprise will be returned to the client.  In addition, two clients opened accounts at Enterprise for the sole purpose of acquiring privately held stock in a bank that recently employed them. The transactions were in progress at the time of the Court ordered freeze.  These assets are being treated the same as Private Equities already acquired.

Accounts for six clients were also reclassified from Lohmeier Actively Managed to Lohmeier Other on the basis of written evidence and documentation provided by the account holders showing that they complained about the speculative trading in their accounts and diligently sought to move their accounts from Enterprise and curtail the speculative investments.

One account was reclassified from Lohmeier Actively Managed to Lohmeier Other, based upon the fact that it was the only Lohmeier Actively Managed account opened in 2008.

A 401(k) account managed by David Steckler was reclassified as a Steckler account, having been erroneously classified as a Lohmeier Actively Managed account.

Additionally, two accounts were reclassified from Lohmeier Other to Custodial accounts based on the limited trading in the accounts as well as other evidence that the accounts were not to be actively traded.  One account was reclassified from excluded to custodial based on a reevaluation of the nominal value of the account.

Several corrections were also made to securities valuations which impacted Net Contributions for various Enterprise client accounts.

## CONCLUSION

Based on the foregoing, the Receiver respectfully requests that the Court approve the Final Plan of Allocation in accordance with the recommendation of the Receiver.  The Receiver is available to answer any additional questions or provide any additional information the Court may require.

Date:  September 11, 2008                                Respectfully submitted,


                                                         /s/ Michael Z. Gurland
                                                         Counsel to the Receiver Phillip L. Stern

Michael Z. Gurland, Esq.
NEAL, GERBER & EISENBERG LLP
Two North LaSalle Street, Suite 2200
Chicago, IL  60602-3801
(312) 269-8000
(312) 269-1747