# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>    Plaintiff,<br><br>    v.<br><br>ENTERPRISE TRUST COMPANY, JOHN H. LOHMEIER, and REBECCA A. TOWNSEND,<br><br>    Defendants. | No. 08 C 1260<br>Judge James B. Zagel |

## MEMORANDUM OPINION AND ORDER

Seven months ago I appointed a Receiver to control and conduct the business of Enterprise Trust Company in order to protect the interests of the clients of Enterprise and, where necessary, to bring the actions of Enterprise into compliance with applicable laws and regulations. Appointment of the Receiver was made on motion of the Securities and Exchange Commission. The Receiver, Phillip L. Stern, assumed his duties and, as required, reported his actions and his findings at various intervals over the past few months. He submitted a proposed plan of allocation. After considering and resolving some issues, he submitted the Receiver Final Plan of Allocation, to which objections have been filed by some investors.[1] I must now decide what is the appropriate plan.

---

[1] The proposed plan was distributed to Enterprise clients. Objections and comments were made and responded to, and the papers with respect to them have been submitted here by the Receiver. As is customary, revisions were made in the Final Plan in light of new information – accounts were reclassified, so were assets and pricing errors corrected, but the basic proposal regarding distribution was not significantly altered.

The objections arise, in largest part, in response to the proposal to differentiate among types of clients in determining the percentage of their respective losses for which they will be compensated.

**I.      Distribution**

   *A.      Sorting Clients*

The governing principle is that the Receiver should distribute assets equitably with similarly situated investors treated alike. The Receiver does not perceive all investors to be similarly situated. To many of the objectors all "victimized investors" (non-insider investors) are similarly situated and should all receive the same *pro rata* share. Moreover, the objectors argue, even *pro rata* distribution is inequitable whenever an illiquid asset, currently about $9 million of these, in the Receiver's custody and control can be traced directly to a claimant. In those cases, the particular asset should be returned whole to the claimant who provided it to Enterprise without deducting its value from the claimant's share of cash.

Enterprise received about $103 million from clients since it began its business, currently about $28 million remains in liquid assets. There are 1,198 funded accounts and various investors had multiple accounts. Some clients did not permit Enterprise to manage their investments; these clients wanted Enterprise to provide Custodial services (and, perhaps, advice) with respect to those investments. Other account holders sought active management of their investments.

Enterprise is in Receivership because it lost millions for its clients with speculative trading losses in margin accounts. To trade as it did, Enterprise was driven to pledge as collateral the securities of clients who had Custodial accounts and were deceived about how their securities

2

were being used. The majority of these Custodial assets were mutual fund holdings, many of which were held in retirement accounts. Some of the managed account clients, too, were kept in the dark about the nature of the trading and the losses in their accounts.

All the Custodial accounts were to be maintained as is unless change was authorized by the client with exceptions for payment of fees, reinvestment of interest and dividends which Enterprise was authorized to do under the terms and conditions of the account.

The managed accounts were more diverse and divided, sensibly, by the Receiver into four subcategories. In John Lohmeier's sphere, some accounts were actively managed with monthly activity such as margin trading, derivative trading and shorting. Others were actively managed but did not engage in shorting or were opened late in the game. There were accounts brought to Enterprise by David Steckler and by David Disraeli for which strategies different from those employed by John Lohmeier were employed.[2]

The record keeping/accounting practice at Enterprise made it impossible to trace and verify the value of each account at the time of Receivership, nor could reliable valuation be based upon trading activity. Third party records allowed calculation of total contributions, withdrawals and distributions for each account. The net of these numbers for each account became the "Net Contribution" on which allocation would be based. The objectors now accept this either because (1) it is the best number available, or (2) they do not want to bear the expense (including the full cost of discovery) of finding a tenable alternative.

---

[2] These Custodial and managed accounts constitute the universe of those who are to receive a distribution. Excluded from this universe are no out-of-pocket loss accounts which are those which were unfunded and those in which the assets exceeded the amount the client contributed to the account, accounts which were effectively closed before my order froze the assets of Enterprise and the accounts of John Lohmeier, Rebecca Townsend and Ruthe Gomez.

A major dispute is over the decision to compensate some clients at a higher percentage of the net distribution amount than is given to others.

The Receiver proposes that equity called for compensation to be differentiated on the basis of the nature of risk explicitly assumed by the client. Custodial clients, he concluded, agreed to bear only the market risk associated with their personal decision to own a particular security. Apart from the common understanding that this is the risk that goes along with Custodial accounts, the conduct of Enterprise corroborates this understanding since it thoroughly concealed what it had done in its reports to these clients.

Managed account clients are willing to take on trading risk, that is, the risk that a trading decision made by the manager of the account will go wrong, particularly speculative trading on the margin. Concealment by Enterprise of its actions in this regard were less thorough than its practices with Custodial clients.

The Custodial clients were subjected to risk qualitatively worse from that imposed on managed account clients because it was a risk, without any possible reward. Custodial shares were posted merely as collateral for trades which, had they been successful would have yielded profit only to the managed account client. They stood to lose an entire investment if there was a margin call that Enterprise could not meet from its managed accounts and, in fact, the Custodial clients lost over $8 million that way.

The Receiver states that this excess of unfairness toward the Custodial client vis-à-vis the managed account client led him to the initial conclusion that the Custodial clients should be compensated in full for their losses and, only after that was done, would the managed account

clients be paid. The Custodial clients could not, in fact, be compensated in full so there would be zero for any other client.

The Receiver, though, understood that all of Enterprise clients were, in some meaningful sense, defrauded by Enterprise's managers. The Receiver reached his conclusions by a process that has some similarities to comparative fault or comparative liability except that what was being compared was comparative unfairness of Enterprise in its treatment of classes of clients. Part of the measure of this is to look at the risk Enterprise imposed and how far this unauthorized risk lay beyond that which the client was willing to assume. This judgment would necessarily include the impossibility of reward to the client because the absence of reward surely affects the willingness to accept risk. Judgment of comparatives like these in law is necessarily committed to a general sense that this or that result is about right. There is no critical template against which to measure a proposed percentage allocation, so the matter of percentage is left to the discretion of the judge as comparative fault is left to the discretion of a jury. A reflection of this reality is that objectors do not object *per se* to the chosen percentages. Rather they urge they should be at a percentage higher than the one assigned to them or they urge that all clients should receive the same percentage.

The Receiver proposes[3] that Custodial accounts will receive around 60% of net contribution. For the accounts managed by Steckler and Disraeli they will receive about 51%, for these accounts did not benefit from trading based on collateral from Custodial accounts but yet the clients did agree to assume the risk of active trading. The same percentage would apply to

---

[3] The Receiver originally proposed somewhat different figures based on certain market values and other factual determinations which have now changed after further investigation.

5

accounts (referred to as Lohmeier other accounts) that John Lohmeier managed that did not engage in speculative short selling or were opened in 2008 and not managed in any significant way. The greatest part of client losses arose from speculative trading by John Lohmeier in his actively managed accounts, and Custodial assets were liquidated to satisfy the margin obligations of these accounts. For these accounts, the Receiver proposes about 23%. Obviously the exact percentages may change by the time distribution can occur.

Lastly, the Receiver proposes no distribution of any kind to John Lohmeier and Rebecca Townsend on the grounds that they were the principals who induced clients to bring their accounts to Enterprise, prevented some from getting assets out of Enterprise, engaged in speculative trading that lost millions, covered up their losses and violated the laws of Illinois and Nevada. Ruthe Gomez, who sold her accounts to Enterprise, has waived all claims to her remaining assets at Enterprise and consents to inclusion of those assets in the pool from which other clients will be paid.

There are no hard rules governing a district court's decisions in matters like these. The standard is whether a distribution is equitable and fair in the eyes of a reasonable judge. *See SEC v. Elliot,* 953 F.2d 1560 (11th Cir. 1992); *SEC v. Wang,* 944 F.2d 80 (2d Cir. 1991); *SEC v. Basic Energy & Affiliated Resources, Inc.,* 273 F.3d 657 (6th Cir. 2001). The cases allow for different treatment of classes of assets and claimants. Summary hearings based on written proposals for allocation and written objections are permissible. *SEC v. Wencke,* 783 F.2d 829 (9th Cir. 1986). Disqualifying those who took the business over the edge is the most common feature, and the least contested aspect, of distribution plans. For all other matters, the wide discretion given here

means that the same objections and arguments are made in each case because nothing is really out of bounds for objectors and Receivers.

In most cases, all claimants can be said to be similarly situated and, at the same time, be said to be dissimilar. They all lost money because of the way the enterprise was run by its managers, and they can all claim that none of them accepted the risks that damaged them. But one can draw reasonable distinctions between their claims and those of others which, at times, can justify different treatment for their claims. So plans of distribution are rarely approved without a fight amongst claimants.

The Custodial account holders object to allowing any recovery for managed account holders, but the Receiver believes that, while managed account holders were willing to accept risk, the trades were more speculative than the clients expected. This belief is not directly challenged by any objector. This is unsurprising. The demise of Enterprise seems to have followed the standard course for these kinds of disasters – things start to go wrong and greater risk is assumed so that greater rewards can make up for the losses already incurred. Those clients whose accounts were managed in that way have a valid right to some distribution, and I find that a distribution that is nearly two-thirds less than that of given to Custodial account holders is reasonable, fair and equitable. It is, in my judgment, a fair discount in benefits that is appropriate for those who accepted more risk than Custodial account holders.[4]

---

[4] The Steckler account holders and the Lohmeier managed account holders make this same objection which I deny here.

The final objection of Custodial account claimants (and some others[5]) is their assertion of a right to recover assets whose title can be traced back to them. If it can be proved that a specific asset in possession of the Receiver belonged to a specific client, that asset should be returned to him or her. As Judge Sweet noted in *SEC v. Credit Bancorp, Ltd,* No. 99-11395, 2000 WL 1752979, at *15-16 (S.D.N.Y. Nov. 29, 2000), a key reason why tracing is often disapproved is that the difference between those who get more and those who get less is a "fortuity." When Enterprise improperly pledged Custodial assets, it simply handed over something that was in one of its pockets; it could just have easily reached into another pocket. The disarray of business records found by the Receiver supports my view that Enterprise was acting in desperation and the selection of collateral was random. If tracing is used, the Custodial account holder who gets his asset back is like the Ponzi victim who gets out early with an absurd profit. Under the law, he might get to keep it, but no one would call that equitable. I overrule this objection.

The Disraeli objectors want full recovery or, in the alternative, to share recovery with the Custodial account holders excluding all other claimants. These objectors were accepting of the risk of managed accounts which the Custodial account holders were not; they are not similarly situated. This is true of the Steckler objectors as well. That the Disraeli objectors fell into the hands of Enterprise near its end does not alter their status. Victims of frauds do not get special treatment because they lost money just before the business closed down.

---

[5] The Disraeli account holders, as do some of the holders of Lohmeier Actively Managed accounts, advocate tracing, which I reject.

The Steckler objectors don't think that the Lohmeier other account holders should not get the same share of recovery that they do, but those accounts were managed the way the Steckler accounts were managed.

There are objections to the classification of certain accounts as Lohmeier Actively Managed accounts, but analysis of their accounts showed high activity with extensive short selling, options transactions and margin trading unmitigated by written objections to the transactions or instructions to cease.

Apart from individual disputes over classification, the Lohmeier Actively Managed account holders do not agree that they should receive less than Custodial account holders. Like the Custodial account holders, they agreed to market risk. They were willing to accept trading risk, which the Custodial account holders refused to assume, but not the risk that they would invest with an enterprise which would destroy itself by misusing the securities in Custodial accounts and violating other laws and regulations. This latter risk is one that everyone assumes by dealing with any sort of investment house including the custodial customers. The difference between the two classes of claimants is the level of risk accepted for loss resulting from unsuccessful trading as opposed to loss caused by breaches of trust. The actively managed account holders knowingly assumed substantially more risk of unsuccessful trading than did the Custodial account holders. And they suffered these losses. They gained chances of trading gains at the unauthorized expense of Custodial account holders whose assets, when pledged, allowed the risk takers to make more trades, the profits of which would have gone solely to the risk takers. To regard these two classes of account holders as remotely equal to each other is inequitable.

**B.      Sorting Assets**

The liquid assets of Enterprise are easily measured in dollars, but there are illiquid assets too, and these all can be traced back to specific accounts.

There is the Private Equity, investments in private banks and real estate made for some of its clients. These investments could be sold but the sale would, in the judgment of the Receiver, result in significant losses;[6] and, perhaps, harm to those who issued the securities which consideration I leave to one side.

The Receiver proposes to return the Private Equity investment to the account holder of the investment. The holder can then decide for itself whether to sell or hold for a better day. The Receiver proposes to reduce the cash allocation to that holder by the amount of the private equity returned. The amount will be the cost of the private equity investment, an amount which might or might not reflect the value of the investment at the time it is returned. The passage of time will probably inure to the benefit of some of the holders of these investments.

Those who hold illiquid assets do not disagree with the idea of in-kind distribution, they just assert a right to have the investments without diminution of their share of the cash. But, allowing a private equity holder to take both the investment and the cash is, on its face, a distribution of an unfair share of assets to at least some who hold private equity. They will likely receive more than others of the same class.[7]

---

[6] The question of sale price of one of these assets was the subject of a recent hearing in this case and, based on what I heard at that hearing, the prediction of the Receiver that full value would be hard to obtain is credible, and none of the objectors challenges this conclusion.

[7] No objector has demanded the right to refuse distribution of the investment in order to take a full share of the proposed cash distribution. I doubt that this demand would be economically sound, but the demand could be supported by considerations of fairness which

10

I approve the proposal to return private equity investments in kind and deduct the cost of the investment from the account holder's share of the cash distribution.

In this case, John Lohmeier and Rebecca Townsend, the primary operators of Enterprise, object to their exclusion from those who can claim a share of the distribution. Their objections are weightless. Each have entered into consent decrees and agreements to preclude themselves from arguing that, in the case before this court, they did not violate federal security laws as alleged in the complaint charging fraud. According to the Receiver, there is evidence, uncontested here, that both objectors violated state laws, gave false reports to clients, and performed other bad acts including the failure to cooperate meaningfully with the Receiver's investigation. It is difficult to find cases in which business officers like Lohmeier and Townsend took a share of a Receiver's distribution, and it will not occur in this case. They are not innocent victims of Enterprise's actions.

### C.     *The Hold Back*

The Receiver seeks to hold back about $1 million to fund distribution, to fund further litigation if any, and to investigate the possibility that other entities may share responsibility for the Enterprise losses due to their own conduct and to pursue such claims if they exist. All of these actions provide some benefit to the clients of Enterprise and may result in additional recovery. Whatever part of the hold back remains unused will be distributed to the clients in accordance with the plan of allocation approved by this court.

---

might be outweighed by the costs and administrative problems this would create for the Receivership. In any event, the demand has not been made and the time to make it has expired along with the time for other objections.

The practice of holding back is common in these situations. The amount is within the realm of reason, I think, at the center point of the reasonable range. It is enough to allow for efficient distribution of funds, to defend (or confess error with respect to) the order of this court, if necessary, and to investigate claims against others. It is not so large as to encourage the Receiver to pursue inappropriate claims which the Receiver correctly defines as litigation which "is not viable, unlikely to merit the cost associated with pursuit of the claim or . . . duplicative of any action that may be brought by government agencies or private litigants."

There are other minor objections to the plan based on the Receiver's conduct. I overrule them.[8]

## II.  Conclusion

The process by which the Receiver vetted the details of the proposed plan has, by virtue of objection and information provided, resulted in a number of specific revisions to the Final

---

[8] (a) The Receiver agreed not to object to paying a law firm $75,000 to resolve a claim for about $300,000 in legal fees owed by Enterprise. I granted the law firm's motion for the fees. Based on the limited work that the firm performed in my court, I thought the Receiver had the better end of the agreement.
 (b) Some object to the Receiver's plan to investigate claims of Enterprise against third parties and others demand that he make specific investigations. The Receiver's approach to these questions is reasonable.
 ( c) The Receiver has refused some requests for discovery on the grounds that the costs of responding would be better not spent in diminution of the assets of the estate. I agree that discovery directed to the issue of reasonableness of the plan is unnecessary to the decision on the plan of distribution except to the extent it would allow a claimant to trace assets which, in light of my ruling, would be of no value to the claimant. Discovery was provided with respect to the calculations of net contribution where it would be of use. Receiver has identified the one dishonestly bond which permits recovery of $50,000 for each covered person, but it is contingent on the fact of a criminal conviction. A claim under the policy is premature and was refused on that ground by the insurer. Insurance coverage and other efforts of the Receiver may increase the pool of assets to be distributed, but what is before me now is whether the plan is fair and equitable and not how large an amount is to be distributed.

Plan of Allocation. These were listed in a separate exhibit submitted with the papers for the hearing on the final plan. Eleven client accounts were reclassified for various reasons and securities valuations were updated. Some adjustments were made for a few unique accounts. A cash deposit received by Enterprise after I entered a freeze order was returned to the client. Transactions for two accounts to acquire privately held stock that were in progress when the freeze order was entered were completed, and the assets are treated in the same manner as Private Equities.

The Final Plan of Allocation presented by the Receiver is approved.

ENTER:

_____
James B. Zagel
United States District Judge

DATE: October 7, 2008